No. *2014-1110*

_____

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

_____

IN RE PAPST LICENSING DIGITAL CAMERA
PATENT LITIGATION

PAPST LICENSING GMBH & CO. KG,

*Plaintiff-Appellant,*

v.

FUJIFILM CORPORATION, FUJIFILM NORTH AMERICA CORPORATION
(formerly known as FUJIFILM USA, INC.), HEWLETT-PACKARD COMPANY,
JVC COMPANY OF AMERICA, NIKON CORPORATION, NIKON, INC.,
OLYMPUS CORP., OLYMPUS IMAGING AMERICA INC., PANASONIC
CORPORATION (formerly known as MATSUSHITA ELECTRIC INDUSTRIAL
CO., LTD.), PANASONIC CORPORATION OF NORTH AMERICA,
SAMSUNG OPTO-ELECTRONICS AMERICA, INC., SAMSUNG TECHWIN
CO., AND VICTOR COMPANY OF JAPAN, LTD.,

*Defendants-Appellees.*

_____

Appeal from the United States District Court for the District of Columbia in
Case No. 1:07-mc-00493-RMC, United States District Judge Rosemary M. Collyer

═══════════════════════════════════

**DEFENDANT-APPELLEE HEWLETT-PACKARD COMPANY'S BRIEF**

═══════════════════════════════════

Charlene M. Morrow
David D. Schumann
Bryan A. Kohm
FENWICK & WEST LLP
801 California Street
Mountain View, CA  94041
650.988.8500

Attorneys for Defendant-Appellee
HEWLETT-PACKARD COMPANY

May 5, 2014

# CERTIFICATE OF INTEREST

Counsel for Defendant-Appellee Hewlett-Packard Company certifies the

following pursuant to Federal Circuit Rule 47.4:

1. The full name of every party or amicus represented by me is:

    Hewlett-Packard Company.

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

    As indicated in item 1.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

    None.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this case are:

| Law Firm | Partners and Associates |
|---|---|
| Fenwick & West LLP | Charlene M. Morrow<br>David Schumann<br>Bryan Kohm<br>Jeffrey V. Lasker*<br>Heather N. Mewes* |

May 5, 2014

By: /s/ Charlene M. Morrow
   Charlene M. Morrow
FENWICK & WEST LLP
Silicon Valley Center
801 California Street
Mountain View, CA 94041
cmorrow@fenwick.com
650-988-8500
*Attorneys for Defendant-Appellee*

\* Former Fenwick & West LLP attorney

i

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST .................................................................... I

TABLE OF ABBREVIATIONS ................................................................ VI

STATEMENT OF RELATED CASES ................................................... VII

INTRODUCTION ........................................................................................ 1

STATEMENT OF THE ISSUES ................................................................ 2

STATEMENT OF THE CASE ................................................................... 2

    I.    Papst Lacked a Good Faith Basis for Bringing this Action
Against HP in the First Instance ........................................... 2

    II.    Papst Requested Hardware-Based Constructions of "second
connecting device" .................................................................. 4

    III.    Papst Agreed that HP Does Not Infringe but Nonetheless
Pressed Its Claims Against HP .............................................. 6

    IV.    Papst Sought to Revive Claims Against HP at the Summary
Judgment Stage ....................................................................... 9

ARGUMENT .............................................................................................. 10

    I.    Summary Judgment for HP Should Be Affirmed Because
the District Court Properly Construed "second connecting
device" ...................................................................................... 10

        A.    The District Court's Claim Construction was Proper ............... 10

            1.    The Second Connecting Device is a Physical
Plug or Socket ............................................................. 11

            2.    The District Court Properly Concluded that the
Second Connecting Device Permits Attachment
to A Plurality of Dissimilar Data
Transmit/Receive Devices ......................................... 17

CASE-PARTICIPANTS ONLY

**TABLE OF CONTENTS**
**(CONTINUED)**

Page

II. Alternate Grounds for Affirmance of Summary Judgment
for HP ......................................................................................26

III. Papst's List of Orders to be Vacated Is Incorrect ...............................26

CONCLUSION ...................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez,*
130 S. Ct. 2971 (2010)...................................................................................10

*Dickinson and Co. v. Tyco Healthcare Grp.,*
616 F. 3d 1249 (Fed. Cir. 2010) ....................................................................19

*Funai Elec. Co., Ltd. v. Daewood Elecs. Corp.,*
593 F. Supp. 2d 1088 (N.D. Cal. 2009) .........................................................15

*Gaus v. Conair Corp.,*
363 F.3d 1284 (Fed. Cir. 2004) .....................................................................19

*Inpro II Licensing, S.A.R.L. v. T-Mobile USA, Inc.,*
450 F.3d 1350 (Fed. Cir. 2006) ................................................................25, 26

*Intellectual Prop. Dev., Inc. v. UA-Columbia Cablevision of
Westchester, Inc.,*
336 F.3d 1308 (Fed. Cir. 2003) .....................................................................14

*Linear Tech. Corp. v. USITC,*
566 F.3d 1049 (Fed. Cir. 2009) .....................................................................20

*Microsoft Corp. v. Multi-Tech Sys., Inc.,*
357 F.3d 1340 (Fed. Cir. 2004) .....................................................................14

*Monsanto Co. v. Scruggs,*
459 F.3d 1328 (Fed. Cir. 2006) .....................................................................27

*Netword, LLC v. Centraal Corp.,*
242 F.3d 1347 (Fed. Cir. 2001) .....................................................................25

*On Demand Machine Corp. v. Ingram Indus., Inc.,*
442 F.3d 1331 (Fed. Cir. 2006) .....................................................................22

*Powell v. Home Depot, Inc.,*
663 F.3d 1221 (Fed. Cir. 2011) .....................................................................20

iv

<h1 style="text-align:center">TABLE OF AUTHORITIES</h1>
<b>(continued)</b>

<b>Page(s)</b>

*Retractable Techs., Inc. v. Becton*,
653 F.3d 1296 (Fed. Cir. 2011) ............................................................19, 20, 23

*Stumbo v. Eastman Outdoors, Inc.*,
508 F. 3d 1358 (Fed. Cir. 2007) ........................................................22

*Telcordia Techs., Inc. v. Cisco Sys.*,
612 F. 3d 1365 (Fed. Cir. 2010) (Rader, C.J.).................................22

*WhitServe, LLC v. Computer Packages, Inc.*,
694 F.3d 10 (Fed. Cir. 2012) ............................................................26

**RULES**

Fed. R. App. P. 28(i) .....................................................................1, 26

Fed. R. Civ. P. 56 ..............................................................................9

**OTHER AUTHORITIES**

*Merriam-Webster Collegiate Dictionary* 244 (10th ed. 1997) ................17

*New IEEE Standard Dictionary of Electrical and Electronics Terms*
187 (5th ed. 1993).............................................................................15

*Webster's Third New Int'l Dictionary* 480 (1993) ................................18

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| A_____ | Cited page(s) of the Joint Appendix |
| Camera Manufacturers | Appellees, collectively |
| DTRD | Data transmit/receive device |
| HP | Hewlett-Packard Company |
| Papst | Papst Licensing GmbH & Co. KG |
| PB | Papst's Opening Brief |
| Tasler | Michael Tasler, the named inventor of the patents-in-suit |
| '399 Patent | U.S. Patent No. 6,470,399, Flexible Interface for Communication Between a Host and an Analog I/O Device Connected to the Interface Regardless the Type of the I/O Device |
| '449 Patent | U.S. Patent No. 6,895,449, Flexible Interface for Communication Between a Host and an Analog I/O Device Connected to the Interface Regardless the Type of the I/O Device |

## STATEMENT OF RELATED CASES

Papst has asserted infringement of the '399 and '449 patents against other entities in the following actions:   08-cv-1406, *Papst v. Canon, Inc.;* 09-cv-530, *Papst v. Sanyo Electric Co., Ltd.*   Those cases are pending before the Honorable Rosemary M. Collyer in the United States District Court for the District of Columbia in the same multi-district litigation proceeding involved in this appeal, and have been stayed.   They will be affected by the outcome of this appeal.

## INTRODUCTION

The Court should affirm the grant of summary judgment to Hewlett-Packard Company ("HP").  HP is in a unique position among the Appellees because a separate summary judgment order was entered for HP.  One aspect of that summary judgment order provides an independent basis for affirming the judgment for HP.  That is, the district court correctly construed "second connecting device," and under its construction, Papst has repeatedly admitted that HP does not infringe.  A264, A265.  That issue is separately argued below.

HP has submitted a separate brief because the other Appellees have taken the position that the Court need not reach this issue.  Camera Manufacturers' Brief at 1–2.  HP disagrees; this issue is ripe for decision as to HP and provides a unique and clear ground for affirmance of the judgment for HP.[1]

Judgment as to HP was also entered on the alternate ground that due to the combined effect of the district court's rulings on other bases for granting summary judgment, all of Appellees' accused products do not infringe.  A265.  Under Fed. R. App. P. 28(i), HP joins in specified portions of the common briefing on those issues, and in the alternative seeks affirmance on those grounds.

---

[1] Appellant incorrectly suggests that the construction of "second connecting device" only remains a live dispute due to the district court's denial of summary judgment of non-infringement for the other Camera Manufacturers.  PB at 25 n.36, and 64 n.143.  In fact, it is a live dispute, unique to HP, due to a separate order granting summary judgment on this ground to HP.  A255–71.

## STATEMENT OF THE ISSUES

(1)  Whether the Court should affirm the district court's grant of summary judgment of non-infringement by HP of United States Patent Nos. 6,470,399 and 6,895,449 given Appellant's stipulation of non-infringement based the construction of "second connecting device."

(2)  Whether the Court should affirm judgment as to HP based on the alternate ground that summary judgment was properly granted as to the "data transmit/receive device," "input/output device customary in a host device," and "simulating a virtual file system" limitations, together with the summary judgment ruling that memory cards cannot satisfy both the "interface device" and "data transmit/receive device" limitations.

## STATEMENT OF THE CASE

### I.  PAPST LACKED A GOOD FAITH BASIS FOR BRINGING THIS ACTION AGAINST HP IN THE FIRST INSTANCE

The patents-in-suit, U.S. Patent Nos. 6,470,399 and 6,895,449, never refer to cameras.  They are entitled "Flexible Interface for Communication Between a Host and an Analog I/O Device Connected to the Interface Regardless [sic] The Type the Interface."  The Abstracts describe an interface device that is connected between a host device (such as an IBM-PC) and an analog I/O device called the "data transmit/receive device."

Core to the invention is the ability to attach the interface device to different or multiple data transmit/receive devices. The patents explain that "an interface may be put to totally different uses," and thus it is desirable that an interface be attachable to "very different" systems. A283 at 1:55-58. The patents stress the "enormous advantage" to be gained for "the interface device according to the present invention" by separating the hardware used to attach data transmit/receive devices from other portions of the patented interface, so that dissimilar devices can be used with the interface. A286 at 8:23-31.

The connection between the interface device and external devices, including the data transmit/receive devices, is achieved via "connecting" devices. Each of the asserted claims requires both a first and second connecting device. A288 at 12:51-60; A289 at 13:58-66, 14:38-46 (claims 1, 11 and 14); A298 at 11:54-58; A299 at 13:21-25, 14:17-21 (claims 1, 17 and 18). The first connecting device connects the interface device to the host device, and the second connecting device attaches the interface device to the data transmit/receive device.

The preferred embodiment[2] for the first connecting device "contains the following components: an SCSI interface 1220 and a 50-pin SCSI connector 1240 for attachment to an SCSI interface present on most host devices or laptops." A287 at 9:30-33. The preferred embodiment of the second connecting device

_____

[2] Although the patents disclose alternative embodiments for other aspects of the invention, only one embodiment teaches the connecting devices.

"comprises 8 BNC inputs with the calibration relay 1505, a block 1510 with 8 device amplifiers with an overvoltage protection of ±75 V, this block being connected in turn to 8 sample/hold (S&H) circuits 1515." *Id*. at 9:49-51.

Papst could not reasonably have expected to prove that the accused HP digital cameras include a second connecting device. As shown in the figure below, used by Papst during claim construction, Papst mapped the "data transmit/receive" device to the image sensor, labeled CCD, in HP digital cameras:



A1552. The image sensor collects image data. As one can readily see from this figure, that sensor is built into the body of the camera. There is no way for a user to unplug the image sensor and plug the camera into either a different image sensor or another type of sensor, without breaking the camera into pieces.

## II. PAPST REQUESTED HARDWARE-BASED CONSTRUCTIONS OF SECOND CONNECTING DEVICE

Below, Papst sought constructions of "second connecting device" recognizing that in each asserted patent, these limitations are directed to hardware.

With respect to "second connecting device" in the '449 patent, Papst proposed "the circuit device used to couple the data transmit/receive device to the interface device." A1488–89 ("Therefore, the 'second connecting device' should be construed to mean the circuit devices used to couple the data transmit/receive device to the interface device, without limiting such circuit devices to sampling circuits or analog to digital converters. Also, the second connecting device should not be limited to a mere connector."). Papst also sought a construction of the "second connecting device" in the '399 patent consisting of a recitation of "the structure actually recited in [the claim], i.e., "'a sampling circuit for sampling the analog data provided by the data transmit/receive device' or 'an analog-to-digital converter for converting data sampled by the sampling circuit into digital data.'"" A1484.

The district court issued its Claim Construction Ruling on June 12, 2009. At the Camera Manufacturers' request, it construed "second connecting device" in the '449 patent as "a physical plug or socket for permitting a user readily to attach and detach the interface device with a plurality of dissimilar data transmit/receive devices." A1622–23, A1660 ¶ 8. The district court construed "second connecting device" in the '399 patent as "a physical plug or socket for permitting a user readily to attach and detach the interface device with a plurality of dissimilar data transmit/receive devices, including a sampling circuit for sampling the analog data

provided by the data transmit/receive device and an analog-to-digital converter for converting data sampled by the sampling circuit into digital data." A57. The district court denied Papst's request for reconsideration of its order on these terms. A2237.

## III. PAPST AGREED THAT HP DOES NOT INFRINGE BUT NONETHELESS PRESSED ITS CLAIMS AGAINST HP

After claim construction, Papst stipulated that all accused HP products did not infringe because they lacked a "second connecting device" as that term was construed by the district court. A1703–4 ¶ 9. Papst explained:

> After the Court's rulings on claims construction, Papst studied the effect of the Court's rulings. Papst was able to determine that none of Hewlett-Packard's ("HP") accused devices met the Court's definition of "second connecting device."

A1710. Accordingly, Papst and HP filed a joint stipulation on February 26, 2010 that HP's accused devices "do not infringe any claim of either the '399 patent or the '449 patent," because "each of the Accused Devices lacks an interface device having a plug or socket that permits a user readily to physically attach/detach the interface device to/from a data transmit/receive device outside the Accused Device" in accordance with the district court's claim construction of "second connecting device." A1703–4 ¶ 9. Based on this stipulation, Papst and HP jointly moved for entry of final judgment as to HP. A1698–1701. Papst also reiterated its factual admission that no HP product infringed the patents-in-suit numerous times:

- "After the Court's rulings on claims construction, Papst studied the effect of the Court's rulings. Papst was able to determine that none of Hewlett-Packard's ('HP') accused devices met the Court's definition of 'second connecting device.'"  A1710;

- "From this record the Federal Circuit can readily understand what it is that makes the HP devices noninfringing, namely, they lack ways for attaching external data transmit/receive devices."  A1717;

- "Papst can stipulate to non-infringement in that case because each accused HP device 'lacks an interface device having a plug or socket that permits a user readily to physically attach/detach the interface device to/from a data transmit/receive device outside the' accused HP device."  A1707;

- "HP and Papst were able to determine and agree that HP's accused products do not infringe the Court's construction of the term 'second connecting device.'"  A1740;

- "HP happens to sell only cameras that everyone agrees do not infringe under the current construction of 'second connecting device.'"  A1757;

- "If [the Court's claim construction is] affirmed, that eliminates HP's liability."  A1763.

In a manner that almost defies description, despite this stipulation and admissions that HP does not infringe, after the *Markman* hearing Papst tried to renew its claims of infringement by HP, assert new claims of infringement on entirely different production lines, and seek expensive and burdensome discovery from HP.

In August 2010, Papst sought extensive and burdensome discovery from HP (as well as the other Camera Manufacturers) in a 31-page proposed discovery plan. A1766–1801.  In October 2010, Papst filed amended infringement contentions that levied accusations of infringement against the same HP PhotoSmart cameras that Papst previously admitted did not infringe, as well as additional product lines including cellphones sold by Palm, an HP subsidiary, and third party cameras sold on a HP website.  A1802, A1804.  Because these assertions contradicted Papst's binding admissions that HP's products could not infringe, HP moved to strike these contentions.  A2114, A2119–122.  Papst opposed the motion (A2130) and also sought leave to file revised infringement contentions (A2144).

The district court granted HP's motion on January 28, 2011, striking Papst's contentions against HP's previously accused digital cameras and those premised on Palm cellphone products, and stayed Papst's contentions based on HP's alleged sales on its website of Canon and Samsung digital cameras.[3]  A2166, A2168.  The district court also imposed sanctions barring Papst from modifying its Final Contentions or from making any arguments regarding infringement not set forth in those contentions.  A2170.

---

[3] The Second Wave cases against camera manufacturers including Canon remain stayed.  A2152.  The Samsung contentions were resolved on summary judgment. A255–56.

## IV. PAPST SOUGHT TO REVIVE CLAIMS AGAINST HP AT THE SUMMARY JUDGMENT STAGE

When the other Camera Manufacturers reached the summary judgment stage, HP moved for entry of judgment, or in the alternative summary judgment of non-infringement. A2206. Rather than timely file an opposition, Papst filed a collateral motion to strike portions of HP's motion while requesting partial entry of judgment on Papst's preferred terms. A2246. The district court promptly denied it:

> As this Court has already said, "the business of Papst is *litigation*, not invention or production. Litigation is the business model whereby Papst, when successful, achieves royalty payments from others. . . . [Its U.S.] counsel are highly experienced in U.S. patent law and in district court litigation." Papst needs no guidance from the Court to address and litigate HP's motion. To the extent Papst suggests entry of judgment in HP's favor on certain products, no further briefing by either party is necessary or will be accepted.

A2259–60 (alteration in original, citations omitted).

Papst next opposed HP's motion for judgment (A2261), and moved for leave to take discovery under Rule 56 from HP and the other Camera Manufacturers (A2312), despite having no infringement contentions pending against HP and already having been barred from asserting any new ones. A2366–9. The district court granted HP's motion as to HP's own products and its sales of Samsung products, and severed and stayed Papst's claims against HP as a seller of Canon products. A255–71, A2464–5.

After the district court granted two of the motions for summary judgment filed by the Camera Manufacturers, Papst moved to "clarify" one order (A2371–7) and executed two additional stipulations of non-infringement. A2378–9, A2438–39. One of Papst's stipulations, however, identified only three of the eleven HP devices properly subject to the stipulation, which Papst corrected after HP objected to the incomplete stipulation. *Compare* A2380–2 *to* A2438–47. Papst then moved to withdraw those stipulations, as well as the motion to clarify (A2448–49), despite full knowledge of the court's earlier order instructing that Papst's factual admissions of non-infringement "are binding and conclusive and not subject to subsequent variation." *See* A2160 (citing *Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*, 130 S. Ct. 2971 (2010)). HP opposed the motion as to the two stipulations (A2454), and the court denied it (A2453).

The court entered final judgment for HP on November 14, 2013. A2466–7. HP's request for attorneys' fees and costs was denied without prejudice.

## ARGUMENT

## I. SUMMARY JUDGMENT FOR HP SHOULD BE AFFIRMED BECAUSE THE DISTRICT COURT PROPERLY CONSTRUED "SECOND CONNECTING DEVICE"

### A. The District Court's Claim Construction was Proper

The district court properly construed "second connecting device" to require "a physical plug or socket for permitting a user readily to attach and detach the

interface device with a plurality of dissimilar data transmit/receive devices." A55–57.

### 1. The Second Connecting Device is a Physical Plug or Socket

The "second connecting device" is a hardware device that enables the "interfacing [of] the interface device with the data transmit/receive device." A298. In the '399 patent, the "second connecting device" also includes hardware for sampling and converting the data received from the data transmit/receive device: "a sampling circuit for sampling the analog data provided by the data transmit/receive device and an analog-to-digital converter for converting data sampled by the sampling circuit into digital data." A288–9.

While a "second connecting device for interfacing" is a coined term, the patent specifications explain that connectors are the devices that actually connect the interface device to other devices, a host device, or data transmit/receive device. A connector is a hardware device. It is a "coupler used to join two cables or plug a cable into a port or interface." A1519. Numerous connectors known in the art, a few of which are depicted below, confirm this understanding:



**connector**
Several kinds of connector

A1520.

The patents-in-suit teach how connectors are used as connecting devices.

Figure 1 of the patents is a "general block diagram" showing their disposition in

the system:



The first connecting device is referred to as "1st CD," item 12, and the second

connecting device is referred to as "2nd CD," item 15. Figure 2 is a more detailed

diagram of the same system:



The first connecting device "contains the following components: an SCSI interface 1220 and *a 50-pin SCSI connector* 1240 for attachment to an SCSI interface present on most host devices or laptops." A287 at 9:30-33 (emphasis added). The second connecting device, in turn, "comprises *8 BNC inputs* with the calibration relay 1505, a block 1510 with 8 device amplifiers with an overvoltage protection of ±75 V, this block being connected in turn to 8 sample/hold (S&H) circuits 1515." *Id*. at 9:49-51 (emphasis added); Fig. 2, item 1505. Examples of both connectors are depicted below:





A1514, A1534. Both connectors comprise hardware plugs/sockets for attaching and detaching devices.

The district court properly adopted a claim construction that explains that the claimed "connecting devices" are connectors, and to use the standard technical definition of a connector. *E.g., Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1352–53 (Fed. Cir. 2004) (affirming a construction tracking the technical dictionary that was consistent with the specification's description of the term). Similarly, in one of the cases cited by Papst, *Intellectual Prop. Dev., Inc. v. UA-Columbia Cablevision of Westchester, Inc.*, the Court held that the district court properly referenced extrinsic materials to determine the meaning of "high frequency" in the relevant art. 336 F.3d 1308, 1314 (Fed. Cir. 2003). Here, the district court looked at the teaching in the patent to inform its understanding of the coined term used in the claims, and then referred to extrinsic technical dictionaries that are consistent with the teaching in the specification. A51–7.

Nor is Papst in a position to criticize the district court for having adopted this aspect of the claim construction. Papst argues that the district court erred in the construction of "second connecting device" because "the plain meaning of 'device' here does not require a separate structure," and "[t]he Court wrongly viewed the invention through a hardware lens." PB at 65. In the district court,

however, Papst proposed a claim construction that would have read the connecting

devices as "circuit devices" and included devices in addition to a connector:

> Therefore, the "second connecting device" should be
> construed to mean *the circuit devices* used to couple the
> data transmit/receive device to the interface device,
> without limiting such circuit devices to sampling circuits
> or analog to digital converters. Also, the second
> connecting device *should not be limited to a mere
> connector*.

A1488–9 (emphasis added).  A "device" is a "[a] hardware unit that is capable of

performing some specific function."  A612.[4]  A "circuit" is an "interconnection of

electrical elements."  *The New IEEE Standard Dictionary of Electrical and

Electronics Terms* 187 (5th ed. 1993).  In other words, before the district court

Papst agreed that the connecting devices were hardware devices.[5]

It was not until after the claim construction ruling that Papst backtracked and

tried to assert a construction not limited to circuit devices including connectors.

A1694.  The district court denied Papst's second motion for reconsideration, which

raised this argument.  A3003-6.  Papst thus waived its arguments that this claim

element is not directed to a circuit device including a connector.  *See Funai Elec.

Co., Ltd. v. Daewood Elecs. Corp.*, 593 F. Supp. 2d 1088, 1102 (N.D. Cal. 2009)

(holding that an indefiniteness argument dependent on claim constructions not

---

[4] In its Opening Brief, Papst cites a definition of "device" in the mechanical arts,
not the definition of "device" in the electronic arts.  PB at 31.

raised during *Markman* and not appearing in patent local rule disclosures was waived).

In addition, the propriety of treating the second connecting device as hardware is confirmed by the fact that the rest of the "second connecting device" claim limitation in the '399 patent also recites hardware: a sampling circuit to sample the analog data and an analog-to-digital converter to convert the analog samples to digital data. A288 at 12:55-60 ("the second connecting device including a sampling circuit for sampling the analog data provided by the data transmit/receive device and an analog-to-digital converter for converting data sampled by the sampling circuit into digital data").

The specification also confirms this is a proper understanding. In describing an interface device "*of the invention,* the specification states that "any modification of *the specific hardware symbolized by the second connecting device* 15 can be implemented essentially without changing the operation of the interface device according to the present invention." The preferred embodiment is, of course, hardware: the second connecting device comprises "8 BNC inputs with the calibration relay 1505, a block 1510 with 8 device amplifiers with an overvoltage protection of ±75 V, this block being connected in turn to 8 sample/hold (S&H) circuits 1515." A287 at 9:49-60. It was thus not improper, and in fact is necessary, to construe the second connecting device as a piece of hardware.

Moreover, the district court's ruling does not improperly limit the claim to the preferred embodiments. PB at 65. The construction requires no particular connectors nor any additional hardware recited as being part of the preferred embodiment hardware devices, other than that specifically called out in the claims of the '399 patent.

>    **2.    The District Court Properly Concluded that the Second Connecting Device Permits Attachment to A Plurality of Dissimilar Data Transmit/Receive Devices**

The district court similarly did not err when it held that the "second connecting" device must be detachable. Papst argues that the "plain meaning of 'device' here does not require a separate structure." PB at 65. But a "device" is "[a] hardware unit that is capable of performing some specific function." A612. In the asserted claims, this device connects the data transmit/receive device to the interface device. Accordingly, what is claimed is a hardware unit that connects one structure, the interface device, to another structure, the data transmit/receive device.

Papst's suggestion that a "connecting device" need not be connectable defies common sense. As the definition of "connect" makes clear, a device that connects is something that joins two other things together. *See Merriam-Webster Collegiate Dictionary* 244 (10th ed. 1997) (connect: to join or fasten together usu[ally] by something intervening; identifying "connector" as noun); *see also*

*Webster's Third New Int'l Dictionary* 480 (1993) (cited by Papst) (defining

"connected" has a plain English definition of "to join, fasten, or link together.").

That the connecting device forms such an attachment is made clear by the

remainder of the claims, which require that the interface device operates the same

"regardless of the type of the data/transmit device attached to the second

connecting device of the interface device . . . ." *See, e.g.*, A289 at 13:1-3.

The Court should also reject Papst's argument that "the court's construction

for 'second connecting device' is logically inconsistent with its constructions for

immediately adjacent claim language." PB at 65. Specifically, Papst argues that

the "simultaneous juxtaposition of a 'second connecting device' that *requires* a

'physical plug or socket,' to perform the stated function for 'interfacing' that does

*not* require a physical connection," is "incoherent and nonsensical." *Id.* at 66

(emphasis added). Those adjectives more properly apply to Papst's own argument.

Papst is simply ignoring the fact that the claims require a "connecting device,"

which it previously admitted is a physical structure.

Papst's proposal—which notably lacks any mention of connecting two

devices—that a second connecting device means anything that communicates with

a data transmit/receive device using a sampling circuit and analog-to-digital

converter should be rejected because it reads "connecting" entirely out of the

claims. Although the patent teaches that a sampling circuit and analog-to-digital

converter, which process signals, may be included in the second connecting device,
neither provide the function of "connecting." A sampling circuit samples data and
an analog-to-digital converter processes it. Neither forms the requisite connection.

The district court's approach is consistent with the decisions of this Court.
For example, in a case that Papst cited in its Opening Brief, this Court rejected the
same kind of argument that Papst makes here, that a claimed device need not be a
separate structure from the devices to which it is connected. In *Becton, Dickinson
and Co. v. Tyco Healthcare Grp.*, this Court held that a claim limitation reciting a
"spring means connected to said hinged arm" provided for two separate elements, a
spring and an arm, that could not be the same. 616 F. 3d 1249, 1254 (Fed. Cir.
2010). It explained that "[w]here a claim lists elements separately, 'the clear
implication of the claim language' is that those elements are 'distinct
component[s]' of the patented invention." *Id.* (quoting *Gaus v. Conair
Corp.*, 363 F.3d 1284, 1288 (Fed. Cir. 2004)).

The *Becton* decision goes on to explain that the Court must presume that the
use of different terms connotes different meaning. *Id.* ("In the absence of any
evidence to the contrary, we must presume that the use of . . . different terms in the
claims connotes different meanings.") (citation omitted). While this presumption
may of course be rebutted, where the specification treats each element a separate

structure, and the claims recite a separate element to connect those structures, it is proper to construe the claims as containing separate structures.[6]

Here, the specification clearly teaches that the second connecting device is a separate element:

- "***Regardless of which data transmit/receive device*** at the *outline line 16 is **attached** to the second connecting device*, the digital signal processor 13 informs the host device that it is communicating with a hard disk drive." A285 at 6:19-20;

- Users can "perform essentially identical operator actions for ***almost any data transmit/receive devices which can be attached to*** *the second connecting device*" A286 at 7:40-42;

- "***The connection***, symbolized by the line 16, of the interface device 10 *to **any data transmit/receive device*** implements . . . ." A287 at 10:28-29;

- "This means however that the interface device according the present invention . . . can, ***regardless of the type of data transmit/receive device attached*** *to the second connecting device*, behave initially as a virtual and at the same time passive hard disk." A288 at 12:12-19.

It was also proper to hold that the "second connecting device" is not only a separate element but also detachable. That is not only consistent with the plain

---

[6] Papst cites a number of off-point cases where this presumption has been rebutted. *E.g.*, *Retractable Techs., Inc. v. Becton*, 653 F.3d 1296, 1303 (Fed. Cir. 2011) (the claims recited structural overlap between elements); *see also Linear Tech. Corp. v. USITC*, 566 F.3d 1049, 1055–1056 (Fed. Cir. 2009) ("second circuit" and "third circuit" shown in specification as sharing circuit components); *Powell v. Home Depot, Inc.*, 663 F.3d 1221, 1231–32 (Fed. Cir. 2011) (specification taught contiguous cutting box and dust collection structures).

meaning of "connecting," discussed above, but also lends meaning to the remainder of the claims, which require that the interface operates in the same way "regardless of the type of the data/transmit device attached to the second connecting device of the interface device." *See, e.g.*, A289 at 13:1-3.

Detachability was also emphasized as a benefit of the invention. When discussing the problems faced by the prior art, the patents note that interfaces "may be put to totally different uses," and therefore it is "desirable that an interface be sufficiently flexible to permit *attachment of very different electrical or electronic systems* to a host device by means of the interface," such as the radiological equipment and multimeter examples mentioned in the specification. A293 at 1:57-60 (emphasis added). The patents aim to provide "a *universal solution which can cover the entire spectrum of possible data transmit/receive devices*." A288 at 12:38-41 (emphasis added); *see also id.* at 12:53-59.

This is not just a desirable feature or in a preferred embodiment; the patents clearly state that *the* interface device of the invention has this function:

> In *the interface device according to the present invention an enormous advantage is to be gained*, as apparent in the embodiment described in the following, *in separating the actual hardware required to attach the interface device 10 to the data transmit/receive device* from the communication unit, which is implemented by the digital signal processor 13, the memory means 14 and the first connecting device 12, *as this allows a plurality of dissimilar device types to be operated in parallel in identical manner*.

A296 at 7:23-31 (emphasis added); A286 at 8:23-31.  This statement about the

invention should be lent meaning.  This Court has explained that "when the scope

of the invention is clearly stated in the specification, and is described as an

advantage and distinction of the invention, it is not necessary to disavow explicitly

a different claim scope."  *On Demand Machine Corp. v. Ingram Indus., Inc.*, 442

F.3d 1331, 1340 (Fed. Cir. 2006).  It thus was correct for the district court to give

weight to this unambiguous statement about the scope of the invention and limit

Papst to a separable hardware connector.  *See Telcordia Techs., Inc. v. Cisco Sys.*,

612 F. 3d 1365, 1374–1375 (Fed. Cir. 2010) (Rader, C.J.) ("By repeatedly

describing the inventive DTDM mechanism as one that only allows one packet per

frame, the patentee has demonstrated a clear intention to limit the claim scope

using words or expressions of manifest execution or restriction.") (internal

quotation and citation omitted); *Stumbo v. Eastman Outdoors, Inc.*, 508 F. 3d

1358, 1362–1363 (Fed. Cir. 2007) (construing the term "closable vertical opening"

"in light of the specification" where construction is "supported by the

specification," "the specification . . . inherently requires a slit-like shape for the

opening," and "there is nothing in the specification to suggest that the patentee

contemplated" alternative shapes).

Similarly, in one of the cases cited by Papst in its Opening Brief,

*Rectractable Techs.*, this Court held that it was proper to limit the claimed "body"

of a syringe to a one-piece structure where the specification had both criticized

prior art syringes as containing a two-piece body and describing "the invention" as

including a one-piece body.  653 F.3d 1296, 1305–1306.  It explained that:

> In this case, while the claims leave open the possibility
> that the recited "body" may encompass a syringe body
> composed of more than one piece, the specifications tell
> us otherwise. They expressly recite that "the invention"
> has a body constructed as a single structure, expressly
> distinguish the invention from the prior art based on this
> feature, and only disclose embodiments that are expressly
> limited to having a body that is a single piece. Thus, a
> construction of "body" that limits the term to a one-piece
> body is required to tether the claims to what the
> specifications indicate the inventor actually invented.
> Accordingly, the district court erred when it construed
> "body" as encompassing bodies composed of multiple
> pieces.

*Id.* at 1306.

Papst argues incorrectly that the "enormous advantage" described in the

passage above refers only to an "optional embodiment" in which "multiple parallel

connections *can be* implemented."  PB at 43 (emphasis in the original).  Papst

simply misreads the text.  This passage refers to the enormous advantage to be

gained from an "interface device *according to the invention*," not just to a

preferred embodiment.  A286 at 8:23-24 (emphasis added).  In addition, the

sentence on which Papst focuses merely states that when each of these multiple

devices of the invention is connected to a host device, each will appear as a virtual

hard disk.  *Id.* at 8:31-33.

In addition, the Court should reject Papst's creative misreading of the patent figures where it tries to argue that the communication lines shown in Figure 1 of the patents demonstrate that the data transmit/receive device may be permanently fixed to the interface device. PB at 20. Papst's error lies in focusing on Figure 1 in a vacuum. Figures 1 and 2 are the same embodiment. Figure 1 is a "general block diagram" of the interface device according to the invention. A285 at 5:38-39. Figure 2 shows the "detailed block diagram" of the same interface device. The two must be read together. Figure 1 shows the "second connecting device" as functional block 15. The second connecting device communicates with the I/O device, as Papst notes, "by means of an output line 16 to a data transmit/receive device . . . ." Figure 2 shows that the output line is attached via the connector, i.e., connecting device, comprised of an 8 BNC input connectors 1505 located between the interface device and the data transmit/receive device. The patent also notes that the "first connecting device 12 of Fig. 1" comprises a 50-pin SCSI connector, as shown in Figure 2, for attachment to most host devices, necessarily via host line 11. A287 at 9:29-33. As such, when read in context, communication lines 11 and 16 on which Papst relies are in fact detachable at the first and second connecting devices, respectively. Thus, Papst's assertion that the specification's depiction in Figure 1 of an interface attached to the DTRD does not require structural

separation disregards unequivocal teachings in the specification to the contrary. PB at 34.

Given these teachings, the district court properly concluded that the connecting device is a physical plug or socket that can be attached to a device. This Court consistently recognizes that a patentee cannot construe claims to "enlarge what is patented beyond what the inventor has described as the invention." *See Inpro II Licensing, S.A.R.L. v. T-Mobile USA, Inc.*, 450 F.3d 1350, 1355 (Fed. Cir. 2006) (quoting *Netword, LLC v. Centraal Corp.*, 242 F.3d 1347, 1352 (Fed. Cir. 2001). In *Inpro II Licensing*, the district court construed "host interface" as "a direct parallel bus interface," which is a 50-pin connector used to connect devices to a host computer, a μPDA in the patent. 450 F.3d at 1354; U.S. Patent No. 6,523,079 at 2:30-33 (noting that the parallel bus interface includes "a connector allowing the unit to be docked by plugging it into a docking bay in a host unit"). The patentee argued that the district court erred by limiting "host interface" to only a single form of interface because multiple types of interfaces were described in the patent. *Inpro II Licensing*, 450 F.3d at 1353. This Court rejected the patentee's argument, noting that other interfaces were addressed with respect to different aspects of the invention, not the host interface. *Id.* at 1355. This Court also noted that the patent described the direct parallel bus interface as an important feature. *Id.*

The same reasoning applies here. The patents-in-suit describe only a hardware plug or socket for connecting devices, such as the data transmit/receive device. And the patents stress the enormous advantage gained by the invention by separating the hardware connecting the interface device to the data transmit/receive device to allow a plurality of dissimilar devices. A286 at 8:23-31. It would be improper to now broadly construe "second connecting device" to enlarge what is described as the invention. *See Inpro II Licensing*, 450 F.3d at 1355.

## II. ALTERNATE GROUNDS FOR AFFIRMANCE OF SUMMARY JUDGMENT FOR HP

The summary judgment order as to HP was also entered on the alternate ground that due to the combined effect of the Court's rulings on other bases for granting summary judgment, all of Appellants' accused products were held not to be infringing. A265. Under Fed. R. App. P. 28(i), HP joins in common briefing on those issues, and seeks affirmance on the bases set forth in the common briefing in the Argument sections I-IV. Camera Manufacturers' Brief at 31-67.

## III. PAPST'S LIST OF ORDERS TO BE VACATED IS INCORRECT

Papst wrongly asserts that this Court should vacate district court orders impacting HP that do not depend on the claim construction issues raised by Papst. Papst has offered no reason why any of these orders should be vacated, much less adequately developed an argument supporting its position. Papst, therefore, has waived any challenge to those orders. *See WhitServe, LLC v. Computer Packages,*

*Inc.*, 694 F.3d 10, 19 n.4 (Fed. Cir. 2012); *Monsanto Co. v. Scruggs*, 459 F.3d 1328, 1341 (Fed. Cir. 2006).

Moreover, even if Papst has not waived its challenge to these orders, that challenge should be rejected by this Court. Following claim construction, the district court cautioned Papst that it would have a single opportunity to provide a final set of infringement contentions that contained the specificity the district court deemed necessary. A2943 at 19:10-13. Instead, Papst served 314 pages of Final Infringement Contentions that the district court called "purposefully vague" and "drafted to further Papst's intention to engage in protracted and expensive litigation." A210–11. Given Papst's "total lack of respect for court orders" and repeated failure to "identify specifically where in the accused products the claims limitations [were] found," the court imposed "a reasonable sanction" for Papst's "astounding and brash" failure to follow the court's orders: Papst would be "required to live with its Final Contentions as they stand without further modification." A210–13. The district court subsequently barred Papst from violating that order as to HP, when Papst sought to add new unrelated products. A2162–5. None of these findings about Papst's conduct depends on the substance of the claim construction rulings. There is thus no reason to reverse sanctions and exclusion orders based on Papst's outright defiance of the court's orders.

In what can only be characterized as a blatant misrepresentation of the record, Papst also argues that the district court's grant of summary judgment as to the "Wrongfully Accused Products" and "Table 15" products resulted from the district court's failure to apply the proper constructions, and thus those orders should be vacated.  PB at 66–67.  In fact, the district court granted summary judgment as to the Table 15 products because Papst failed to "allege[] infringement with regard to [the] devices with the required specificity."  A239.  The grant of summary judgment as to the Wrongfully Accused Products, in turn, resulted from the fact that HP never used, made, imported, sold, or offered for sale the products, and because Papst waived any claim of inducement by failing to allege such a theory with specificity in its contentions.  A219–20, A232.

## CONCLUSION

For the reasons set forth above, HP respectfully submits that this Court should affirm the district court's grant of summary judgment of non-infringement.

Dated: May 5, 2014          FENWICK & WEST LLP


                            By:  /s/ Charlene M. Morrow
                                 Charlene M. Morrow

                            Attorneys for Defendant-Appellee
                            HEWLETT-PACKARD COMPANY

## CERTIFICATE OF SERVICE

I hereby certify that on May 5, 2014, I caused the foregoing **DEFENDANT-APPELLEE HEWLETT-PACKARD COMPANY'S BRIEF** to be electronically filed with the Clerk of the Court using CM/ECF, which will automatically send notification of such filing to counsel of record.

Dated:  May 5, 2014               By: /s/ Charlene M. Morrow
                                  Charlene M. Morrow
                                  *Attorneys for Defendant-Appellee*

**CERTIFICATE OF COMPLIANCE
WITH TYPE-VOLUME LIMITATION,
TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

1.      This brief of Defendant-Appellee Hewlett-Packard Company complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).  This brief contains 5,299 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).  In addition, the portions of Defendants-Appellees' brief joined by Hewlett-Packard Company contains 7,076 words.  The total word count is 12,375 words.

2.      The brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Civil Procedure 32(a)(6).  The brief has been prepared in a proportionally spaced typeface using Microsoft Office Word Version 2010 in 14-point Times New Roman.

Dated:  May 5, 2014                           FENWICK & WEST LLP


                                                        By: /s/ Charlene M. Morrow
                                                              Charlene M. Morrow

                                                        FENWICK & WEST LLP
                                                        801 California Street
                                                        Mountain View, CA  94041
                                                        cmorrow@fenwick.com
                                                        (650) 988-8500

                                                        *Attorneys for Defendant-Appellee*