2014-1110

# 𝔘nited 𝔖tates 𝔆ourt of 𝔄ppeals
# for the 𝔉ederal 𝔆ircuit

———— ◆ ————

IN RE PAPST LICENSING DIGITAL CAMERA
PATENT LITIGATION

_____

PAPST LICENSING GMBH & CO. KG,
                                   *Plaintiff-Appellant*

v.

FUJIFILM CORPORATION, FUJIFILM NORTH AMERICA
CORPORATION (formerly known as FUJIFILM USA, INC.),
HEWLETT-PACKARD COMPANY, JVC COMPANY OF AMERICA,
NIKON CORPORATION, NIKON, INC., OLYMPUS CORP.,
OLYMPUS IMAGING AMERICA INC., PANASONIC CORPORATION
(formerly known as MATSUSHITA ELECTRIC INDUSTRIAL CO.,
LTD.), PANASONIC CORPORATION OF NORTH AMERICA,
SAMSUNG OPTO-ELECTRONICS AMERICA, INC., SAMSUNG
TECHWIN CO., AND VICTOR COMPANY OF JAPAN, LTD.
                                   *Defendants-Appellees.*

Appeal from the United States District Court for the District of
Columbia in No. 1:07-mc-00493-RMC, Judge Rosemary M. Collyer

**BRIEF OF DEFENDANTS-APPELLEES OTHER THAN
HEWLETT-PACKARD COMPANY**

*COUNSEL FOR APPELLEES LISTED ON INSIDE*

MAY 5, 2014

Steven J. Routh
Sten A. Jensen
John R. Inge
T. Vann Pearce, Jr.
ORRICK, HERRINGTON & SUTCLIFFE
LLP
1152 15th Street, N.W.
Washington, DC 20005
(202) 339-8400

*Attorneys for Appellees FUJIFILM Corporation and FUJIFILM North America Corporation*

Rachel M. Capoccia
Thomas W. Davison
ALSTON & BIRD LLP
333 South Hope Street
16th Floor
Los Angeles, California 90071
(213) 576-1037

*Attorneys for Appellees Panasonic Corporation; Victor Company of Japan, Ltd.; Panasonic Corporation of North America; and JVC Company of America*

Patrick J. Kelleher
DRINKER BIDDLE & REATH LLP
191 North Wacker Drive
Suite 3700
Chicago, IL 60606-1698
(312) 569-1375

*Attorneys for Appellees Samsung Techwin Co., Ltd. and Samsung Opto-Electronics America, Inc.*

David L. Witcoff
Marc S. Blackman
JONES DAY
77 W. Wacker Drive
Chicago, Illinois 60601
(312) 782-3939

*Attorneys for Appellees Nikon Corporation and Nikon Inc.*

Richard de Bodo
Andrew V. Devkar
BINGHAM MCCUTCHEN LLP
The Water Garden
Suite 2050 North
1601 Cloverfield Boulevard
Santa Monica, CA 90404-4082
(310) 255-9070

*Attorneys for Appellees Olympus Corporation and Olympus Imaging America Inc.*

# CERTIFICATE OF INTEREST

Counsel for Defendants-Appellees certify the following:

1.     The full name of every party represented by me is:

     FUJIFILM Corporation; FUJIFILM USA, Inc. (now known
as FUJIFILM North America Corporation)

2.     The name of the real party in interest (if the party named in
the caption is not the real party in interest) represented by me is:

     None

3.     All parent corporations and any publicly held companies
that own 10 percent or more of the stock of the party or amicus curiae
represented:

     FUJIFILM Holdings Corporation

4.     The names of all law firms and the partners or associates
that appeared for the party or amicus now represented in the trial court
or agency or are expected to appear in this court are:

     Steven J. Routh, Sten A. Jensen, John R. Inge, T. Vann
Pearce, Jr., (Orrick, Herrington & Sutcliffe LLP).

     Previously, Messrs. Routh, Jensen and Inge were partners at

Hogan & Hartson LLP, a predecessor to Hogan Lovells US LLP.

Dated: May 5, 2014

Respectfully submitted,

ORRICK, HERRINGTON & SUTCLIFFE LLP

By: /s/ Steven J. Routh *
Steven J. Routh

*Attorneys for Appellees FUJIFILM Corporation; FUJIFILM North America Corporation*

* Steven J. Routh consented to the use of his electronic signature herein

# CERTIFICATE OF INTEREST

Counsel for Defendants-Appellees certify the following:

1.  The full name of every party represented by me is:

> Samsung Techwin Co., Ltd, Samsung Opto-Electronics America, Inc.

2.  The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

> Samsung Techwin Co., Ltd, Samsung Opto-Electronics America, Inc.

3.  All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented:

> Samsung Electronics Co., Ltd.

4.  The names of all law firms and the partners or associates that appeared for the party or amicus now represented in the trial court or agency or are expected to appear in this court are:

> Patrick J. Kelleher, Brian C. Rupp, Jasmine R. Patel, David J. Moorhead* (Drinker Biddle & Reath LLP)

*Former Drinker Biddle & Reath LLP attorney

Dated: May 5, 2014

Respectfully submitted,

DRINKER BIDDLE & REATH LLP

By: /s/ Patrick J. Kelleher*
Patrick J. Kelleher

*Attorneys for Appellees Samsung Techwin Co., Ltd.; Samsung Opto-Electronics America, Inc.*

*  Patrick J. Kelleher consented to the use of his electronic signature herein

# CERTIFICATE OF INTEREST

Counsel for Defendants-Appellees certify the following:

1.  The full name of every party represented by me is:

   Nikon Corporation and Nikon Inc.

2.  The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

   N/A.

3.  All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented:

   Nikon Inc. is a wholly-owned subsidiary of Nikon Americas Inc.  Nikon Americas Inc. is a wholly-owned subsidiary of Nikon Corporation.  There is no parent corporation of Nikon Corporation, and no publicly held corporation that owns 10 percent or more of its stock.

4.  The names of all law firms and the partners or associates that appeared for the party or amicus now represented in the trial court or agency or are expected to appear in this court are:

CASE PARTICIPANTS ONLY

David L. Witcoff, Marc S. Blackman, Marron Mahoney*

(Jones Day)

*Former Jones Day attorney

Dated: May 5, 2014                    Respectfully submitted,

                                      JONES DAY

                                      By: /s/ David L. Witcoff*
                                      David L. Witcoff

                                      *Attorneys for Appellees Nikon*
                                      *Corporation and Nikon Inc.*

                                      *  David L. Witcoff consented to
                                      the use of his electronic
                                      signature herein

## CERTIFICATE OF INTEREST

Counsel for Defendants-Appellees certify the following:

1.  The full name of every party represented by me is:

> Matsushita Industrial Electric Co., Ltd. (now known as
> Panasonic Corporation), Panasonic Corporation of North
> America, Victor Company of Japan, Ltd. (now known as
> JVCKENWOOD Corporation), and JVC Company of
> America (now known as JVC Americas Corp.)

2.  The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

> Panasonic Corporation, Panasonic Corporation of North
> America, JVCKENWOOD Corporation, JVC Americas Corp.

3.  All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented:

> Panasonic Corporation of North America is a wholly-owned
> subsidiary of Panasonic Corporation, and no other publicly
> held company owns 10% or more of the stock of Panasonic
> Corporation of North America.  JVC Company of America is

now known as JVC Americas Corp., and it is a wholly owned subsidiary of JVCKENWOOD Corporation. No other publicly held company owns 10% or more of the stock of JVC Americas Corp.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented in the trial court or agency or are expected to appear in this court are:

> Alston & Bird LLP, Hogan & Hartson, and Hogan Lovells have appeared and only Alston & Bird will appear in this Court. Attorneys who have appeared or will appear include Rachel Capoccia, Marsha Mullin, Thomas Davison, Evan Woolley, Richard de Bodo, and Andrew Devkar.

Dated: May 5, 2014

Respectfully submitted,

ALSTON & BIRD LLP

 /s/ Rachel M. Capoccia
Rachel M. Capoccia

*Attorneys for Appellees Panasonic Corporation (formerly known as Matsushita Electric Industrial Co., Ltd.); Victor Company of Japan, Ltd.; Panasonic Corporation of North*

*America; JVC Company of
America*

## CERTIFICATE OF INTEREST

Counsel for Defendants-Appellees certify the following:

1.    The full name of every party represented by me is:

    Olympus Corporation; Olympus Imaging America Inc.

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

    Olympus Corporation; Olympus Imaging America Inc.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented:

    The parent company of Olympus Imaging America Inc. is Olympus Corporation of the Americas. The parent company of Olympus Corporation of the Americas is Olympus Corp. Olympus Corp. is a publicly-held corporation traded on the Tokyo Stock Exchange and has no parent company. No publicly-held corporation owns 10% or more of Olympus Corp.

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented in the trial court or agency or are expected to appear in this court are:

Richard de Bodo and Andrew V. Devkar of Bingham McCutchen LLP.

Dated: May 5, 2014                         Respectfully submitted,

BINGHAM MCCUTCHEN LLP

By: /s/ Richard de Bodo*

*Attorneys for Appellees Olympus Corporation; Olympus Imaging America Inc.*

\* Richard de Bodo consented to the use of his electronic signature herein

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST ............................................................. i

TABLE OF AUTHORITIES .............................................................. xvi

TABLE OF ABBREVIATIONS ........................................................... xix

STATEMENT OF RELATED CASES .................................................. 1

INTRODUCTION.................................................................................. 2

COUNTER-STATEMENT OF THE ISSUES ......................................... 3

COUNTER-STATEMENT OF THE CASE .............................................. 5

    I.    BACKGROUND OF THE PATENTS-IN-SUIT ................... 5

        A.    The Patents Claim a Flexible, Universal Interface
            Device That Permits Host Computers to
            Communicate With Any Type of Data
            Transmit/Receive Device. ........................................ 5

        B.    The Patents Describe the Claimed Invention As
            Providing a Flexible, Universal Interface Device. ....... 8

        C.    The File History Confirms That the Claimed
            Interface Device Provides a Flexible, Universal
            Solution. .................................................................. 11

        D.    Papst Relies on Concocted "Configurations" in an
            Attempt to Confine Aspects of the Invention to
            Only Specific Purported Embodiments. ..................... 13

    II.    RELEVANT FACTUAL AND PROCEDURAL
        HISTORY ............................................................................ 14

        A.    Papst Acquires Tasler's Patents and Threatens
            Litigation in an Attempt to Extract Settlements....... 14

        B.    Litigation Over the Patents-In-Suit Is
            Consolidated in the District of Columbia. ................. 15

        C.    The District Court Construes the Claims. ................. 16

    III.    PAPST DISREGARDS COURT ORDERS AND IS
        SANCTIONED AGAIN. ..................................................... 18

        A.    The District Court's Summary Judgment Rulings .... 21

B.   The Memory Card Summary Judgment Ruling.........23

C.   The "DTRD" Summary Judgment Ruling.................23

D.   The "Input/Output Device Customary in a Host Device" Summary Judgment Ruling..........................24

E.   The "Virtual File System" Summary Judgment Ruling..........................................................................25

F.   The Table 15 Products Summary Judgment Ruling..........................................................................25

G.   The Wrongfully Accused Samsung Brand Products Summary Judgment Ruling.......................26

SUMMARY OF THE ARGUMENT ......................................................26

STANDARDS OF REVIEW ...................................................................30

ARGUMENT ...........................................................................................31

I.   THE DISTRICT COURT'S MEMORY CARDS SUMMARY JUDGMENT RULING SHOULD BE AFFIRMED. ...........................................................................31

A.   Any Dispute Over the Construction of "Interface Device" Is Immaterial to the District Court Judgment, Thus the Court Need Not Address It. ......31

B.   Papst Has Waived Any Argument for a New Construction of "Interface Device.".............................33

C.   The District Court Properly Construed "Interface Device" As a Stand-Alone Device Separate From Both the Host Device and DTRD. ...............................34

1.   The District Court's "Interface Device" Construction Is Fully Supported by the Intrinsic Evidence. ..............................................35

2.   Papst Misreads This Court's Precedent. ...........38

D.   Papst Mischaracterizes the Record in an Effort to Manufacture "Additional Errors." .............................41

1.   The district court never relied on the single word "attached.".................................................41

2.   The district court did not improperly read the specification into the claims. .......................42

3. Papst ignores the "desirable flexibility" of the alleged invention and its own statements to that effect. .................................. 42

4. The district court did not inappropriately rely on the advantages of a flexible interface. ............................................. 44

5. The district court did not improperly consider the patents' title. ............................. 45

6. The district court consistently construed "interface device" and "interfacing." .................. 46

II. THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT BASED ON ITS CONSTRUCTION OF "DTRD." ........................................... 46

A. Papst Persuaded the District Court to Adopt the Construction of DTRD That It Now Challenges, and Never Proposed Its Current Construction Below. ....................................................... 47

B. Papst's New Proposed Construction Is Unsupported by Intrinsic Evidence. ........................... 49

III. THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT BASED ON ITS CONSTRUCTION OF "INPUT/OUTPUT [STORAGE] DEVICE CUSTOMARY IN A HOST DEVICE." ................. 54

IV. THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT OF NON-INFRINGEMENT BASED ON "SIMULATING A VIRTUAL FILE SYSTEM" FOR ALL OF PAPST'S CLAIMS UNDER THE '449 PATENT. ............................................... 58

A. The District Court's Construction Is Supported by the Intrinsic Record. ................................... 59

B. The District Court's Construction Is Consistent With the Ordinary Meaning, and the Patentee Did Not Act as His Own Lexicographer. .................... 61

C. The District Court's Construction Is Consistent with the Dependent Claims. ....................... 63

D.    Papst's Current Position Is Inconsistent with Its
      Position Before the District Court and Therefore
      Has Been Waived. ...................................................... 65

E.    Even If Considered, Papst's New Position Is
      Meritless. .................................................................. 67

V.    THE DISTRICT COURT PROPERLY CONSTRUED
      "SECOND CONNECTING DEVICE." ............................... 68

A.    The Flexible Nature of the Interface Device
      Requires That the Second Connecting Device
      Support Attachment of a Plurality of DTRDs. ........... 68

B.    Papst Would Improperly Read Out the Claim
      Term "Connecting." ..................................................... 74

VI.   THE UN-APPEALED SANCTIONS ORDER AND
      SUMMARY JUDGMENT RULINGS ARE NOT
      BEFORE THIS COURT. .................................................. 76

CONCLUSION ...................................................................... 79

# TABLE OF AUTHORITIES

**CASES**                                                                 **PAGE(S)**

*Acumed LLC v. Stryker Corp.,*
    483 F.3d 800 (Fed. Cir. 2007) ............................................................... 41

*Ajinomoto Co., Inc. v. Int'l Trade Comm'n,*
    597 F.3d 1267 (Fed. Cir. 2010) ............................................................ 75

*Bicon, Inc. v. Straumann Co.,*
    441 F.3d 945 (Fed. Cir. 2006) ................................................... 35, 74

*Casio America Inc. v. Papst Licensing GmbH & Co. KG,*
    Case No. 1:06-cv-01751-RMC (D.D.C. 2006) ...................................... 16

*CCS Fitness, Inc. v. Brunswick Corp.,*
    288 F.3d 1359 (Fed. Cir. 2002) ............................................................ 62

*Conoco, Inc. v. Energy & Evntl. Int'l, L.C.,*
    460 F.3d 1349 (Fed. Cir. 2006) ................................................... 49, 66

*Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.,*
    672 F.3d 1270 (Fed. Cir. 2012) ............................................. 49, 55, 66

*Exxon Chemical Patents, Inc. v. Lubrizol Corp.,*
    64 F.3d 1553 (Fed. Cir. 1995) ............................................................ 45

*Gen. Elec. Co. v. Int'l Trade Comm'n,*
    685 F.3d 1034 (Fed. Cir. 2012) ............................................................ 40

*Hockerson–Halberstadt, Inc. v. Converse Inc.,*
    183 F.3d 1369 (Fed. Cir. 1999) ............................................................ 34

*In re Papst Licensing GmbH & Co. KG Litigation,*
    550 F. Supp. 2d 17 (D.D.C. 2008) ....................................................... 16

*Inpro II Licensing, S.A.R.L. v. T-Mobile USA, Inc.,*
    450 F.3d 1350 (Fed. Cir. 2006) ................................................... 72, 73

*Johnston v. IVAC Corp.,*
    885 F.2d 1574 (Fed. Cir. 1989) ............................................................ 57

*K-2 Corp. v. Salomon S.A.*,
  191 F.3d 1356 (Fed. Cir. 1999) ........................................................ 55

*Key Pharms. v. Hercon Labs.*,
  161 F.3d 709 (Fed. Cir. 1998) .......................................................... 47

*Linear Technology Corp. v. ITC*,
  566 F.3d 1049 (Fed. Cir. 2009) ........................................................ 40

*LizardTech, Inc. v. Earth Res. Mapping, Inc.*,
  424 F.3d 1336 (Fed. Cir. 2005) ........................................................ 47

*Mangosoft, Inc. v. Oracle Corp.*,
  525 F.3d 1327 (Fed. Cir. 2008) ........................................................ 31

*Monsanto Co. v. Scruggs*,
  459 F.3d 1328 (Fed. Cir. 2006), *cert. denied*, 127 S.Ct. 2062
  (2007)................................................................................................ 75

*Nazomi Commc'n, Inc. v. Nokia Corp.*,
  739 F.3d 1339 (Fed. Cir. 2014) ........................................................ 50

*Netword, LLC v. Central Corp.*,
  242 F.3d 1347 (Fed. Cir. 2001) ........................................................ 72

*NTP, Inc. v. Research in Motion, Ltd.*,
  418 F.3d 1282,1310-11 (Fed. Cir. 2005) .................................... 39, 40

*O2 Micro Int'l, Ltd. v. Monolithic Power Sys.*,
  467 F.3d 1355 (Fed. Cir. 2006) .................................................. 30, 77

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) ...................................... 36, 55, 56, 61

*Poly-America, L.P. v. GSE Lining Tech., Inc.*,
  383 F.3d 1303 (Fed. Cir. 2004) ........................................................ 45

*Powell v. Home Depot U.S.A., Inc.*,
  663 F.3d 1221 (Fed. Cir. 2011) ........................................................ 40

*Retractable Techs., Inc. v. Becton, Dickinson & Co.*,
  653 F.3d 1296 (Fed. Cir. 2011) ........................................................ 40

*Sage Prods., Inc. v. Devon Indus., Inc.,*
126 F.3d 1420 (Fed. Cir. 1997) ........................................................ 34

*SanDisk Corp. v. Kingston Technology Co., Inc.,*
695 F.3d 1348 (Fed. Cir. 2012) ........................................................ 31

*SciMed Life Sys. v. Advanced Cardiovascular Sys.,*
242 F.3d 1337 (Fed. Cir. 2001) ........................................................ 36

*Sinorgchem Co. v. ITC,*
511 F.3d 1132 (Fed. Cir. 2007) ........................................................ 62

*Starhome GmbH v. AT&T Mobility LLC,*
743 F.3d 849 (Fed. Cir. 2014) .................................................... 54, 61

*SynQor, Inc. v. Artesyn Techs., Inc.,*
709 F.3d 1365 (Fed. Cir. 2013) ........................................................ 75

*Telcordia Technologies, Inc. v. Cisco Systems,*
612 F.3d 1365 (Fed. Cir. 2010) ........................................................ 68

*Teleflex, Inc. v. Ficosa N. Am. Corp.,*
299 F.3d 1313 (Fed. Cir. 2002) ........................................................ 54

*Thorner v. Sony Computer Entm't Am. LLC,*
669 F.3d 1362 (Fed. Cir. 2012) ........................................................ 62

*Verizon Servs. Corp. v. Vonage Holdings Corp.,*
503 F.3d 1295 (Fed. Cir. 2007) ........................................................ 36

*Whitserve v. Computer Packages, Inc.,*
694 F.3d 10 (Fed. Cir. 2012) ........................................................ 76

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| A_____ | Cited page(s) of the Joint Appendix |
| Camera Manufacturers | Appellees, collectively |
| DTRD | Data transmit/receive device |
| Fujifilm | FUJIFILM Corporation and  FUJIFILM USA, Inc. (now known as FUJIFILM North America Corporation) |
| HP | Hewlett-Packard Company |
| Papst | Papst Licensing GmbH & Co. KG |
| PB | Papst's Opening Brief |
| STW/SOA | Samsung Techwin Co., Ltd. and Samsung Opto-Electronics America, Inc. |
| Tasler | Michael Tasler, the named inventor of the patents-in-suit |
| '399 Patent | U.S. Patent No. 6,470,399, Flexible Interface for Communication Between a Host and an Analog I/O Device Connected to the Interface Regardless the Type of the I/O Device |
| '449 Patent | U.S. Patent No. 6,895,449, Flexible Interface for Communication Between a Host and an Analog I/O Device Connected to the Interface Regardless the Type of the I/O Device |

## STATEMENT OF RELATED CASES

Papst has asserted infringement of the '399 and '449 patents against other entities in the following actions:

08-cv-1406, *Papst v. Canon, Inc.*

09-cv-530, *Papst v. Sanyo Electric Co., Ltd.*

Those cases are also pending before the Honorable Rosemary M. Collyer in the United States District Court for the District of Columbia in the same multi-district litigation proceeding involved in this appeal, and have been stayed. They will be affected by the outcome of this appeal.

## INTRODUCTION

This appeal involves five assertions of claim-construction error specific to two patents now owned by Plaintiff-Appellant Papst.  The district court granted judgment of non-infringement in favor of the Camera Manufacturers after issuing six separate summary judgment rulings.  Those rulings cover different, overlapping portions of the wide array of digital cameras and other products that Papst accused of infringement.  On appeal, Papst challenges no aspect of the district court's summary judgment rulings besides five claim constructions.  Each of Papst's challenges is without merit, and in several instances it has waived or is estopped from presenting the challenge to this Court.

This Court can affirm the district court's judgment in its entirety by affirming the district court's summary judgment rulings regarding (1) memory cards; (2) "data transmit/receive device" ; and (3) "customary in a host device."  Those three rulings together, if affirmed, would cover all of the accused products—thereby requiring a judgment of non-infringement on all of Papst's claims—and would render unnecessary this Court's consideration of the final two issues: (4) the "simulating a virtual file system" summary judgment ruling; and (5) the

"second connecting device" claim construction.  In any event, all of the district court's summary judgment rulings are correct, and the judgment below in favor of the Camera Manufacturers should be affirmed.

## COUNTER-STATEMENT OF THE ISSUES

### 1.  Memory Cards Summary Judgment Ruling

a.  Whether the Court should affirm the district court's ruling that memory cards in the accused products cannot be both the claimed "DTRD" and part of the claimed interface device, based on Papst's concessions, irrespective of claim construction?

b.  If the Court reaches the claim construction issue (which it need not do), whether the district court properly construed "interface device" as a "stand-alone" device, given that the claims require the "interface device" be able to connect to different types of DTRDs and the specification and prosecution history likewise demonstrate that the "interface device" is separate from the "DTRD"?

### 2.  "DTRD" Summary Judgment Ruling

a.  Whether Papst is estopped from challenging the claim construction that Papst itself persuaded the district court to adopt?

b.    If the Court reaches the claim construction issue (which it need not do), whether the district court correctly determined that the DTRD must be *capable of* transmitting data to the host device *when connected to the host device* by the interface device, as described throughout the claims and specification?

### 3.    "Input/Output Device Customary In a Host Device" Summary Judgment Ruling

Whether the district court properly construed "input/output device customary *in* a host device" by giving meaning to all claim terms and rejecting Papst's request to construe "in" to mean "inside or outside"?

### 4.    "Simulating a Virtual File System" Summary Judgment Ruling

Whether the district court properly construed the "virtual file" claim terms according to their well-known meaning in the art, and rejected Papst's argument that these terms should have a broader meaning that would encompass real files?

### 5.    "Second Connecting Device" Claim Construction

Whether the district court properly construed "second connecting device" to require that it be a "physical plug or socket" that permits one to readily "attach and detach the interface device with a plurality of

dissimilar [DTRDs]" given that the claims require that the "interface device" be able to connect to different types of DTRDs through the second connecting device?

## COUNTER-STATEMENT OF THE CASE

## I.     BACKGROUND OF THE PATENTS-IN-SUIT

### A.     The Patents Claim a Flexible, Universal Interface Device That Permits Host Computers to Communicate With Any Type of Data Transmit/Receive Device.

The two patents-in-suit disclose "[a]n interface device [that] provides fast data communication between a host device . . . and a data transmit/receive device, . . . regardless of the type of data transmit/receive device" connected to the interface device.  A280, Abstract.[1]  The patented interface device is intended to provide a "universal method" for transmitting data between a myriad of data devices and a host computer, without requiring specialized drivers for each data device or specialized training for technicians.  A283, 1:54-64. To support such universal application "[i]t is desirable that an interface be *sufficiently flexible to permit attachment of very different electrical or*

---

[1] The patents-in-suit share a substantially identical specification.  All references to the specification will cite to the '399 patent, unless specified otherwise.

*electronic systems to a host device by means of the interface.*" A283, 1:56-59. "The devices from which data is to be acquired *cover the entire electrical engineering spectrum.*" A283, 1:34-35.[2] This flexibility would not be possible unless the interface device is separate from and not permanently attached to any host computer or DTRD.

Figure 1 of the patent is a "general block diagram of the interface device according to the present invention." A285, 5:38-39:[3]



The diagram shows the main components of the flexible interface device, including the first connecting device ("1st CD"), which connects to a host device (*e.g.*, a computer), A285, 5:47-50; and the second connecting device ("2nd CD"), which is connectable to any of a wide

---

[2] All emphasis in this brief has been added, unless specified otherwise.

[3] Figure 1 does not merely illustrate "an embodiment" as Papst claims. PB20.

variety of DTRDs. A284, 3:43-45, 3:64-66, 4:16-18; A285, 5:56-60, 6:19:23. More detail on the invention is found in Figure 2, which describes the 1st CD and 2nd CD as commonly used physical connectors. A287, 9:29-53.

The claimed interface device provides for "communication between" a host device and a DTRD. *E.g.,* A288, 12:42. The host sends a signal to the interface device inquiring as to what type of device the host is communicating with. A285, 6:3-10. Regardless of the type of DTRD attached to the 2nd CD, the interface device tricks the host by telling it that it is communicating with "an input/output device customary in a host device," *i.e.*, something with which the host is already familiar (and has drivers to support), such as a hard disk drive. A285, 6:19-22. The host device thereafter "communicates with the interface device by means of the driver for the input/output device customary in a host device." *See, e.g.* claim 1, A289, 13:3-8; A390.

In the preferred embodiment, the devices communicate as if the DTRD were a hard disk drive. A285, 5:64-6:47. The host requests files from the purportedly connected hard drive by issuing a "read" command. A285, 6:55-58. The interface device interprets the command

and obtains an input data stream from the DTRD through the 2nd CD. A285, 6:59-67. The interface device then transfers the data to the host as though it were transferring an actual file physically stored on a hard drive. A285, 6:55-67; A286,7:5-22. In this way, the transient input data stream from the DTRD is made to appear to the host as if it were a real file stored on a hard disk drive. *Id.*

The main differences between the '399 and '449 patents are: (1) the '399 patent requires that the DTRD provide "analog data," and that the corresponding second connecting device include an analog-to-digital converter and a sampling circuit; (2) the interface device of the '449 patent tells the host device it is communicating with a "*storage device* customary in a host device" (rather than an input/output device customary in a host device); and (3) the '449 patent claims "simulating a virtual file system" "including a directory structure." '449 patent claim 1, A298 11:67-12:4-6.

## B. The Patents Describe the Claimed Invention As Providing a Flexible, Universal Interface Device.

In its opening brief, Papst attempts to diminish, or eliminate entirely, the primary stated purpose for Tasler's claimed invention to permit communication between a host device and a variety of different

8

DTRDs, as described above. *E.g.*, A283, 1:34-35, 1:55-64. Papst focuses on the invention's use of standard computer drivers to provide flexibility with respect to connection to different host devices, *see* PB8, PB12, PB22, but seems to ignore the flexibility to communicate with different DTRDs, or tries to confine it to a single embodiment. *See* PB14-15.

First, every claim of both patents requires that when responding to the host as to the type of device attached, the interface device responds the same "*regardless of the type of the data transmit/receive device attached to the second connecting device.*" *E.g.*, A289, 13:1-3. That language makes clear that every interface device must be capable of being attached to different types of "DTRDs." *See, e.g.,* A288-289, 12:64-13:8 (claim 1).

Second, the patents emphasize that "the present invention" as a whole, and not merely one embodiment, is a flexible, universally adaptable interface device to permit transmission of data from a myriad of DTRDs to a host computer:

> In the case of the interface device 10 according to *the present invention* it is necessary for users to note the conventions of the configuration file once only in order to be able to use the interface device 10 as an interface between a host device and *almost any data transmit/receive device.*

9

A286, 7:45-49.

> In accordance with a first aspect of *the present invention,* the object is met by an interface device for communication between a host device . . . and a data transmit/receive device, . . . [which operates] regardless of the type of data transmit/receive device attached to the second connecting device . . .

A284, 3:28-49; *see also* 3:61-66, 4:13-18.

The specification further describes the "enormous advantage to be gained" in an interface device "*according to the present invention*"

> in separating the actual hardware required to attach the interface device 10 to the data/transmit receive device from the communication unit . . . as this allows a plurality of dissimilar device types to be operated in parallel in identical manner.

A286, 8:25-31.

Thus, the specification explains, the "interface device" of "the present invention" accomplishes the goal of providing a universal interface for communication between computers and "*almost any data transmit/receive device.*" A286, 7:39-49. "The interface device 10 thus provides a *universal solution* which can cover *the entire spectrum of possible data transmit/receive devices.*" A288, 12:37-40.

Papst's focus on the use of standard *software* drivers to provide flexibility misses the point of the patents' invention, as drivers alone do not allow the interface device to facilitate communication between host computers and the entire spectrum of *hardware* DTRDs.

## C. The File History Confirms That the Claimed Interface Device Provides a Flexible, Universal Solution.

The prosecution history of the patents-in-suit further emphasizes that the interface device is a stand-alone device that connects to a plurality of DTRDs. During prosecution of the '399 patent, Tasler amended claim 1 to recite "wherein the first command interpreter is configured in such a way that the command interpreter, when receiving an inquiry from the host device as to [the] __*a*__ type of a device attached to the multi-purpose interface of the host device." A391. In the same response, Tasler stated "it is clear that the data transmit/receive device *to be connected to* the second connecting device of the subject interface provides analog data." A389. Together, this claim amendment—from *the* type of device to *a* type of device—and the statement that the DTRD is *to be connected to* the interface, not that it *is connected to* the interface, show that the claimed "interface device" is not permanently affixed to a single DTRD.

11

The prosecution history also confirms that Tasler did not invent the use of host drivers to transfer data. *Compare* PB22 (inaccurately characterizing the prosecution history). During the '399 patent's prosecution, the examiner rejected all originally proffered claims as obvious in view of the prior art. A378-380. The examiner found it would be obvious for a "host device [to] communicate with a transmit/receive device, through an interface device, by means of the standard driver in the host device instead of installing a device-specific driver into the host device." A379. The applicant did not disagree. Instead, he amended the claims to provide that the DTRD could transmit analog data. A389-390. He also distinguished on grounds that the cited prior art, while using customary host device drivers, did not "lie" to the host device as to the true nature of the DTRD. A390. In the '449 patent's prosecution, the examiner allowed the claims precisely because the prior art of record did not teach both the "regardless" limitation and the "virtual file" system limitation. A468.

**D.    Papst Relies on Concocted "Configurations" in an Attempt to Confine Aspects of the Invention to Only Specific Purported Embodiments.**

Papst's description of the patents-in-suit seeks to downplay the required flexibility and "universal" nature of the claimed interface device.  Papst's opening brief describes two purported configurations of the interface device (PB12-14), but the "multi-tasking" and "branched/ parallel" configurations are just red herrings, designed to try to confine features of the invention as a whole to these purported specific embodiments.

*First*, Papst contends that its so-called "multi-tasking configuration" is the only embodiment that supports "communication between" a host device and a DTRD when both are connected to the interface device.  *See* PB51-52.  But, as explained more fully in Argument Section II, *infra*, *every claim* requires that the host device, interface device, and DTRD communicate when connected simultaneously, not just the dependent claims that include the "buffer" limitation.

*Second*, Papst relies upon its so-called "branched/parallel configuration" to try to confine to a single embodiment (described at

A286, 8:23-33) the requirement that the invented interface device be flexible enough to permit attachment of multiple different DTRDs. PB14-15. That argument, however, is contradicted by the claim language, specification, and file history, as discussed above. The flexibility touted throughout the specification and claims, in all embodiments, requires the claimed interface device to operate "regardless of the type of [DTRD] attached to the [2nd CD]," thereby permitting attachment of a variety of DTRDs.

In sum, Papst simply concocted these configurations in an attempt to avoid the relevant claim language and to explain away clear statements of the "present invention," neither of which Papst addresses in its opening brief.

## II.   RELEVANT FACTUAL AND PROCEDURAL HISTORY

### A.   Papst Acquires Tasler's Patents and Threatens Litigation in an Attempt to Extract Settlements.

The accused Camera Manufacturers include most of the world's leading digital camera companies. In 1988, Fujifilm brought the world's

first digital camera to market.[4]  Since then, the Camera Manufacturers'

research and innovations have spurred continued growth in the digital

camera market.

Papst takes credit in its opening brief for "attempt[ing] to

negotiate reasonable licenses" with the Camera Manufacturers (PB21);

but the reality was quite different, as illustrated by Papst's assertion

against Fujifilm.  Papst acquired the Tasler patents in 2006 and

immediately contacted Fujifilm and other digital camera

manufacturers.  A2838-2841, ¶¶9-12, 14-16.  But Papst was not

interested in discussing the merits of its claims; rather, its negotiating

strategy was to threaten expensive litigation, emphasizing that other

companies purportedly spent $60 million defending against Papst's

infringement claims on a different (and completely unrelated) set of

patents.  A2841-2842, ¶¶17-19; A2844, ¶¶22-23; A2868.

### B.  Litigation Over the Patents-In-Suit Is Consolidated in the District of Columbia.

Faced with threats by Papst of the type described above, Casio

filed a declaratory judgment action in 2006 in the United States District

---

[4] *See* http://www.fujifilmusa.com/features/digital-cameras/index.html
(last accessed May 2, 2014).

Court for the District of Columbia. *Casio America Inc. v. Papst Licensing GmbH & Co. KG*, Case No. 1:06-cv-01751-RMC (D.D.C. 2006). After being sanctioned for discovery violations, Papst attempted to escape the D.C. venue by filing infringement actions against the Camera Manufacturers in district courts across the country and then seeking pretrial consolidation of all cases in the Northern District of Illinois. A2468; *In re Papst Licensing GmbH & Co. KG Litigation*, 550 F. Supp. 2d 17 (D.D.C. 2008). The MDL Panel granted the request for consolidation but transferred all cases to the District of Columbia. A2468-2469.

## C. The District Court Construes the Claims.

The district court reviewed approximately two hundred pages of claims construction briefing, heard testimony from experts on both sides at a technology tutorial, appointed and consulted with a neutral technical expert, and conducted a three-day *Markman* hearing. A19; A30; A2674-2676. After issuing its claims construction ruling and resolving two subsequent motions for reconsideration by Papst, the

district court adopted (as relevant here) the following constructions.[5]
A93-98. Notably, the court granted Papst's first motion for
reconsideration and adopted Papst's construction of "data
transmit/receive device" (A1676; A1681-86):

| Term | Construction |
|---|---|
| "Interface device" | A "stand-alone device" |
| "Data transmit/receive device" | "A device that is capable of either (a) transmitting data to or (b) transmitting data to and receiving data from the host device when connected to the host device by the interface device" |
| "Device customary in a host device" | A "device that was normally present within the chassis of most commercially available computers at the time of the invention" |
| "Simulating a virtual file system" ('449 patent) | "Appearing to be a system of files, including a directory structure, that is not physically stored; rather, it is constructed or derived from existing data when its contents are requested by an application program so that it appears to exist as files from the point of view of the host device" |

---

[5] Unless noted differently, these terms are found in all asserted claims of both patents-in-suit.

| "Second connecting device" | "A physical plug or socket for permitting a user readily to attach and detach the interface device with a plurality of dissimilar data transmit/receive devices [and an analog-to-digital converter for converting data sampled by the sampling circuit to digital data]"[6] |
|---|---|

## III. PAPST DISREGARDS COURT ORDERS AND IS SANCTIONED AGAIN.

Despite several claim constructions by the district court that were dispositive of Papst's claims, Papst refused to dismiss the Camera Manufacturers except for HP, and maintained that it should be allowed to proceed with extensive and costly discovery. *E.g.*, A178-84. With respect to HP, however, Papst stipulated that HP's products did not infringe (A1702-05), even while continuing to assert claims against similar products of the other Camera Manufacturers (A1742-44). Papst demanded, for example, detailed discovery on *every* digital camera ever developed by the Camera Manufacturers. A2898-2900. Given the lack of any consistent or credible infringement theories to support Papst's

---

[6] The bracketed language was included in the '399 patent's construction for this term, as these elements are recited expressly in the claims.

extensive discovery demands, the district court ordered Papst to "bring its asserted claims and infringement contentions up-to-date in light of the Modified Order on claims construction." A206.

Papst responded with "Final Infringement Contentions" ("FICs") that were described by the district court as "purposefully vague" and "drafted to further Papst's intention to engage in protracted and expensive litigation." A210-11. The district court further found that, over four years after litigation had begun, Papst had yet to "identify specifically where in the accused products the claims limitations [were] found." A212. Noting that Papst's "astounding and brash" failure to follow the court's orders was "consistent with Papst's approach from the beginning" of the litigation, the district court sanctioned Papst and ordered that it would be "required to live with its Final Contentions as they stand without further modification." A210.

In its FICs, Papst continued to allege that hundreds of digital cameras and accessories infringe the patents-in-suit. The FICs group the accused products by two criteria.

*First*, Papst contends that the accused products infringe based on whether, when using Universal Serial Bus ("USB"), they are (1) Picture

Transfer Protocol-capable ("PTP") or (2) Mass Storage Class-capable ("MSC"). A827-828; A1043-1129. USB is an industry connection standard for communication between a host computer and external devices. A1404-1405, ¶¶5-7, 13. PTP and MSC relate to how a device is recognized by, and communicates with, a computer when connected via USB. A1405-1406, ¶¶14-15. According to Papst, PTP devices will be recognized as "an image class device, such as a scanner." A860. MSC devices will be recognized as a USB mass storage class device such as a USB disk drive. A858. Papst asserts the '399 patent against both PTP- and MSC-capable devices, and asserts the '449 patent against MSC-capable devices only. A875-901.

*Second*, Papst asserts infringement based on the type of external accessories that can connect to the accused products, such as detachable lenses, external microphones, and memory cards. A844-849. Papst's theory is that the accused products act as the claimed "interface device" between the external accessories (alleged by Papst to be "DTRDs") and computers (the alleged "host devices.") A829-833. Tables 1-6 in the

FICs list the accused products for each type of alleged DTRD. A902-966.[7]

Papst's various infringement theories all identified the accused digital cameras as the claimed "interface device"—a concept completely foreign to the patents-in-suit. The patents-in-suit never once mention digital cameras. A280-299. The accused digital cameras do not provide a flexible, universal interface between external data devices and a host computer. Papst's current theory is that the cameras are the "interface device" between computers and accessories, such as microphones, memory cards and printers—devices which, of course, could be connected directly to a computer to transfer data without superfluous routing through a digital camera.

## A. The District Court's Summary Judgment Rulings

The district court ruled on six separate summary judgment motions by the Camera Manufacturers, each directed to certain aspects

---

[7] Papst's FICs also alleged certain internal camera components could be "DTRDs," but Papst later stipulated to non-infringement on these theories and does not raise them on appeal.

of the FICs.[8]  After the parties agreed that those rulings disposed of

Papst's claims against all products accused in Papst's FICs, the court

denied without prejudice the Camera Manufacturers' final pending

summary judgment motion (regarding "second connecting devices") and

entered judgment under Rule 54(b).  A272-279.  This appeal followed.

In opposing each of the Camera Manufacturers' summary

judgment motions, Papst asserted that it needed discovery under Rule

56(d) and that disputed issues of material fact precluded summary

judgment.  A2320-2323.  Papst submitted a 254 page-long expert

declaration accompanied by 52 exhibits (one of which was six DVDs

containing several gigabytes of data) in support of its oppositions.  *See*

A2759-2760.  Yet Papst now appeals the court's summary judgment

rulings based solely on claim constructions, abandoning all of the

grounds for opposing summary judgment that it advanced before the

district court.

---

[8] The grant of summary judgment as to HP on its separate motion is
addressed in HP's appeal brief.

## B.    The Memory Card Summary Judgment Ruling

Table 5 in Papst's FICs alleged that detachable memory cards are "DTRDs." A916-947. However, in its opposition to the Camera Manufacturers' summary judgment motion, Papst conceded that memory cards cannot be the DTRDs of the '399 patent because memory cards do not provide analog data. A105. As a result, summary judgment of non-infringement based upon memory cards as the DTRD must be affirmed as to the '399 patent. For the '449 patent, Papst's FICs alleged that memory cards are simultaneously DTRDs, and the "memory" of the separate "interface device." A842-843, A916-947. In granting summary judgment, the district court ruled: "A memory card cannot be *both* a data transmit/receive device and part of an interface device." A108 (emphasis in original).

## C.    The "DTRD" Summary Judgment Ruling

Despite bearing the burden of proof, Papst did not present any evidence to contradict the Camera Manufacturers' evidence that the alleged DTRDs in Tables 1-4 and 6 of the FICs —*e.g.,* flashes, GPS units, and lenses—could not transmit data to a computer when connected to an accused product in MSC mode. A116. The district court examined, paragraph-by-paragraph, Papst's proffered expert

23

declaration and concluded that "[the expert] has shown himself to be more dedicated to his client than to his science. . . . [His declaration] is irrelevant, contradictory, supportive of [the Camera Manufacturers' expert's] declaration, or plainly dissembling." A130-139. The district court also concluded that Papst's doctrine of equivalents argument and request for Rule 56(d) discovery relied on infringement theories that were not raised in the FICs and thus were barred. A144-146.

In combination, the memory card and "DTRD" summary judgment rulings disposed of all infringement claims against MSC-capable devices. A2754-2755.

## D. The "Input/Output Device Customary in a Host Device" Summary Judgment Ruling

The Camera Manufacturers moved for summary judgment of non-infringement of all the accused PTP-capable devices because they identify themselves to a computer as USB still image capture devices, such as scanners, which are *outside* a computer and, thus, are not "input/output devices customary *in* a host device." Papst alleged that PTP-capable devices infringed this limitation under the doctrine of equivalents (A827, A894-895), but the district court ruled that Papst's theory directly contradicted the court's claim construction and

completely vitiated the claim limitation requiring the identified device to be "in" a host device.  A161-168.

This ruling, when combined with the memory card and "DTRD" rulings, disposed of Papst's claims against all accused products (whether MSC- or PTP-capable).  A2754.

### E.    The "Virtual File System" Summary Judgment Ruling

The district court ruled that the accused products do not satisfy the "virtual file system" limitation of the '449 patent, providing an additional basis for non-infringement.  A199.  Papst's admissions that the accused products physically store files in a real, not virtual, file system were "fatal to Papst's opposition."  A187-188.

### F.    The Table 15 Products Summary Judgment Ruling

Papst presented no infringement theories under any claim construction for certain accused products, listed in Table 15 of the FICs. A1130-1136.  Papst merely stated that these products "may" infringe. The district court found that Papst failed to identify a triable fact issue regarding these Table 15 products.  A253.

### G. The Wrongfully Accused Samsung Brand Products Summary Judgment Ruling

Papst sued two Samsung entities, STW/SOA, for alleged infringement of the patents-in-suit.  A826.  STW/SOA moved for summary judgment of non-infringement as to 47 accused products that STW/SOA never made, used, sold, offered for sale or imported in/into the United States ("Wrongfully Accused Products").  A219-220; A236-238.  STW/SOA supported its motion with confidential business records and sworn statements.  The district court granted the motion for summary judgment, holding that Papst failed to raise a genuine issue of material fact challenging this evidence.

### SUMMARY OF THE ARGUMENT

Papst challenges five district court claim constructions, which are addressed in Sections I-V.  Two fundamental errors permeate Papst's brief:

*First*, Papst ignores that this Court reviews district court judgments.  Papst nowhere explains how its various arguments would affect the judgment under review, and many of Papst's arguments, even if accepted, would not alter that judgment.  For example, if this Court affirms three of the five claim constructions challenged by Papst (either

issues I-III or issues II-IV), such an affirmance would require dismissal of all of Papst's claims against all accused products, thus fully supporting the judgment below in favor of the Camera Manufacturers.

*Second*, Papst disavows (or ignores) many constructions that Papst itself advanced below and presents new constructions on appeal. Papst apparently is unhappy that positions advanced by its former counsel resulted in summary judgment, but this Court does not allow a party to abandon and change positions simply because those positions led to an undesired outcome before the district court.

More specifically, the Camera Manufacturers present the following arguments below:

**I.A.**  The Court need not consider Papst's challenge to the district court's construction of "interface device," as under any proposed construction the memory cards cannot be *both* the "DTRD" *and* the "memory" of the claimed interface device.  Accordingly, the "memory card" summary judgment ruling must stand, and Papst offers no other reason to consider the "interface device" construction.

**I.B.**  In any event, the district court correctly concluded that the claimed "interface device" is a "stand-alone" device not permanently

27

attached to a "DTRD."   The claim language, specification, and file history all support the district court's construction, and Papst ignores and misreads the intrinsic evidence and governing precedent in proffering a brand-new claim construction.

**II.A.** Papst cannot challenge the district court's construction of "DTRD" because Papst successfully persuaded the court to adopt that construction over the Camera Manufacturers' proposed claim construction.  Nor can Papst advocate a brand-new claim construction position on appeal.

**II.B.** Papst's new claim construction arguments rest entirely on mischaracterizations of the record, including misstatements of the district court's construction rather than the actual adopted construction—the court's construction requires only that the DTRD be *capable of* transmitting data to the host device when connected through the interface device, not any *actual use* of the interface device.  Papst also misapplies the doctrine of claim differentiation and misinterprets the intrinsic record.

**III.**   The district court properly construed the claim phrase "device customary in a host device" to mean a device that is "normally

present within the chassis of most commercially available computers at the time of the invention." Papst argues that this claim phrase should cover devices that are "inside *or outside*" the host computer (PB54 (emphasis in original)), but this would render the word "in" superfluous.

**IV.** The district court properly ruled that the terms "virtual file" and "virtual file system" had a well understood meaning in the art: files not physically stored in memory like a real file system, yet made to appear that way. Papst's interpretation means that the claimed "virtual" files and file system would encompass *real* files and file systems, but points to nothing in the intrinsic record supporting this complete evisceration of the claim language.

**V.** The district court properly construed "second connecting device" to be a "physical plug or socket" that permits a user to readily attach a plurality of dissimilar DTRDs to the interface device. The claims, specification, and file history all support this construction.

**VI.** Papst tries to sweep aside four more district court orders with a single sentence at the very end of its Argument. This single conclusory sentence does not preserve the issues Papst attempts to raise. Moreover, these orders do not turn on the challenged claim

constructions and Papst has not identified any basis upon which they could be reversed.

## STANDARDS OF REVIEW

Claim construction (at present) and summary judgment are reviewed *de novo*. If the Supreme Court, in *Teva Pharmaceuticals USA Inc. v. Sandoz Inc.*, No. 13-854, were to hold that deference to district court claim constructions is appropriate, that would only underscore the appropriateness of affirmance in this case.

If the Court were to review the evidentiary sanction imposed on Papst by the district court for failing to comply with its order requiring Papst to disclose final infringement contentions (which the Court need not do because Papst does not present that as one of its stated issues, *see* PB6, and has otherwise waived this issue, *see* Section VI *infra*), an abuse of discretion standard would apply. *O2 Micro Int'l, Ltd. v. Monolithic Power Sys.*, 467 F.3d 1355, 1366-67 (Fed. Cir. 2006).

# ARGUMENT

## I. THE DISTRICT COURT'S MEMORY CARDS SUMMARY JUDGMENT RULING SHOULD BE AFFIRMED.

Papst alleges error in the district court's construction of the claim term "interface device." PB29-46. The Court should reject this challenge for two reasons. *First*, the only summary judgment ruling allegedly affected by this construction (the memory cards ruling) would not change even if Papst's arguments were accepted. *Second*, the district court properly construed "interface device" in any event.

### A. Any Dispute Over the Construction of "Interface Device" Is Immaterial to the District Court Judgment, Thus the Court Need Not Address It.

This Court "review[s] judgments, not opinions, and need not focus on the methodology used by the district court." *E.g.*, *Mangosoft, Inc. v. Oracle Corp.*, 525 F.3d 1327, 1330 (Fed. Cir. 2008). Accordingly, "where, as here, a party's claim construction arguments do not affect the final judgment entered by the court, they are not reviewable." *SanDisk Corp. v. Kingston Technology Co., Inc.*, 695 F.3d 1348, 1354 (Fed. Cir. 2012).

Papst argues that the district court granted the memory card motion for summary judgment based on an erroneous construction of

"interface device." PB26 n.37. This is the only ruling Papst argues should be reversed if the "interface device" construction is modified. PB26, PB66. Papst fails, however, to explain how the "interface device" construction affects the summary judgment ruling on the "memory card" motion.

In fact, the district court's ruling would not change even using Papst's newly proposed construction. The district court granted the Camera Manufacturers' motion because a memory card cannot meet both the "memory" claim limitation (which is part of the interface device) and the "DTRD" claim limitation, as argued by Papst. A100. Papst acknowledges that the "interface device" and "DTRD" must be two different devices. PB29, PB31, PB34. For example, "[t]he ordinary meaning of 'interface device' in the context of the patents-in-suit thus refers to a mechanism that serves as the communications boundary between the 'host device' and the 'data transmit/receive device.'" PB31. Further Papst states "[t]his varied usage of the word 'attached' to describe *connections between different 'devices'* supports a broad construction . . . ." PB34.

Thus, even if the district court's "interface device" construction is too narrow, and Papst's new construction were accepted, the memory card summary judgment ruling would still stand because it does not turn on that construction. A memory card cannot be both part of the claimed interface device and DTRD, even if, as Papst contends, those two devices can be located within the same housing and/or permanently attached. Papst has identified no other reason to consider the "interface device" construction. Accordingly, the Court need not consider this issue. Because Papst did not appeal the memory cards summary judgment ruling on any other basis, that ruling should be affirmed.

## B. Papst Has Waived Any Argument for a New Construction of "Interface Device."

In its opening brief, Papst proposes for the first time a construction of "interface device," arguing that the purported "ordinary meaning" of the term "in the context of the patents-in-suit . . . refers to a mechanism that serves as the communications boundary between the 'host device' and the 'data transmit/receive device.'" PB31. Papst had never previously offered any construction for "interface device" and, in fact, had argued consistently below that the preamble is not limiting

and therefore no construction was necessary. A1475-1476. By failing to offer any construction of this term—not even to suggest that it should have its ordinary meaning—Papst has waived offering a new construction for the first time on appeal. *E.g.*, *Hockerson–Halberstadt, Inc. v. Converse Inc.*, 183 F.3d 1369, 1374 (Fed. Cir. 1999); *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1426 (Fed. Cir. 1997) (effectively applying waiver by precluding Sage's claim constructions because, differing from the claim construction urged at trial, it was not preserved for appeal).

## C. The District Court Properly Construed "Interface Device" As a Stand-Alone Device Separate From Both the Host Device and DTRD.

Papst recognizes that the "interface device" must be a separate device that stands alone from the "host device." A33. Papst also recognizes that the "interface device" may be separate from the "DTRD." A33. Papst disputes only that the "interface device" must be separate from the "DTRD." A33. Yet the claims, specification, and prosecution history require an "interface device" that is separate from the host device and the DTRD. A33-41. The district court considered

this evidence and properly construed "interface device" to be a "stand-alone device." A33-41.

**1. The District Court's "Interface Device" Construction Is Fully Supported by the Intrinsic Evidence.**

The district court's construction of "interface device" is supported by the plain language of the claims. The claims recite and distinguish between three different devices: an "interface device," a "host device," and a "DTRD." *E.g.*, A288-289, 12:64-13:8 (claim 1). The claims further require that the "interface device" be stand alone because it must be capable of being attached to different types of DTRDs. Every single claim recites that when responding to the host as to the type of device attached, the interface device responds the same "*regardless of the type of the data transmit/receive device attached to the second connecting device*." *E.g.*, A289, 13:1-3. That language makes clear that the interface device must be capable of being attached to different types of "DTRDs." *See, e.g.,* A288-289, 12:64-13:8 (claim 1). If, as Papst argues, the "interface device" were permanently connected to a single "DTRD," the "regardless" limitation would be superfluous. *See, e.g.*, *Bicon, Inc. v.*

*Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) ("[C]laims are interpreted with an eye toward giving effect to all terms in the claim.").

The "regardless" clause was key to the district court's claim construction opinion. A35-36 ("regardless" language "strongly indicates that various kinds of data transmit/receive devices could be attached and that, therefore, the interface device was neither a permanent part of the data transmit/receive device nor of the host device/computer.") Papst acknowledges that the "wherein" clause containing the "regardless" limitation is the "focus of the invention." PB16-18. Yet Papst *never addresses that clause* in its Argument. *See* PB29-46. Papst's failure to address the key claim language dooms its argument.

The patents' specification further supports the district court's construction. Affirmative statements in the specification about what constitutes "the present invention" control the scope of the claims for claim construction. *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007) ("When a patent thus describes the features of the 'present invention' as a whole, this description limits the scope of the invention."); *see also Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) (*citing SciMed Life Sys. v. Advanced*

*Cardiovascular Sys.*, 242 F.3d 1337, 1341-44 (Fed. Cir. 2001) (same)).

Here, the patents emphasize the interface device's flexibility to attach

to different DTRDs as an important aspect of "the present invention,"

for example:

> In the case of the interface device 10 according to *the present invention* it is necessary for users to note the conventions of the configuration file once only in order to be able to use the interface device 10 as an interface between a host device and *almost any data transmit/receive device*.

A286, 7:45-49. *See also* Counter-Statement of the Case, Section

A.2, *supra*, and A284, 3:28-49, 3:61-66, 4:13-18.

The specification describes only "interface devices" that stand

alone from DTRDs and host devices. *See, e.g.,* A280, Abstract; A283,

1:1-14; A284-285, 3:22-5:32; A285, 5:47-63; A288, 12:38-40; A281-82,

Figs. 1-2. The disclosed prior art interface devices are separate from

the host device and the DTRD. A283-284, 2:64-3:22. Similarly, the only

DTRDs described in the specification, *e.g.*, a "diagnostic radiology

system in a medical engineering environment" and a "multimeter,"

stand alone from an "interface device." A283, 1:34-54; A293, 1:35-55.

Further, the patents tout the "flexible" and "universal" nature of

the stand-alone "interface device" to be integral to solving the alleged

problem of the prior art. A283, 1:56-60 ("[A]n interface may be put to totally different uses. It is, therefore, desirable that an interface be sufficiently flexible to permit attachment of very different electrical or electronic systems to a host device by means of the interface."); A288, 12:37-40 ("The interface device 10 thus provides a universal solution which can cover the entire spectrum of possible data transmit/receive devices."); A298, 11:41-44 (same). Again, Papst never even attempts to address these statements. *See* PB29-46.

Finally, the prosecution history of the '399 Patent also supports the district court's construction. *See supra* Counter-Statement of the Case, Section A.3. When amending claim 1, the applicant clearly stated that the DTRD was "to be connected" to the second connecting device, as opposed to being already permanently affixed. A389.

### 2.    Papst Misreads This Court's Precedent.

Papst's arguments focus on the wrong legal principle. Papst repeatedly asserts that "the use of two terms in a claim requires that they connote different meanings, *not* that they necessarily refer to two different structures." PB29, PB35 (emphasis in original). But no one has claimed that the "interface device" and "DTRD" are "*necessarily*"

different structures based solely on their separate recitation in the claims. Papst's cited legal principle does not address the issue at hand: whether the claimed interface device is stand-alone from the DTRD based on the intrinsic evidence as a whole.

Here, the district court correctly analyzed the intrinsic record to determine that the "interface device" is a stand-alone device that is separate and distinct from the "DTRD." A33-41 ("the data transmit/receive device must be a separate device from the invention is not mere happenstance but an integral aspect of what was invented"); *see, e.g.,* A280, Abstract; A283, 1:1-14; A284-285, 3:22-5:32; A285, 5:47-63; A281-82 at Figs. 1-2; *see supra* Counter-Statement of the Case Section A. Likewise, the host device must be connectably separate from the interface device as well. *E.g.,* A284, 4:23-28.

The cases cited by Papst are merely examples of patents with claims and specifications that did not support certain claim elements being different structures. As such, they are easily distinguishable. Papst relies most heavily on *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282,1310-11 (Fed. Cir. 2005). *See* PB35-37. In *NTP*, the Court declined to hold that two separate claimed devices had to be disposed in

separate housings, because this Court found no sufficient "textual 'hook' in the claim language" beyond the terms "connected" or "coupled" to limit the claim terms to separable structures. *Id.* at 1310. Here, the Camera Manufacturers do not rely upon the terms "connecting" or "attached" in the patents' claims and specification, but instead have a much a stronger "textual hook"—namely, the "regardless" limitation discussed above, which Papst entirely ignores. This limitation, found in every claim of both patents-in-suit, is clearly tied to the specification's repeated references to the flexibility of the "present invention" requiring it to be connectable to multiple, different DTRDs.[9]

---

[9] Papst's other cases (PB37-38) likewise miss the mark. *See Linear Technology Corp. v. ITC*, 566 F.3d 1049, 1055 (Fed. Cir. 2009) ("nothing in the *claim language or specification* . . . support[ed] narrowly construing the terms to require . . . entirely distinct 'second' and 'third' circuits.); *Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1231–32 (Fed. Cir. 2011) ("cutting box" could structurally overlap with the "dual collection structure" because the specification indicated that the cutting box could function as a dust collection structure.); *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1303 (Fed. Cir. 2011) ("[t]he *claims and the specifications* indicate that the 'needle holder' and 'retainer member' need not be separately molded pieces."); *Gen. Elec. Co. v. Int'l Trade Comm'n*, 685 F.3d 1034, 1045 (Fed. Cir. 2012) ("*The specification*, in describing how the circuit shunts current from the generator rotor and the inverter, and describing the connections of the components, does not require that the components are entirely separate.") (emphasis added).

## D. Papst Mischaracterizes the Record in an Effort to Manufacture "Additional Errors."

In an effort to find an error where none exists, Papst argues that the district court improperly relied on certain portions of the claims and specification. PB38-46. Although the district court's analysis was proper, the errors alleged by Papst are not grounds for reversal in any event. *Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 809 (Fed. Cir. 2007) (the Court "need not decide whether the logic or subsidiary definitions used by the district court to reach the correct construction were sound."). The district court's construction of "interface device" is proper in view of the intrinsic evidence as a whole.

### 1. The district court never relied on the single word "attached."

Papst mischaracterizes the district court's claim construction ruling in arguing that "[t]he district court reached this construction based on the claim term 'attached,' reasoning that it signified having a separate 'interface device' 'attached' to the DTRD." PB2; *see also* PB6, PB20-21, 33-34, 39. That is inaccurate. The district court ascribed no such significance to the word "attached." A33-41. Rather, the court correctly observed that the *phrase* "regardless of the type of the DTRD attached" must mean that the interface device permitted attachment of

41

various types of DTRDs and, thus, was not permanently connected to a single DTRD. A36. Papst's attempt to ascribe a broad meaning to "attached," without reference to the claim limitation as a whole, is misplaced.

## 2. The district court did not improperly read the specification into the claims.

Papst's argument that the district court improperly read the specification's embodiments or figures into the claims is misplaced. PB39-41. The district court referred to the specification (and the figures in it) to confirm that it was consistent with the claims. A36 ("[w]hatever uncertainty on this point may exist after studying the Claims is eliminated upon a review of the specification"). Indeed, the district court properly rejected Papst's argument that the stand-alone device construction improperly imports limitations from the specification to the claims by explicitly relying on the language of the claims. A40-41.

## 3. Papst ignores the "desirable flexibility" of the alleged invention and its own statements to that effect.

Papst mischaracterizes the claimed invention by suggesting that the "flexibility" discussed in the patents-in-suit does not refer to the

ability to flexibly attach different types of DTRDs.  PB42.  This is

another example of Papst trying to reverse course from positions it took

below.  In its *Markman* hearing slides, Papst took precisely the opposite

position:



A2521.

Papst now argues that "statements that describe a feature as

'desirable' are *alone* insufficient to strictly limit claims to embodiments

with that attribute."  PB42.  Yet the district court relied on the claim

language and confirmed that the specification in its entirety was

consistent on this point.  A33-A41.

4.    **The district court did not inappropriately rely on the advantages of a flexible interface.**

The district court's determination that the "[DTRD] must be a separate device" and that this was not "mere happenstance but an integral aspect of what was invented," relied on the language of the asserted claims and the disclosure of the specification, including the "enormous advantage" provided by this aspect of the invention:

> In the interface device according to the *present invention* an *enormous advantage* is to be gained, as apparent in the embodiment described in the following, *in separating the actual hardware required to attach the interface device 10 to the data transmit/receive* device from the communication unit . . . as this *allows a plurality of dissimilar device types to be operated in parallel in identical manner.*

A286, 8:23-31.  This disclosure and the intrinsic evidence as a whole support the district court's construction of the "interface device" as a "stand-alone device."  A33-A41.

Papst contends that the district court improperly relied upon this passage, but that argument is based upon a misinterpretation of the text.  While the above passage does describe an embodiment of the patent, the "enormous advantage" it touts is presented as an advantage of the "present invention;" namely, the ability to attach different types of DTRDs to the interface device.  The described embodiment permits a

plurality of DTRDs to be attached *simultaneously*, using multiple interface devices. But each of these interface devices can support a plurality of DTRDs, as explained above, and this passage does not say anything to the contrary.

### 5. The district court did not improperly consider the patents' title.

Papst again mischaracterizes the district court's opinion by complaining that the district court improperly relied upon the patents' title to narrow the claims. PB45-46. Indeed, the patents' title—which parrots language found in the claims—further emphasizes the claim language that the interface device communicates with a host "regardless of the type" of the DTRD. A280, A290. It is not error for courts to consider a patent's title along with other intrinsic evidence in claim construction, and that is all the district court did here. A33-41; *see Poly-America, L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1310 (Fed. Cir. 2004) (citing, *inter alia*, the patent's title in construing a claim preamble as a limitation); *Exxon Chemical Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1557 (Fed. Cir. 1995) (patent's title supported claim construction).

45

**6.    The district court consistently construed "interface device" and "interfacing."**

There is no inconsistency between the district court's construction of "interface device" and "interfacing."  A31-41, A50-51.  While the district court construed "interfacing" as "establishing communication with," it did not find that there is no physical connection between the interface device and DTRD.  PB46.  Indeed, the second connecting device of the interface device includes a physical plug or socket for attachment to a DTRD.  *See* Section V, *infra*.  Because the second connecting device interfaces, or communicates with, the DTRD, and provides the physical connection, there is no need to also construe "interfacing" to require a physical connection.

## II.    THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT BASED ON ITS CONSTRUCTION OF "DTRD."

The asserted claims provide that the interface device facilitates communication between a host device and a DTRD.  A288, 12:45; A298, 11:49.  The district court construed DTRD to mean "a device that is capable of either (a) transmitting data to or (b) transmitting data to and receiving data from the host device when connected to the host device by the interface device"—the *exact* construction Papst proposed.  A48.  Despite getting the construction it advanced before the district court,

Papst now contests this construction in attempting to reverse summary
judgment of non-infringement on the Camera Manufacturers' DTRD
Motion.  As a matter of law, however, Papst is estopped from
challenging the construction it proposed below.  Papst's arguments also
should be rejected on the merits, if the Court elects to consider them.

## A. Papst Persuaded the District Court to Adopt the Construction of DTRD That It Now Challenges, and Never Proposed Its Current Construction Below.

In response to Papst's motion for reconsideration of its initial
claim construction order, the district court adopted word-for-word the
construction of DTRD that Papst proposed.  A48; A1676.  Papst cannot
now challenge that construction on appeal to attack the subsequent
district court summary judgment ruling.  *See LizardTech, Inc. v. Earth
Res. Mapping, Inc.*, 424 F.3d 1336, 1341 (Fed. Cir. 2005) (a party that
"agreed to the district court's construction . . . cannot now argue [on
appeal] against that claim construction simply because it resulted in an
adverse ruling on summary judgment"); *accord, e.g. Key Pharms. v.
Hercon Labs.*, 161 F.3d 709, 715 (Fed. Cir. 1998) ("The impropriety of
asserting a [claim construction] position which the trial court adopts
and then complaining about it on appeal should be obvious on its face,

and litigants hardly need warning not to engage in such conduct."). This Court, therefore, need not entertain Papst's arguments concerning the construction of "DTRD."

Papst also cannot advocate a new claim construction on appeal that it never proposed to the district court. Although Papst's opening brief never actually proposes a precise construction for "DTRD," it nonetheless takes issue with the "when connected to the host device by the interface device" part of the district court's construction, thereby suggesting a construction that omits that phrase. PB47-53. But Papst never argued below that the phrase should be omitted.[10] Rather, in responding to the DTRD summary judgment motion, Papst argued that the Camera Manufacturers had "improperly interpreted" the "when connected" clause. A2786-2809. This Court has made clear that "a party may not introduce new claim construction arguments on appeal."

---

[10] While Papst initially proposed a construction of "DTRD" that did not include the phrase "when connected to the host device by the interface device," Papst never objected to the Camera Manufacturers' inclusion of that phrase in their proposed construction. A1476; A1488; A2488-2490. And, as discussed above, Papst then affirmatively endorsed a construction with that phrase in seeking reconsideration.

*E.g.*, *Digital-Vending*, 672 F.3d at 1273 (quoting *Conoco, Inc. v. Energy & Evntl. Int'l, L.C.*, 460 F.3d 1349, 1358-59 (Fed. Cir. 2006)).

## B. Papst's New Proposed Construction Is Unsupported by Intrinsic Evidence.

If the Court reaches the merits of Papst's arguments on the DTRD construction, then it should hold that the construction is appropriate. Those arguments rest on a misunderstanding of the district court's construction, the patent's disclosure, and the basis for the construction.

*First*, Papst's argument misstates the district court's construction. According to Papst, the district court construed DTRD to "require that it 'does not transmit data to the interface device *until* the interface device is connected to the [host] computer.'" PB47 (emphasis in original). The district court, however, construed the term as "a device that is *capable of* either (a) transmitting data to or (b) transmitting data to and receiving data from the host device *when connected to the host device* by the interface device." A48; *see also* A44 ("[w]hat is at issue, however, is the communication *capability* between the invented interface device and a data transmit/receive device, . . . ."). The construction thus does *not* preclude a DTRD from transmitting data to an interface device *when* it is *not connected* to a computer. However,

49

because the accused products lacked the capability of transmitting data from a DTRD to the host computer when connected to the computer, the district court granted summary judgment of non-infringement: "Because the [alleged DTRDs] *cannot* transmit data to a computer when connected to a computer by an Accused Camera operating in MSC mode, the [alleged DTRDs] do not meet the 'data transmit/receive device' claim limitation." A144.

Likewise, Papst wrongly claims that the district court's DTRD construction requires a specific use. PB52-53. As explained above, the construction simply requires that the DTRD be *capable* of transmitting data to a computer through an interface device when all three devices are connected. This Court has recognized that "there is nothing unusual or improper in construing device claims to require particular functionality." *Nazomi Commc'n, Inc. v. Nokia Corp.*, 739 F.3d 1339, 1344 (Fed. Cir. 2014). The decisions relied on by Papst are inapposite because they do not address limitations directed to a device's capability. *See* PB52-53.

*Second*, Papst also mis-describes the disclosed invention. Papst argues, incorrectly, that the specification discloses an interface device

that can store data from the DTRD indefinitely until the device is connected to a computer. PB49. The portions of the specification Papst cites, however, do not support this argument. PB49-50. Rather, they merely state that the interface device "simulates" a hard disk drive for purposes of communication with the host device (A285, 5:6-20), and that the interface device may store software instruction files that control how the interface device presents data received from the DTRD (A286, 7:32-67; A84). The specification nowhere discloses indefinite storage by the interface device of data from a DTRD. To the contrary, the patent repeatedly states that the object of the invention is to provide a "high data transfer rate" between a DTRD and a computer. A280, Abstract; 283-284, 3:25-28, 4:23-27, 4:30-36. This would not be achieved if data were stored in the interface device.[11]

*Third*, Papst misstates the district court's reasoning in arguing that the court "apparently" construed DTRD to require a chronological order of communication in view of the "first" and "second" connecting

---

[11] Rather, the specification teaches that the data is stored only on the host device (computer), after the high speed data transfer through the interface device. "The only limitation to long-term data transfer at high speed is therefore imposed exclusively by the speed and the size of the *mass storage device of the host device*." A286, 8:55-58.

device terms.  PB50-51.  The district court never stated that its construction of DTRD was in any way based on the claims' use of the terms "first" and "second."  A44-48.

In the same vein, Papst argues that the district court improperly based the DTRD construction on the title of the patent.  PB51.  On the contrary, as explained above in Argument Section I.C.3.e, it is not error for courts to consider a patent's title in claim construction.  Further, the district court considered the title of the patent as merely one of many rationales in the intrinsic evidence supporting its construction.  A46-47.

*Fourth*, contrary to Papst's argument, the district court's DTRD construction is consistent with the doctrine of claim differentiation.  PB51-52.  Dependent claim 3–which Papst relies on–recites a "buffer to buffer data to be transferred between the data transmit/receive device and the host device."  A289, 13:19-22.  The patent explains that the buffer helps to synchronize data transfer between the DTRD and interface device, and between the interface device and the host device, when the two transfer rates are different.  A286-287, 7:26-29; 9:8-12.  Claim 1, from which claim 3 depends, does not require this buffer and, therefore, is broader in scope.  For example, claim 1 can be practiced

without a buffer when the transfer rates are the same for the DTRD-to-interface device connection and for the interface device-to-host connection.

Even though the buffer limitation differentiates the scope of claims 1 and 3, Papst argues that claim differentiation dictates that claim 1 must not require the DTRD, interface device, and host to be connected together. PB51-52. Claim 1, however, expressly requires all three devices to be "attached to" to each other. A288-289, 12:64-13:3 (" . . . when receiving an inquiry from the host device as to a type of a device *attached to* the multi-purpose interface of the host device, sends a signal, regardless of the type of the data transmit/ receive device *attached to* the second connecting device of the interface device . . .") This is not "optional," but is the configuration required by the claim language. PB51-52.

For the foregoing reasons, the district court's DTRD construction is correct, and the district court's DTRD summary judgment of non-infringement should be affirmed.

## III. THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT BASED ON ITS CONSTRUCTION OF "INPUT/OUTPUT [STORAGE] DEVICE CUSTOMARY IN A HOST DEVICE."

The asserted claims recite that the interface device be configured so that it "signals to the host device that it is an *input/output [storage] device customary in a host device*."[12]  A288-89, 13:61-14:8; A298, 11:59-67.  The district court properly construed that limitation to mean "a data input/output [storage] device that was normally present within the chassis of most commercially available computers at the time of the invention."  A76.  Papst's arguments to the contrary are without merit and should be rejected on multiple grounds.

*First*, in assuming that the claimed device can be *inside or outside* of a host device, Papst ignores the explicit language of the claim limitation, which explicitly recites an "input/output [storage] device customary *in* a host device."  A288-89; A298 (emphasis added).  This Court "indulge[s] a 'heavy presumption' that a claim term carries its ordinary and customary meaning." *Starhome GmbH v. AT&T Mobility LLC*, 743 F.3d 849 (Fed. Cir. 2014) (quoting *Teleflex, Inc. v. Ficosa N.*

---

[12] "Input/output" is in the '399 patent's claims, while "storage" is in the '499 patent's claims.  The difference is immaterial here.

54

*Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002)). Here, Papst has not come close to overcoming that presumption; the district court properly concluded that "in" means "in." Contrary to Papst's suggestion (PB56) the district court correctly considered the meaning of "in" in the context of the entire limitation:

> [T]he interface device "signals to the host device that it is an input/output device customary in a host device." The phrase "customary in a host device" refers to the immediately antecedent noun "device"; there is no other antecedent word that the phrase reasonably could modify. Thus, the input/output must be "customary in a computer." And the word "in" should be construed in accordance with its ordinary meaning to mean "within" . . . .

A75.

*Second*, Papst's argument would render the term "in" superfluous, contrary to this Court's precedents. *See, e.g., Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*, 672 F.3d 1270, 1275 (Fed. Cir. 2012) (*Phillips* reinforced the importance of construing claim terms "such that words in a claim are not rendered superfluous"). "In" does not mean "out," as the district court properly observed, and the claims must be construed as written, not as Papst wishes they had been written. A76; *see also K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999)

("courts can neither broaden nor narrow claims to give the patentee something different than what he has set forth.").

*Third*, Papst's argument is premised on an incorrect reading of the specification, which nowhere suggests that the applicant adopted a meaning of "in" broader than its ordinary meaning. *See Phillips*, 415 F.3d at 1312-13, 1317. Notably, the portion of the specification relied upon by Papst identifies different types of *drivers* (*i.e.*, software) that are customary in a host device, such as "*drivers for* hard disks, *for* graphics devices, or *for* printer devices." PB55 (quoting A284, 4:27-39). Papst argues that this passage provides that external devices, such as printers, are "customary in" a computer. To the contrary, this passage merely states that *their drivers* are "customary in" a computer. Indeed, the patent discloses that the object of the patented invention is achieved by using drivers that are "found *in* practically all host devices." A284 at 4:27-30. The district court properly gave this limitation its ordinary meaning. A75.

*Fourth,* Papst tries to create the false impression that the district court's construction excludes the preferred embodiment by selectively quoting the specification's discussion of *exemplary* embodiments. PB55.

But the ellipses in Papst's block quote misleadingly redacts the key statement: "the hard disk driver is utilized in the preferred embodiment of the interface device of the present invention." A284, 4:34-36; *see also* A285, 6:33-35 ("it assumes that the interface device 10 according to a preferred embodiment of the present invention is a hard disk drive"). Because it is undisputed that hard disk drives were present inside the chassis of most commercially available computers at the time of the invention (see PB55), the preferred embodiment is not excluded by the claim construction.

*Fifth*, Papst's argument that the ordinary meaning of "in" covers things inside and outside (PB57), defies common sense. Papst's unsupported attorney argument cannot substitute for record evidence. *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1581 (Fed. Cir. 1989).

Because Papst contests the "input/output [storage] device customary in a host device" summary judgment based solely on claim construction grounds, and because the district court's construction of that term is correct, the judgment of non-infringement should be affirmed.

## IV. THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT OF NON-INFRINGEMENT BASED ON "SIMULATING A VIRTUAL FILE SYSTEM" FOR ALL OF PAPST'S CLAIMS UNDER THE '449 PATENT.

As explained above (*see* Counter-Statement of the Case, Sections A.2 and 3), the district court's rulings on the memory card, "DTRD," and "customary in a host device" summary judgment motions dispose of all infringement claims against all accused products. If the Court affirms those three rulings, it can stop there. The remaining issues provide additional grounds for affirmance. In particular, the "simulating a virtual file system" summary judgment ruling, if affirmed, would result in a complete judgment of non-infringement on all of Papst's claims under the '449 patent. As the only portion of the memory card summary judgment ruling at issue on appeal applies to the '449 patent, affirming this judgment obviates the need to decide issue I. A105. Accordingly, if the Court affirms on issues II-IV, then all accused products do not infringe.

Each claim of the '449 patent requires an interface device arranged for "simulating a virtual file system" to the host. The district court properly construed "simulating a virtual file system" as:

appearing to be a system of files, including a directory structure, that is not physically stored; rather, it is constructed or derived from existing data when its contents are requested by an application program so that it appears to exist as a system of files from the point of view of the host device. A97.[13]

In challenging that construction, Papst argues that virtual files and a virtual file system are physically stored on the interface device. PB58-59. Files and a file system such as that, however, would be *real*, not *virtual*. The district court's construction is consistent with the intrinsic evidence and the ordinary meaning of the terms, whereas Papst's argument that physical files and file systems somehow qualify as "virtual" would improperly vitiate the claim limitation.

## A. The District Court's Construction Is Supported by the Intrinsic Record.

The interface device of the '449 patent causes a stream of data received from a DTRD to appear to a host device as if it were a real file stored on a real storage device (such as a hard drive). *See, e.g.,* A295, 6:1-22. To accomplish that, the interface device presents a "virtual" file system to the host device—*i.e.*, it emulates a real file system to the host device. The "virtual files" are not physically stored in memory (as real

---

[13] The term "virtual files" was construed consistently. A97.

files are).  Rather, when requested by the host device, a "virtual file" is constructed, on the fly, from the stream of data received from the DTRD and made to appear to the host device as if it were physically stored in memory.  *See, e.g.,* A295, 5:55-67.

As shown in the graphic below, and as detailed in the specification, when the host device sends a "read" command to the interface device, the host thinks it is reading a file, and the interface device maintains this ruse by transferring data from the DTRD to the host device in the form of a "real-time input" file.  *See, e.g.,* A295, 5:55-6:22.  The 'real-time input' files are the "virtual files" referenced in the specification.



Thus, the virtual files and virtual file system of the '449 patent
are not physically stored in memory; they instead are made to appear to
the host device as if they were.

## B. The District Court's Construction Is Consistent With the Ordinary Meaning, and the Patentee Did Not Act as His Own Lexicographer.

The district court properly found that the term "virtual file
system" was well understood by those of ordinary skill in the art, and
the patent's use of the term is consistent with the ordinary meaning.
*See* A83-85. Technical dictionaries from the relevant time period
confirm that "virtual" was defined in the art consistent with how the

term is used in the patent. *See* A83 (New IEEE Dictionary of Electrical & Electronics Terms (5th ed.) 1993, defining "virtual record" as "[a] record that appears to be but is not physically stored; rather, it is constructed or derived from existing data when its contents are requested"); *accord* A84-85. The district court was free to rely on these dictionaries to ascertain the ordinary meaning. *Starhome GmbH v. AT & T Mobility LLC*, 743 F.3d 849, 856 (Fed. Cir. 2014) (citing *Phillips*, 415 F.3d at 1322-23 (Fed. Cir. 2005)).

The ordinary and customary meaning for claim terms should control, absent "only two exceptions": "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). These exceptions are not present here. "To act as its own lexicographer, a patentee must 'clearly set forth a definition of the disputed claim term' other than its plain and ordinary meaning." *Id.* at 1365 (citing *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)). Papst points to nothing in the intrinsic record clearly defining the "virtual" term at issue as having

62

any meaning other than its ordinary meaning. The use of "virtual" set off by quotation marks in the specification merely highlights the "virtual" nature of the emulated hard drive and files disclosed in the patent. While quotations *may* indicate that "what follows is a definition," (*see Sinorgchem Co. v. ITC*, 511 F.3d 1132, 1136 (Fed. Cir. 2007), cited by Papst at PB62), here an express definition never follows the word set off by quotation marks.[14]

## C. The District Court's Construction Is Consistent with the Dependent Claims.

Contrary to Papst's argument, the dependent claims that recite aspects of the virtual files—such as a "configuration file," "batch files or executable files"—are consistent with and further support the district court's construction. As a preliminary matter, the summary judgment of non-infringement at issue here was granted based on the term "simulating a virtual file system," found only in the '449 patent. A199. Accordingly, dependent claims 7-10 of the '399 patent, which include the term "virtual files," are irrelevant to this point.

_____

[14] The passages cited by Papst at PB58 reference simulating a hard disk, not—as Papst represents—storing data on the interface device.

*First*, as the district court correctly found regarding claims 7-10 of the '399 patent, the recited "configuration file" and "batch files or executable files" are software instructions that are "stored" on the interface device to allow it to "present data as if in real files . . . , but which files are, in actuality, non-existent." A84. These software instructions enable the interface device to present the "virtual file system" to the host. The data of the "virtual files" and "virtual file system," however, is not physically stored; rather, it is constructed from the stream of data coming from the DTRD when requested by the host. *See supra.*

*Second*, claim 7, from which claims 8-10 depend, recites that "virtual files . . . are present on the *signaled* hard disk drive." A289. Papst concedes that the *signaled* hard disk drive is not real, but rather refers to a signal "that indicates that a hard disk drive has been attached to the computer (when that is not actually the case)." A1485. In other words, the virtual files in claims 7-10 "are present on the signaled hard disk drive," which in reality does not exist.

*Third*, Papst is wrong in arguing that the district court's construction makes dependent claim 2 of the '449 patent broader than

independent claim 1. Claim 2 does not recite that the "virtual file system" is stored in memory. Rather, it is the "routine," not the "executable or batch file," that is recited to be "stored in the memory": "directory structure has a configuration file . . . or an executable or a batch file for conducting a *routine stored in the memory* . . . or a data file . . . or a help file." A298. In addition, as discussed above, the configuration, batch and executable files recited in claim 2 are merely software instructions that help present the "virtual files" and "virtual file system" to the host as if they were real. Nothing in claim 2 implies that the data of the "virtual files" and "virtual file system" (*i.e.*, data to be received by the DTRD) is stored on the interface device.

### D. Papst's Current Position Is Inconsistent with Its Position Before the District Court and Therefore Has Been Waived.

Before the district court, Papst argued that *real* files can only exist on rotating media, and that "virtual" files appear to be on rotating media but are not. A1491; A1501. That position has no basis in the intrinsic record or in any extrinsic evidence. It apparently was concocted by Papst to provide an infringement theory under the '449

patent, simply because the accused digital cameras use flash memory rather than rotating media such as a hard drive.

Before this Court, in contrast, Papst takes a completely new and inconsistent position—*i.e.*, "'virtual files' and 'virtual file system' are simply the files and file directory stored on the interface device." PB58. This substantially broadens the claim scope compared to Papst's prior construction by removing any reference to rotating media and instead covering *any* files stored in the interface device's memory, no matter the type of memory.

This Court has held that "a party may not introduce new claim construction arguments on appeal or alter the scope of the claim construction positions it took below." *Conoco, Inc. v. Energy & Envtl. Int'l , L.C.*, 460 F.3d 1349, 1358-59 (Fed. Cir. 2006). Indeed, this Court has refused to consider on appeal a position that is "substantially different in scope from the construction" sought below or to "review an argument not presented first to the trial court." *See, e.g., Digital Vending Services v. The University of Phoenix*, 672 F.3d 1270, 1274 (Fed. Cir. 2012). Because Papst's new arguments on the "virtual file"

limitations were never presented to the district court, this Court should decline to review them.

### E.    Even If Considered, Papst's New Position Is Meritless.

Papst's new position also is inconsistent with the intrinsic evidence and, like Papst's original position, would lead to a nonsensical result.  The "virtual files" and "virtual file system" in the specification cannot just be files and file directories stored on the interface device, as Papst argues.  That would entirely miss the point of the virtual file system in the patent.  Under Papst's construction, if a device has files and a file directory physically stored in memory, then it would have "virtual files" and a "virtual file system."  In other words, Papst's construction would mean that *real* files and file systems are "virtual."

Papst's proposed claim construction underscores the utter lack of merit in its infringement theory for the '449 patent.  The accused digital cameras use among the most common files and file system in the world (FAT file system), which has existed since the 1970s.  *See, e.g.,* A183, A190.  As the district court recognized, if the FAT file system were deemed a "virtual file system," the claim term would be rendered

meaningless and there would be no distinction between *real* and *virtual*

files and file systems.  A191.

## V.  THE DISTRICT COURT PROPERLY CONSTRUED "SECOND CONNECTING DEVICE."

### A.  The Flexible Nature of the Interface Device Requires That the Second Connecting Device Support Attachment of a Plurality of DTRDs.

The district court properly construed "second connecting device"

to require "a physical plug or socket for permitting a user readily to

attach and detach the interface device with a plurality of dissimilar

data transmit/receive devices."[15]  A55-57.  As explained above, the claim

language requires the interface device to be connectable to many

different types of DTRDs.  Every claim, for example, includes the

limitation "regardless of the type of the [DTRD] attached to the second

connecting device."  A288-289, 12:42-14:65; A298-299, 11:45-14:42.  The

second connecting device must be a physical connector to allow for the

attachment of different DTRDs.

The specification confirms that the claimed interface device is a

flexible, universal solution, which requires that the second connecting

---

[15] Papst does not challenge the additional elements of the district court's "second connecting device" construction.

68

device permit attachment of different DTRDs. *See Telcordia Technologies, Inc. v. Cisco Systems*, 612 F.3d 1365, 1374-75 (Fed. Cir. 2010) ("By repeatedly describing the inventive DTDM mechanism as one that only allows one packet per frame, the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest execution or restriction.").

The disclosed embodiments further confirm that the second connecting device is a hardware device, namely, a physical plug or socket used to attach and detach DTRDs to the interface device. Two of the key components of the patented system are a first connecting device and a second connecting device. Figure 2 (A282) depicts a "detailed block diagram of an interface device 10 according to the *present invention*" (A287, 9:15-16):



As shown by Figure 2, the disclosed connecting devices consist of physical connectors—both the host device and DTRD use physical "pin" connectors. The first connecting device "contains . . . an SCSI interface 1220 and a 50-pin SCSI connector 1240 for attachment to an SCSI interface present on most host devices or laptops." A287, 9:30-33. The second connecting device, in turn, "comprises 8 BNC inputs with the calibration relay 1505, a block 1510 with 8 device amplifiers with an overvoltage protection of ±75 V, this block being connected in turn to 8 sample/hold (S&H) circuits 1515." A287, 9:49-51; A282, Fig. 2, item 1505. Below are illustrations of such connectors:



Figure 8
External SCSI Connectors



A1514; A1534. These connectors are hardware plugs or sockets used to attach and detach hardware devices (as are the other connectors described in the patent).

Papst's argument that the DTRD may be permanently fixed to the interface device relies on Figure 1 divorced from the remainder of the specification, including Figure 2, which "shows a detailed block diagram of an interface device 10 according to the *present invention*." A287,

9:15-16. Figure 1 shows the "second connecting device" as functional block 15. The second connecting device communicates with the DTRD, as Papst notes, "by means of an output line 16 . . . ." Figure 2 shows the second connecting device as comprising at least blocks 1505, 1510, and 1515 (A287, 9:49-52), and the output line 16 is attached via the BNC connector 1505 located between the interface device and the DTRD. The patent also notes that the "first connecting device 12 of Fig. 1" comprises a 50-pin SCSI connector, as shown in Figure 2, for attachment to most host devices, necessarily via host line 11. A287, 9:29-33. Thus, communication lines 11 and 16 on which Papst relies are in fact detachable at the first and second connecting devices, respectively.

Given these teachings, it was proper for the district court to conclude that the second connecting device is a physical plug or socket that can be attached to a DTRD. This Court consistently has held that a patentee cannot construe claims to "enlarge what is patented beyond what the inventor has described as the invention." *See Inpro II Licensing, S.A.R.L. v. T-Mobile USA, Inc.*, 450 F.3d 1350, 1355 (Fed. Cir. 2006) (quoting *Netword, LLC v. Central Corp.*, 242 F.3d 1347, 1352

(Fed. Cir. 2001). In *Inpro II Licensing*, the district court construed "host interface" as "a direct parallel bus interface," which is a 50-pin connector used to connect devices to a host computer, a PDA in the patent. *Id.* at 1353. The patentee argued that the district court erred by limiting "host device" to only a single form of interface because multiple types of interfaces were described in the patent. *Id.* This Court rejected the patentee's argument, noting that other interfaces were addressed with respect to different aspects of the invention, not the host interface. *Id.* at 1355. This Court also noted that the patent described the direct parallel bus interface as an important feature. *Id.*

The *Inpro II Licensing* holding controls here. The patents-in-suit describe only a hardware plug or socket as the means to connect devices, such as the DTRD. And the patents stress the flexibility and universality of the invention, thereby permitting it to connect to a plurality of dissimilar DTRDs. It would be improper to now broadly construe "second connecting device" to enlarge what is described as the invention. *See Inpro II Licensing*, 450 F.3d at 1355.

Papst's argument that the district court "wrongly viewed the invention through a hardware lens," PB65, ignores that the patent itself

describes the "second connecting device" as hardware:  "any

modification of *the specific hardware* symbolized by the second

connecting device 15 can be implemented essentially without changing

the operation of the interface device according to the present invention."

A286, 8:34-38.  The patent also identifies the hardware components of

the preferred embodiment.  A287, 9:49-60.  Indeed, Papst's own

proposed constructions for "second connecting device" were also

hardware.  *See, e.g.*, A55.  Therefore, it was proper for the district court

to construe the second connecting device as hardware.  Moreover, as the

district court observed:  "Papst confuses 'interfacing' and 'connecting

device.'  The former concerns 'the protocols for the electrical signals and

the formatting of the data,' Tr. 2:12 (Papst), while the latter is a

physical device in these Patents."   A55.

## B.    Papst Would Improperly Read Out the Claim Term "Connecting."

In arguing that the district court erred in construing "second

connecting device," Papst seeks to define the limitation by its recited

function.  PB65 ("the plain meaning of 'device' here does not require a

separate structure" but instead "only signifies something 'designed to

serve a purpose or perform a function'").  But Papst has never argued

that this limitation is subject to Section 112(f), which governs all claims "for performing a specified function without the recital of structure." And even if it were, it would be construed to cover the corresponding *structure* disclosed in the specification, namely the BNC connectors.

Papst also errs by focusing only on the word "device" to the exclusion of the rest of the claim limitation, which recites a "second connecting device for interfacing the interface device with the [DTRD]." PB65. To give meaning to the entire claim limitation, the "connecting device" must be a physical connector for attaching the interface device to a DTRD. *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) ("[C]laims are interpreted with an eye toward giving effect to all terms in the claim.").

Similarly, Papst ignores here, as it does throughout its brief, the claim language "regardless of the type of the [DTRD] attached to the second connecting device." This claim limitation further requires the "second connecting device" to permit attachment to a plurality of DTRDs.

## VI. THE UN-APPEALED SANCTIONS ORDER AND SUMMARY JUDGMENT RULINGS ARE NOT BEFORE THIS COURT.

In the final sentence of its Argument, Papst argues that four additional district court orders should be vacated: one sanctioning Papst and three others granting partial summary judgment. PB66-67. Papst erroneously suggests that these orders rise or fall on the challenged claim constructions. The summary judgment ruling relating to HP is addressed separately in its appeal brief, and Papst failed to present a "developed argument" challenging the remaining three orders. *Monsanto Co. v. Scruggs*, 459 F.3d 1328, 1341 (Fed. Cir. 2006), *cert. denied*, 127 S.Ct. 2062 (2007). A single conclusory sentence is not enough. *SynQor, Inc. v. Artesyn Techs., Inc.*, 709 F.3d 1365, 1385 (Fed. Cir. 2013); *Ajinomoto Co., Inc. v. Int'l Trade Comm'n*, 597 F.3d 1267, 1278 (Fed. Cir. 2010). Papst "did not raise the issue[s] in the 'Statement of the Issues,' cited no legal support," and for the Sanctions Order "did not even recite the standard of review." *Whitserve v. Computer Packages, Inc.*, 694 F.3d 10, 19 n.4 (Fed. Cir. 2012). Accordingly, this Court should find waiver.

During the district court proceedings, Papst shifted and obfuscated its infringement theories and ignored Court orders requiring

that it serve focused discovery requests.  A242-246.  Observing these

tactics firsthand, the district court concluded that Papst "inten[ded] to

engage in protracted and expensive litigation," trying to bully the

Camera Manufacturers into settling.   A211.  After several warnings,

the district court responded to Papst's "total lack of respect for Court

orders" (A213) by issuing a "reasonable sanction," requiring Papst to

"live with its [infringement contentions] as they stand without further

modification."  A210.  Vacating that ruling would allow Papst to escape

the consequences of its sanctionable conduct, and would undermine the

district court's authority to maintain orderly proceedings, even though

the sanctions were not predicated on the constructions being appealed.

Contrary to Papst's suggestion here, Papst was sanctioned

because it completely "flouted" the district court's order to provide

infringement contentions.  A210-215.[16]  Papst's claim charts "utterly

fail[ed] to identify specifically where in the accused products the claims

limitations are found."  A212.  Papst "intentionally obfuscate[d]" its

---

[16] The order requiring infringement contentions was modeled after
Northern District of California Patent Rule 3-1, albeit more lenient
because Papst was not required to crystallize its infringement
contentions until almost one year after claim construction.  A209.

infringement theories with the "intent[] to engage in protracted and expensive litigation." A210-211. Given Papst's "blatant disregard of the Court's Order, which permeates its entire [infringement contentions]," (A211) barring further amendment of those contentions was an "appropriate sanction." *See O2 Micro*, 467 F.3d at 1369.

The district court cited the Sanctions Order, among other bases, in granting the two summary judgment motions addressed here. A219-271. These orders do not depend on the challenged claim constructions. The district court granted STW/SOA's motion for summary judgment of non-infringement as to the 47 Wrongfully Accused Products that STW/SOA never made, used, sold, offered for sale or imported in/into the United States based on STW/SOA's confidential business records and sworn statements. A219-220; A236-238. Papst presented no infringement theory for the Table 15 products under *any* claim construction. A1130-1136; A253. Because any changes to the claim constructions being challenged on appeal would not affect the district court's orders regarding these summary judgment motions, these orders should be affirmed.

# CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Dated: May 5, 2014                                   Respectfully submitted,

                                              /s/ Rachel M. Capoccia
                                              Rachel M. Capoccia
                                              ALSTON & BIRD LLP
                                              333 South Hope Street
                                              16th Floor
                                              Los Angeles, California 90071
                                              (213) 576-1037

                                              Thomas W. Davison
                                              ALSTON & BIRD LLP
                                              950 F Street N.W.
                                              Washington, D.C.  20004
                                              (202) 239-3933

                                              *Attorneys for Appellees*
                                              *Panasonic Corporation (formerly*
                                              *known as Matsushita Electric*
                                              *Industrial Co., Ltd.); Victor*
                                              *Company of Japan, Ltd.;*
                                              *Panasonic Corporation of North*
                                              *America; JVC Company of*
                                              *America*

  /s/ Steven J. Routh
Steven J. Routh
Sten A. Jensen
John R. Inge
T. Vann Pearce, Jr.
ORRICK, HERRINGTON &
SUTCLIFFE LLP
1152 15th Street, N.W.
Washington, DC 20005
(202) 339-8400

*Attorneys for Appellees*
*FUJIFILM Corporation;*
*FUJIFILM North America*
*Corporation*

\* Steven J. Routh consented to
the use of his electronic
signature herein

  /s/ Patrick J. Kelleher
Patrick J. Kelleher
DRINKER BIDDLE & REATH
LLP
191 North Wacker Drive
Suite 3700
Chicago, IL 60606-1698
(312) 569-1375

*Attorneys for Appellees Samsung*
*Techwin Co., Ltd.; Samsung*
*Opto-Electronics America, Inc.*

\* Patrick J. Kelleher consented
to the use of his electronic
signature herein

/s/ David L. Witcoff

David L. Witcoff
Marc S. Blackman
JONES DAY
77 W. Wacker Drive
Chicago, Illinois 60601
(312) 782-3939

*Attorneys for Appellees Nikon Corporation and Nikon Inc.*

\* David L. Witcoff consented to the use of his electronic signature herein

/s/ Richard de Bodo

Richard de Bodo
Andrew V. Devkar
BINGHAM MCCUTCHEN LLP
The Water Garden
Suite 2050 North
1601 Cloverfield Boulevard
Santa Monica, CA 90404-4082
(310) 255-9070

*Attorneys for Appellees Olympus Corporation; Olympus Imaging America Inc.*

\* Richard de Bodo consented to the use of his electronic signature herein

# United States Court of Appeals
## for the Federal Circuit

*Papst Licensing v. FujiFilm Corporation,* 2014-1110

## CERTIFICATE OF SERVICE

I, John C. Kruesi, Jr, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by ALSTON & BIRD LLP, Attorneys for Appellee, Panasonic Corporation to print this document. I am an employee of Counsel Press.

On **May 5, 2014** counsel for Appellee has authorized me to electronically file the foregoing **BRIEF OF DEFENDANTS-APPELLEES OTHER THAN HEWLETT-PACKARD COMPANY** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to all counsel registered as CM/ECF users, including any of the following:

Alan M. Fisch (Principal Counsel)
R. William Sigler
John T. Battaglia
Thomas C. Chen
FISCH HOFFMAN SIGLER LLP
5335 Wisconsin Avenue NW
Eighth Floor
Washington, DC 20015
(202) 362-3500
alan.fisch@fischllp.com
bill.sigler@fischllp.com
john.battaglia@fischllp.com
thomas.chen@fischllp.com
Counsel for Appellant

Charlene M. Morrow
(Principal Counsel)
Fenwick & West, LLP
801 California Street
Silicon Valley Center
Mountain View, CA 94041
650-988-8500
cmorrow@fenwick.com
Counsel for Appellee Hewlett-Packard Company

Bryan A. Kohm
David D. Schumann
Fenwick & West, LLP
555 California Street
12th Floor
San Francisco, CA 94104
415-875-2300
bkohm@fenwick.com
dschumann@fenwick.com
Counsel for Appellee Hewlett-
Packard Company

Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court, via Federal Express, within the time provided in the Court's rules.

May 5, 2014                                        /s/ John C. Kruesi, Jr.
                                                   Counsel Press

# CERTIFICATE OF COMPLIANCE
# UNDER FEDERAL RULES OF APPELLATE PROCEDURE
# 32(A)(7) AND FEDERAL CIRCUIT RULE 32

Counsel for Defendants-Appellees Panasonic Corporation (formerly known as Matsushita Electric Industrial Co., Ltd.) and Victor Company of Japan, Ltd certifies that the brief contained herein has a proportionally spaced 14-point typeface, and contains 13947 words, based on the "Word Count" feature of Microsoft Word 2010, including footnotes and endnotes.  Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b), this word count does not include the words contained in the Certificates of Interest, Table of Contents, Table of Authorities, and Statement of Related Cases.

Dated:      May 5, 2014                    Respectfully submitted,

                                           /s/ Rachel M. Capoccia
                                           Rachel M. Capoccia