2014-1110

# United States Court of Appeals for the Federal Circuit

## IN RE PAPST LICENSING DIGITAL CAMERA PATENT LITIGATION

**PAPST LICENSING GMBH & CO. KG,**

*Plaintiff-Appellant*,

v.

**FUJIFILM CORPORATION, FUJIFILM NORTH AMERICA CORPORATION** (formerly known as Fujifilm USA, Inc.),
**HEWLETT-PACKARD COMPANY, JVC COMPANY OF AMERICA, NIKON CORPORATION, NIKON, INC., OLYMPUS CORP., OLYMPUS IMAGING AMERICA INC., PANASONIC CORPORATION** (formerly known as Matsushita Electric Industrial Co., Ltd.),
**PANASONIC CORPORATION OF NORTH AMERICA, SAMSUNG OPTO-ELECTRONICS AMERICA, INC., SAMSUNG TECHWIN CO.,** AND **VICTOR COMPANY OF JAPAN, LTD.**

*Defendants-Appellees*.

Appeal from the United States District Court for the District of Columbia in
No. 1:07-mc-00493-RMC, Judge Rosemary M. Collyer

## STW's AND SOA's PETITION FOR PANEL REHEARING

Patrick J. Kelleher
DRINKER BIDDLE & REATH LLP
191 North Wacker Dr. #3700
Chicago, IL 60606
312-569-1000
*Attorneys for Samsung Techwin Co., Ltd. and*
*Samsung Opto-Electronics America, Inc.*

2 March 2015

# CERTIFICATE OF INTEREST

Counsel for Defendants-Appellees certifies the following:

1. The full names of every party represented by me are:

Samsung Techwin Co., Ltd, and Samsung Opto-Electronics America, Inc.

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Samsung Techwin Co., Ltd, and Samsung Opto-Electronics America, Inc.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented:

Samsung Electronics Co., Ltd.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented in the trial court or agency or are expected to appear in this court are:

Patrick J. Kelleher, Brian C. Rupp, Jasmine R. Patel, David J. Moorhead* (Drinker Biddle & Reath LLP)

*Former Drinker Biddle & Reath LLP attorney

2 March 2015             By: _____ */s/ Patrick J. Kelleher* _____

Patrick J. Kelleher

*patrick.kelleher@dbr.com*
**DRINKER BIDDLE & REATH LLP**
191 North Wacker Dr. #3700
Chicago, IL 60606
312-569-1000
312-569-3000 (fax)

*Attorneys for Appellees Samsung Techwin Co., Ltd. and Samsung Opto-Electronics America, Inc.*

# **<u>TABLE OF CONTENTS</u>**

I.   Points of Fact or Law Overlooked or Misapprehended by the Court .............1

II.  Argument ........................................................................................2

# TABLE OF CITATIONS

**Page**

CASES

*Monsanto Co. v. Scruggs*, 459 F.3d 1328 (Fed.Cir. 2007) .......................................3

*Oracle America, Inc. v. Google Inc*., 750 F.3d 1339 (Fed.Cir. 2014) ......................4

*SmithKline Beecham Corp. v. Apotex Corp*., 439 F.3d 1312 (Fed.Cir. 2006) ..........3

*SynQor, Inc. v. Artesyn Techs. , Inc.*, 709 F.3d 1365 (Fed.Cir. 2013) ......................3

STATUTES

35 U.S.C. § 271 .........................................................................................................2

## Points of Law or Fact Overlooked or
## Misapprehended by the Court

The District Court granted a motion for summary judgment of noninfringement brought by Samsung Techwin Co., Ltd ("STW") and Samsung Opto-Electronics America, Inc. ("SOA") as to 47 accused cameras because they had never been sold in the United States by STW and SOA. *See* A219-38 (Opinion and Order regarding STW's and SOA's Motion for Summary Judgment of Noninfringement as to Wrongfully Accused Products). This summary judgment order did not involve or concern claim construction in any manner. Papst's Notice of Appeal appealed from this order. But Papst's briefing made no argument for vacatur of it. Accordingly, it was not "undisputed that if [the Court] reject[s] all five of the challenged constructions, the summary-judgment orders must be vacated." Slip op. at 9. Rather, the panel's claim constructions rulings did not impact this order. Accordingly, STW and SOA respectfully request that the panel rehear this issue in order to amend its opinion to clarify that this summary judgment order was not vacated and stands affirmed.

Undersigned counsel conferred by telephone with counsel for Papst to explain the basis for this Petition and to inquire whether Papst would consent to the requested relief. Counsel responded that Papst would not.

## Argument

In the District Court, Papst accused many "Samsung"-brand cameras of infringement. But 47 of those cameras were never made, used, sold, offered-for-sale, or imported in/into the United States by Samsung Techwin or Samsung Opto-Electronics America (hereafter collectively "STW"), the only two "Samsung" entities who are parties.[1]  STW moved for partial summary judgment of noninfringement on those grounds. The District Court granted the motion. A219-38. The decision did not turn on the construction of any claim term or involve claim construction in any manner. It turned on the fact that Papst had no evidence that STW had committed any act cognizable under 35 U.S.C. § 271 with regard to the 47 cameras.

When Papst filed its Notice of Appeal, it included this summary judgment order among the orders appealed from. (Dkt. # 1 at ¶ 14). However, Papst's Principal Brief did not present any argument for reversal of the District Court's decision. Moreover, this decision was not mentioned in Papst's "Statement of the

---

[1]     Papst moved in the District Court for leave to amend its complaint to add additional "Samsung" parties and additional product categories. *See* A567 (District Court Dkt. # 377). Papst's motion was denied, *see* A575 (District Court Dkt. # 424 & # 425), and Papst appealed from that order. Papst also did not address this order in its briefs and presented no developed argument for vacatur or reversal. For this reason and because the panel's decision "vacate[d] the summary judgment of non-infringement," slip op. at 3, the panel's decision did not disturb the District Court's ruling on this motion.

- 2 -

Issues." (Br. at 6). In fact, Papst references the decision only twice, in footnotes 38 and 152. (Br. at 26, 66-67). Neither of these footnotes provides an argument for vacatur or reversal of this summary judgment order, and neither of them suggest that this order hinged, in any way, on the District Court's or this Court's claim construction rulings.

Indeed, the District Court's decision as to the 47 cameras in no way turned on its claim construction rulings. Although the District Court discussed Papst's Final Infringement Contentions ("FICs") and Papst's disobeying Court orders, the District Court granted STW's motion because Papst's contention for induced infringement in the FICs was insufficiently specific to satisfy Papst's basic discovery and disclosure obligations. A231-32. Nowhere on appeal has Papst even attempted to confront, let alone refute, the bases for and appropriateness of the District Court's decision as to the 47 cameras.

A party must support its appeal from an order by "developed argument" for reversal in its Principal Brief. *Monsanto Co. v. Scruggs*, 459 F.3d 1328, 1341 (Fed.Cir. 2007). A single conclusory sentence is not enough. *SynQor, Inc. v. Artesyn Techs., Inc.*, 709 F.3d 1365, 1385 (Fed.Cir. 2013). "[A]rguments raised in footnotes are not preserved." *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed.Cir. 2006). Moreover, a party who fails to present a developed argument for reversal forfeits any challenge to that issue on appeal, and

it should be affirmed.  *See Oracle America, Inc. v. Google Inc.*, 750 F.3d 1339, 1377, n.17 (Fed.Cir. 2014).

Here, Papst did not present a developed argument why the District Court's order granting partial summary judgment as to the 47 cameras was wrong, and that order should be affirmed.  The panel's decision focuses on claim construction and vacates the grants of summary judgment related to reversed constructions.[2] Because the order concerning the 47 cameras did not involve claim construction and because Papst presented no argument or basis to vacate or reverse this order, STW respectfully requests that the panel rehear this issue in order to amend its opinion and affirm this order.

2 March 2015                         Respectfully submitted,
                                     SAMSUNG TECHWIN CO., LTD. and
                                     SAMSUNG OPTO-ELECTRONICS AMERICA, INC.

                                     By:  _____ */s/ Patrick J. Kelleher* _____
                                                          Patrick J. Kelleher
                                                     *patrick.kelleher@dbr.com*

---

[2]     The panel's decision observed that "[i]f some aspects of the summary-judgment orders are unaffected by our claim-construction rulings, they may, to that extent, be reinstated on remand."  Slip op. at 9 n.2.  By filing this petition concerning only the judgment on the 47 cameras, STW does not acknowledge or imply that other judgments are not also affirmable independent of claim construction, nor waive the ability to address the other judgments on remand.  Those other judgments, however, also impact other Camera Manufacturers.  Accordingly, STW has brought this narrow petition regarding a judgment that did not involve or relate to claim construction issues on appeal and that concerns STW alone.

**DRINKER BIDDLE & REATH LLP**
191 North Wacker Dr. #3700
Chicago, IL 60606
312-569-1000

*Attorneys for Appellees Samsung Techwin Co., Ltd. and
Samsung Opto-Electronics America, Inc.*

# ADDENDUM

# United States Court of Appeals
# for the Federal Circuit

_____

**IN RE PAPST LICENSING DIGITAL CAMERA
PATENT LITIGATION**

_____

**PAPST LICENSING GMBH & CO. KG,**
*Plaintiff-Appellant,*

v.

**FUJIFILM CORPORATION, FUJIFILM NORTH
AMERICA CORPORATION (formerly known as
Fujifilm USA, Inc.), HEWLETT-PACKARD
COMPANY, JVC COMPANY OF AMERICA, NIKON
CORPORATION, NIKON, INC., OLYMPUS CORP.,
OLYMPUS IMAGING AMERICA INC., PANASONIC
CORPORATION (formerly known as Matsushita
Electric Industrial Co., LTD.), PANASONIC
CORPORATION OF NORTH AMERICA , SAMSUNG
OPTO-ELECTRONICS AMERICA, INC., SAMSUNG
TECHWIN CO., AND VICTOR COMPANY OF JAPAN,
LTD.,**
*Defendants-Appellees.*

_____

2014-1110

_____

Appeal from the United States District Court for the
District of Columbia in No. 1:07-mc-00493-RMC, Judge
Rosemary M. Collyer.

_____

Decided: February 2, 2015

————————

JOHN T. BATTAGLIA, Fisch Hoffman Sigler LLP, of Washington, DC, argued for plaintiff-appellant. With him on the brief were ALAN M. FISCH and ROY WILLIAM SIGLER.

RACHEL M. CAPOCCIA, Alston & Bird LLP, of Los Angeles, California, argued for defendants-appellees. With her on the brief for Panasonic Corporation, et al., was THOMAS W. DAVISON. On the brief for Fujifilm Corporation, et al., were STEVEN J. ROUTH, STEN A. JENSEN, JOHN R. INGE and T. VANN PEARCE, JR, Orrick, Herrington & Sutcliffe LLP, of Washington, DC. On the brief for Nikon Corporation, et al., were DAVID L. WITCOFF and MARC S. BLACKMAN, Jones Day, of Chicago, Illinois. Of counsel was MARRON ANN MAHONEY. On the brief for Olympus Corporation, et al., were RICHARD DE BODO and ANDREW V. DEVKAR, Bingham McCutchen LLP, of Santa Monica, California. Of counsel was SUSAN BAKER MANNING, Morgan, Lewis & Bockius LLP, of Washington, DC. On the brief for Samsung Techwin, Co., et al., was PATRICK J. KELLEHER, Drinker Biddle & Reath LLP, of Chicago, Illinois.

CHARLENE M. MORROW, Fenwick & West LLP, of Mountain View, California, argued for defendant-appellee Hewlett-Packard Company. With her on the brief were DAVID D. SCHUMANN and BRYAN A. KOHM, of San Francisco, CA.

————————

Before TARANTO, SCHALL, and CHEN, *Circuit Judges.*

TARANTO, *Circuit Judge.*

Papst Licensing GmbH & Co. KG owns U.S. Patent Nos. 6,470,399 and 6,895,449. The written descriptions

are largely the same, the '449 patent having issued on a divisional application carved out of the application that became the '399 patent. The focus of both patents is an interface device for transferring data between an input/output data device and a host computer. The current appeal involves whether certain digital-camera manufacturers infringe Papst's patents. The district court, applying and elaborating on its constructions of various claim terms, entered summary judgment of non-infringement, concluding that none of the manufacturers' accused products at issue here come within any of the asserted claims. Papst appeals five claim constructions. We agree with Papst that the district court erred in the identified respects. We therefore vacate the summary judgment of non-infringement.

## Background

The '399 and '449 patents, both entitled "Flexible Interface for Communication Between a Host and an Analog I/O Device Connected to the Interface Regardless the Type of the I/O Device," disclose a device designed to facilitate the transfer of data between a host computer and another device on which data can be placed or from which data can be acquired. '399 patent, Title and Abstract.[1] The written description states that, while interface devices were known at the time of the invention, the existing devices had limitations, including that they tended to require disadvantageous sacrifices of data-transfer speed or of flexibility as to what host computers and data devices they would work with. '399 patent, col. 1, line 15, to col. 2, line 13. Thus, "standard interfaces"—those "which, with specific driver software, can be used

---

[1]    Because the '399 and '449 patents have very similar written descriptions, we cite the '399 patent, and refer to a "written description" in the singular, except when there are important differences between the two.

with a variety of host systems"—"generally require very sophisticated drivers" to be downloaded onto the host computer, but such drivers "are prone to malfunction and . . . limit data transfer rates." *Id.* at col. 1, lines 22–28. On the other hand, with interface devices that "specifically match the interface very closely to individual host systems or computer systems," "high data transfer rates are possible," but such interface devices "generally cannot be used with other host systems or their use is very ineffective." *Id.* at col. 1, line 67, to col. 2, line 7. The fast, host-tailored interface also "must be installed inside the computer casing to achieve maximum data transfer rates," which is a problem for laptops and other space-constrained host systems. *Id.* at col. 2, lines 8–13.

The patents describe an interface device intended to overcome those limitations. It is common ground between the parties that, when a host computer detects that a new device has been connected to it, a normal course of action is this: the host asks the new device what type of device it is; the connected device responds; the host determines whether it already possesses drivers for (instructions for communicating with) the identified type of device; and if it does not, the host must obtain device-specific drivers (from somewhere) before it can engage in the full intended communication with the new device. In the patents at issue, when the interface device of the invention is connected to a host, it responds to the host's request for identification by stating that it is a type of device, such as a hard drive, for which the host system already has a working driver. By answering in that manner, the interface device induces the host to treat it—and, indirectly, data devices on the other side of the interface device, no matter what type of devices they are—like the device that is already familiar to the host. Thereafter, when the host communicates with the interface device to request data from or control the operation of the data device, the host uses its native device driver, and the interface device

translates the communications into a form understandable by the connected data device.  *See id.* at col. 3, line 25, to col. 5, line 32.

The interface device of the invention thus does not require that a "specially designed driver" for the interface device be loaded into a host computer—neither a "standard" one to be used for a variety of hosts nor one customized for a particular host.  *Id.* at col. 5, line 15.  Instead, it uses a host's own familiar driver, which (as for a hard drive) often will have been designed (by the computer system's manufacturer) to work fast and reliably.  The result, says the written description, is to allow data transfer at high speed without needing a new set of instructions for every host—"to provide an interface device for communication between a host device and a data transmit/receive device whose use is host device-independent and which delivers a high data transfer rate."  *Id.* col. 3, lines 25–28.

Claim 1 of the '399 patent sets forth the specifics of the claimed interface device:

1.  An ***interface device*** for communication between a host device, which comprises drivers for input/output devices customary in a host device and a multi-purpose interface, and a ***data transmit/receive device***, the data transmit/receive device being arranged for providing analog data, comprising:

a processor;

a memory;

a first connecting device for interfacing the host device with the interface device via the multi-purpose interface of the host device; and

***a second connecting device*** for interfacing the interface device with the data transmit/receive

device, the second connecting device including a
sampling circuit for sampling the analog data
provided by the data transmit/receive device and
an analog-to-digital converter for converting data
sampled by the sampling circuit into digital data,

wherein the interface device is configured by the
processor and the memory to include a first com-
mand interpreter and a second command inter-
preter,

wherein the first command interpreter is config-
ured in such a way that the command interpreter,
when receiving an inquiry from the host device as
to a type of a device attached to the multi-purpose
interface of the host device, sends a signal, *re-
gardless of the type of the data trans-
mit/receive device attached* to the second
connecting device of the interface device, to the
host device which signals to the host device that it
is an *input/output device customary in a host
device*, whereupon the host device communicates
with the interface device by means of the driver
for the input/output device customary in a host
device, and

wherein the second command interpreter is con-
figured to interpret a data request command from
the host device to the type of input/output device
signaled by the first command interpreter as a da-
ta transfer command for initiating a transfer of
the digital data to the host device.

*Id.* col. 12, line 42, to col. 13, line 13 (emphases added to
highlight language of particular significance to the issues
on appeal). Claim 1 of the '449 patent is similar, but it
does not require the data device to be an analog device,
and it requires the interface device to respond to the host
that it is a storage device. '449 patent, col. 11, line 46, to

col. 12, line 6.  A few other differences between the claims are discussed *infra*.

Beginning in 2006, Papst sent letters to major digital-camera manufacturers, accusing them of infringing its patents and requesting that they enter into negotiations to license its inventions.  One of the manufacturers sued Papst in the United States District Court for the District of Columbia, seeking a declaratory judgment of non-infringement.  In 2008, Papst filed infringement suits against the camera manufacturers in multiple district courts across the country.  A multi-district litigation panel then consolidated all cases and transferred them to the D.C. district court.

In preparation for claim construction, the district court received a "tutorial" from the parties' experts, whom the court asked to be "neutral" and who addressed the background of the technology, how the claimed inventions work, and other technical understandings, but not whether any particular term in the patent or the prior art has a particular meaning in the relevant field.  J.A. 1596–97; *see In re Papst Licensing GmbH & Co. KG Litig.*, No. 07-mc-00493 (D.D.C. June 6, 2008) (order specifying scope of tutorial).  The court then heard extensive argument from counsel, but it declined to admit expert testimony or to rely on an expert declaration from Papst, stating that "the intrinsic evidence—the claims, the specification, and the prosecution history—provide the full record necessary for claims construction."  J.A. 1597.

The court issued its initial claim-construction order in 2009.  It issued a modified claim-construction order after additional briefing.  The district court then ruled on eight summary-judgment motions filed by the camera manufacturers, treating the manufacturers as two distinct groups—one group consisting of Hewlett-Packard Co. ("HP"), the other of all other accused manufacturers ("Camera Manufacturers").  As detailed in our discussion

*infra*, the court's rulings on summary judgment clarified what it understood some of its claim constructions to mean. With respect to the accused products now at issue, the combined effect of the court's summary-judgment rulings was a determination of non-infringement by the Camera Manufacturers and HP. The court ultimately entered a final judgment of non-infringement under Federal Rule of Civil Procedure 54(b) for both HP and the Camera Manufacturers, *In re Papst Licensing GmbH & Co. KG Litig.*, 987 F. Supp. 2d 58, 62 (D.D.C. 2013), having severed certain other claims, *In re Papst Licensing GmbH & Co. KG Litig.*, 967 F. Supp. 2d 63, 65 n.2, 71 (D.D.C. 2013).

Papst appeals, arguing that the court's summary-judgment orders should be reversed because they rely on incorrect constructions of five different terms from the '399 and '449 patents. We have jurisdiction under 28 U.S.C. § 1295(a)(1).

## DISCUSSION

We review the grant of summary judgment of non-infringement de novo, applying the same standard used by the district court. *See Bender v. Dudas*, 490 F.3d 1361, 1366 (Fed. Cir. 2007). The infringement inquiry, which asks if an accused device contains every claim limitation or its equivalent, *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997), depends on the proper construction of the claims. *See Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (en banc). In this case, we review the district court's claim constructions de novo, because intrinsic evidence fully determines the proper constructions. *See Teva Pharm. U.S.A. Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 840–42 (2015). As we have noted, the district court relied only on the intrinsic record, not on any testimony about skilled artisans' understandings of claim terms in the relevant field, and neither party challenges that approach.

Two clarifications simplify our analysis so that it is enough for us to address the correctness of the district court's constructions. First, the parties have not presented developed arguments other than arguments about the choice, on each issue, between the district court's construction and the alternative construction by Papst that the district court rejected. Specifically, for none of the issues have the parties identified a third possibility and both elaborated an argument for such a possibility and explained the importance to the case of considering it. Second, it is undisputed that if we reject all five of the challenged constructions, the summary-judgment orders must be vacated.[2]

We reject the five constructions at issue. We do so following our familiar approach to claim construction. "We generally give words of a claim their ordinary meaning in the context of the claim and the whole patent document; the specification particularly, but also the prosecution history, informs the determination of claim meaning in context, including by resolving ambiguities; and even if the meaning is plain on the face of the claim language, the patentee can, by acting with sufficient clarity, disclaim such a plain meaning or prescribe a special definition." *World Class Tech. Corp. v. Ormco Corp.*, 769 F.3d 1120, 1123 (Fed. Cir. 2014); *see Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–17 (Fed. Cir. 2005) (en banc); *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). We apply, in particular, the principle that "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' per*

---

[2]    If some aspects of the summary-judgment orders are unaffected by our claim-construction rulings, they may, to that extent, be reinstated on remand.

*Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998), adopted by *Phillips*, 415 F.3d at 1316.

On remand, this case will proceed in light of our claim-construction reversals.  For that reason, it is worth reiterating that a district court may (and sometimes must) revisit, alter, or supplement its claim constructions (subject to controlling appellate mandates) to the extent necessary to ensure that final constructions serve their purpose of genuinely clarifying the scope of claims for the finder of fact.  *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1359 (Fed. Cir. 2008); *Pfizer, Inc. v. Teva Pharm., USA, Inc.*, 429 F.3d 1364, 1377 (Fed. Cir. 2005).  That determination is to be made as the case moves forward.

## A

Papst first challenges the district court's "memory card" summary judgment as relying on an improper construction of the term "interface device" found in the preamble of claims in both patents.  The district court construed the term as limiting the claims' coverage to "stand-alone device[s]."  *In re Papst Licensing GmbH & Co. KG Litig.*, 670 F. Supp. 2d 16, 31–35 (D.D.C. 2009) ("*Claim Constr. Op.*").  In particular, the court held that "the data transmit/receive device must be a separate device from the" claimed "interface device."  *Id.* at 33.  Subsequently, in granting summary judgment, the court explained that what it meant by this requirement is that the interface device may not be "a permanent part of either the data transmit/receive device or the host device/computer," by which it meant that it may not be located permanently inside the housing of either of those two devices.  *In re Papst Licensing GmbH & Co. KG Litig.*, 932 F. Supp. 2d 14, 18, 21–22 (D.D.C. 2013).

1

As a threshold matter, the Camera Manufacturers argue that we should not reach this issue because the district court's summary-judgment rulings do not depend on the construction of "interface device." They invoke principles stated in *SanDisk Corp. v. Kingston Technology Co.*, 695 F.3d 1348, 1354 (Fed. Cir. 2012) ("[W]here, as here, a party's claim construction arguments do not affect the final judgment entered by the court, they are not reviewable."), and *Mangosoft, Inc. v. Oracle Corp.*, 525 F.3d 1327, 1330 (Fed. Cir. 2008) ("we review judgments, not opinions"). We conclude, however, that the premise for invoking the cited principles is missing here.

The district court's summary-judgment order regarding memory-card devices shows that its final judgment did turn on the construction of "interface device." The primary reason the court gave for rejecting Papst's infringement contentions was that "[t]he Court made clear in its claims construction opinion that the interface device is separate and distinct from the data transmit/receive device." *Papst*, 932 F. Supp. 2d at 21. The court cited repeatedly to the portion of its claim-construction opinion addressing "interface device." *E.g.*, *id.* at 18 (citing *Claim Constr. Op.* at 32–35); *id.* at 21 (citing *Claim Constr. Op.* at 34–35); *id.* at 23 (citing *Claim Constr. Op.* at 31–35). And in its opening paragraphs, the court summarized the Camera Manufacturers' position on summary judgment as relying on that same construction. *Id.* at 16 ("Because the invented 'interface device' is a stand-alone device that is separate and apart from any data transmit/receive device, the Camera Manufacturers contend that a memory card cannot be both part of the interface device and a data transmit/receive device . . . ."). In these circumstances, we will consider whether the district court's construction is correct.

2

We hold that the term "interface device" is not limited
to a "stand-alone device" in the district court's sense
relied on for summary judgment: a device that is physical-
ly separate and apart from, and not permanently attached
to, a data device (or a host computer).    Representative
claim 1 of the '449 patent begins, "[a]n interface device . . .
comprising the following features," and then recites the
necessary components of the claimed interface device.  *See*
*supra* pp. 5–6.  Neither the claim language nor the rest of
the intrinsic record supports the district court's exclusion
of a device that performs the required interface functions
and is installed permanently inside the housing of a
particular data device.

The district court did not suggest that the term "in-
terface device" by itself implied its construction.  Rather,
it heavily relied for its construction on its specific claim
requirement that (to paraphrase) a part of the interface,
upon receiving an identification query from the host
computer, send a signal identifying itself as a host-
familiar device "regardless of the type of the data trans-
mit/receive device attached to the second connecting
device of the interface device." '449 Patent, col. 11, lines
63–65.  The court concluded that the "regardless" phras-
ing in the claim "strongly indicates that various kinds of
data transmit/receive devices could be attached" to the
interface device. *Claim Constr. Op.* at 32–33.

But the court's construction does not follow from its
understanding of the "regardless" phrase.  Nothing about
that phrase forbids any single instance of the claimed
interface device to be permanently attached to a particu-
lar data device.  It readily allows permanent attachment
of each copy of the interface device to a particular data
device, prescribing only that the same host-responsive
identification signal be sent regardless of what type of
data device the interface device is attached to.  That is,

there can be multiple copies of the same interface device, with each permanently attached to one of a variety of different data devices. The claim language, in short, does not limit "interface device" to a device not permanently attached to (readily detachable from) a data device.

The written description does not do so either. Critically, the district court's construction, like the Camera Manufacturers' arguments supporting it, fundamentally mistakes what the description makes clear is the stated advance over the prior art. As explained *supra*, the described advance over the prior art was the elimination of the need for special drivers to be placed on the host computer by instead having the host computer use a single, already-present, fast, reliable driver to communicate with the interface and, through it, with the data device, which need not be of a particular type. Nothing about that advance suggests exclusion of a permanent attachment of such an interface to the data device—a construction that is "unmoored from, rather than aligned with" what is described as the invention's advance. *World Class Tech.*, 769 F.3d at 1124.

No passage in the written description says otherwise. The Camera Manufacturers cite passages that describe the invention as "sufficiently flexible to permit attachment of very different electrical or electronic systems to a host device." '399 patent, col. 1, lines 56–59; *id.*, col. 7, lines 45–49 (touting the "present invention" as allowing "an interface between a host device and almost any data transmit/receive device"). But that language does not speak to the connection between the interface and data devices. Rather, it addresses the connection between the host computer and data devices, a connection facilitated by the interface device. Even as to that, the passage may be read merely to assert the capability of one-to-one host-to-data-device connections, with the data device chosen from a wide variety of possible data devices. But even if it is read to assert a capability of one-to-many host-to-data-

device connections, it says nothing to assert that a given copy of the interface device must be attachable to different data devices either simultaneously or seriatim.

The Camera Manufacturers also point to the written description's statement that "[i]n the interface device according to the present invention an enormous advantage is to be gained . . . in separating the actual hardware required to attach the interface device to the data transmit/receive device from the communication unit," '399 patent, col. 8, lines 23–28 (figure numbers removed)—which they say means that permitting multiple data devices to attach to a single interface device is an integral part of the invention. But that passage does not support the district court's limiting construction, and not only because it is part of the description of several preferred embodiments, rather than a clear declaration of what constitutes an essential part of the invention.

The full passage makes clear that the "hardware separation" is not between the interface and data device, but within the interface device itself—between the second connecting device, on one hand, and "the digital signal processor, the memory means[,] and the first connecting device," on the other. *Id.*, col. 8, lines 28–29 (figure numbers removed). When the passage states that this separation "allows a plurality of dissimilar device types to be operated in parallel in identical manner," it immediately adds: "Accordingly, *many interface devices* can be connected to a host device which then sees many different 'virtual' hard disks." *Id.* col. 8, lines 30–33 (emphasis added). The suggestion is that distinct interface devices are used for distinct data devices, each interface device incorporating a "second connecting device" that works for its particular data device. This suggestion works against, rather than supports, the Camera Manufacturers' view of multiple data devices attached to a single (separate) interface device, whether at once or in sequence, for it readily accommodates a one-to-one permanent attachment of an

interface device to a data device.  And the parallel opera-
tion of dissimilar device types is possible because the
invention causes the host computer to use its native
software to transfer data at high speed and because the
invention creates a uniform interface from the host's
perspective for controlling the data device.  *See*, *e.g.*, '399
patent, col. 7, lines 45–49.

Finally, nothing in the prosecution history supports
the district court's narrow construction.  The Camera
Manufacturers point to an amendment that changed the
claim language from "the type of a device attached" to "a
type of device attached" in what became claim 1 of the
'399 patent.  J.A. 391.  But there was no accompanying
explanation of the change, which, on its face, does nothing
more than the "regardless" language of claim 1 does, and
that language, as we have explained, does not forbid
permanent attachment.  The Camera Manufacturers also
note that the applicant stated that "it is clear that the
data transmit/receive device *to be connected to* the second
connecting device of the subject interface provides analog
data."  J.A. 389 (emphasis added).  Nothing in that state-
ment precludes the connection from being permanent once
made.

## B

Papst also appeals the district court's construction of
the phrase "second connecting device," which appears in
both patents.[3]  The district court construed the term as "a
physical plug or socket for permitting a user readily to

---

[3]    The '399 and '449 patent claims use slightly dif-
ferent language, but neither party suggests that the
difference affects the proper construction of "second
connecting device."  Nor does either party argue that the
claim language is means-plus-function language under
what is now codified as 35 U.S.C. § 112(f).

attach and detach the interface device with a plurality of dissimilar data transmit/receive devices." *Claim Constr. Op.* at 43.  The parties' arguments over the proper construction of "second connecting device" largely mirror the arguments over whether the interface device must be readily detachable from the data device.  *See* Camera Manufacturers' Br. 68 ("As explained above, the claim language requires the interface device to be connectable to many different types of [data devices]."); HP's Br. 3 ("Core to the invention is the ability to attach the interface device to different or multiple data transmit/receive devices.").  The district court likewise tied its construction of "second connecting device" to its understanding that the interface device must be a stand-alone one readily attachable to and detachable from multiple data devices.  *See Claim Constr. Op.* at 42, 44.

We conclude that the district court's construction of "second connecting device" is incorrect largely for reasons we have given for rejecting the "interface device" construction.  The district court did not conclude, and the Camera Manufacturers and HP have not meaningfully argued, that the ordinary meaning of "second connecting device" (or "connecting device") requires a physical plug, socket, or other structure that permits a user to readily attach and detach something else.  The principal basis for the district court's inclusion of those requirements was the basis we have already rejected—the view that other claim language and the written description require the interface device (of which the second connecting device is a part, according to the claims) to be stand-alone.  For "second connecting device," the district court added that a preferred embodiment from the written description includes pin connectors and other socket-like structures.  *See Claim Constr. Op.* at 42–44.  But we see nothing to take that embodiment outside the reach of the usual rule that claims are generally not limited to features found in what the written description presents as mere embodi-

ments, where the claim language is plainly broader. *Phillips*, 415 F.3d at 1323.

## C

The district court's construction of the phrase "data transmit/receive device" is challenged here as well. The district court construed the phrase to mean "a device that is capable of either (a) transmitting data to or (b) transmitting data to and receiving data from the host device *when connected to the host device by the interface device*." *Claim Constr. Op.* at 39 (emphasis added). The parties' dispute focuses on the "when connected" portion of the court's construction, which the district court understood to require that the data device be capable of transmitting data while connected to the host, that is, able to begin transmitting after the interface device is connected to the host device. *In re Papst Licensing GmbH & Co. KG Litig.*, 967 F. Supp. 2d 1, 6–7 (D.D.C. 2013). We reject that portion of the court's construction.

### 1

The Camera Manufacturers initially argue that Papst may not challenge the district court's construction because "the district court adopted word-for-word the construction of [data transmit/receive device] that Papst proposed." Camera Manufacturers' Br. 47. That is an unreasonable characterization of what occurred in the district court. The Camera Manufacturers, not Papst, proposed the bulk of the court's construction, including the "when connected" language. *Claim Constr. Op.* at 37. Papst proposed a construction *without* the "when connected" language, opposing inclusion of that language. *Claim Constr. Op.* at 37 (noting "Papst objects to any construction" but argues in the alternative "that the term may be construed 'for context' as 'a device that receives input and provides data to the interface device'" (citation omitted)). When the district court adopted the Camera Manufacturers' "when connected" language, Papst noticed that the

adopted construction, in a respect distinct from the "when connected" dispute, rested on a misunderstanding of a patent figure, and it filed a motion identifying the alleged error and asking the court to modify the adopted construction in the one respect needed to correct it. Papst limited its motion to that point, leaving the other, already-contested aspects of the claim construction untouched. The district court agreed with Papst and fixed the construction as urged. *Claim Constr. Op.* at 39.

The Camera Manufacturers argue that Papst, having unsuccessfully opposed a construction with the "when connected" language, lost its ability to challenge the adoption of the "when connected" language by not re-raising the issue when seeking a modification based on a newly identified issue. *See* Oral Argument at 33:44–34:10 (arguing that Papst forfeited its challenge because it requested a modification without "reserv[ing] the ability to go back later to ask for [its] old construction"). This contention is wholly without merit. In the district court, Papst opposed the construction it now opposes, and it was not required to state its opposition twice. Papst could not have given the district court the impression that it suddenly supported the construction when, in seeking a modification, it limited its request to a manifest error resting on a plain misapprehension of the record, rather than rehashing the broader arguments on claim construction that the court had fully considered. Papst's limited approach in seeking a modification was, indeed, commendably consistent with the general anti-repetition principle governing requests for reconsideration. *See Isse v. Am. Univ.*, 544 F. Supp. 2d 25, 29–30 (D.D.C. 2008) ("'[W]here litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again.'" (citation omitted)).

2

We conclude that the data transmit/receive device recited in the preamble to the claims of the '399 and '449 patents need not be capable of communicating "when connected to the host device by the interface device." (The parties do not dispute that this language, though appearing in the preamble, is a claim limitation. We proceed on the assumption that it is.) Nothing about the ordinary meaning of "data transmit/receive device" suggests any temporal constraint on the transferring of data. As the words imply, a data transmit/receive device is a device that may transmit or receive data; those words offer no information about when data is transferred.

To the extent that some claim language does suggest a temporal constraint, the focus is always on communications between *the interface device* and *the host computer*, not between the data device and the host computer. For example, the interface device must send a signal to the host device "when receiving an inquiry from the host device as to a type of a device attached." '399 patent, col. 12, line 65, to col. 13, line 3. After the interface device signals to the host device, the interface device must be able to receive communications from the host device. *Id.* col. 13, lines 5–8 ("whereupon the host device communicates with the interface device"). But the claims of both patents are silent as to when the interface device must communicate with the data device. If anything, claim 1 of the '399 patent tends to suggest that data can already have been transferred to the interface device from the data device before it is requested by the host computer: claim 1 says that the interface device must "interpret a data request command from the host device . . . as a data transfer command for initiating a transfer of *the digital data* to the host device." *Id.* col. 13, lines 10–13 (emphasis added). Because claim 1 is limited to interface devices that receive analog data from a data device and then convert it to digital data, the quoted language seems to

contemplate that the initiated transfer is of pre-converted digital data stored on the interface device. Regardless, the claim language nowhere requires the interface device to be capable of receiving data that moves from the data device after connecting to the host.

The Camera Manufacturers offer no persuasive argument for why the claim language or any other part of the specification or prosecution history requires that a data device be able to communicate with the host "when connected to the host device by the interface device." At most they assert, without significant elaboration, that the "specification nowhere discloses indefinite storage by the interface device of data from a [data device]." Camera Manufacturers' Br. 51. This assertion does not suggest a disclaimer of any sort; it merely asserts an absence of something in the written description. But that absence must be judged in light of what is plainly present in the written description—a disclosure of memory that is part of the interface device. '399 patent, col. 5, line 52, and Figure 1. And we have been given no reason at all to infer, from the absence of more express statements regarding use of the disclosed memory in the interface device for temporary storage of data from the data device, that the claim should be read to include a textually unsupported "when connected" requirement regarding transfer of data to or from the data device.

The district court, when construing the data-device claim language, focused almost exclusively on whether the data device must be capable of both sending and receiving data. It did not lay out good reasons for adopting the "when connected" requirement as part of its construction. *Claim Constr. Op.* at 37–39; *In re Papst Licensing GmbH & Co. KG Litig.*, 624 F. Supp. 2d 54, 75–77 (D.D.C. 2009). Finding no basis for that requirement, we conclude that the court erred by including that phrase in its construction.

D

The next issue we discuss is the district court's construction of the phrase "virtual files" in the '399 patent and the phrase "simulating a virtual file system" in the '449 patent.[4]  The district court construed "virtual files" as "files that appear to be but are not physically stored; rather, they are constructed or derived from existing data when their contents are requested by an application program so that they appear to exist as files from the point of view of the host device." *Claim Constr. Op.* at 60.  The court construed "simulating a virtual file system" almost identically as "appearing to be a system of files, including a directory structure, that is not physically stored; rather, it is constructed or derived from existing data when its contents are requested by an application program so that it appears to exist as a system of files from the point of view of the host device." *Id.* at 61.  The district court understood its construction to limit the "virtual files" of the "virtual file system" to files "not physically stored on the interface device," whose content is data "originating from the data transmit/receive device." *In re Papst Licensing GmbH & Co. KG Litig.*, 967 F. Supp. 2d 48, 56 (D.D.C. 2013).  We reverse.

The core of the parties' disagreement is whether the "existing data" from which the virtual files are "construct-

---

[4]    The district court did not rely on the construction of "virtual files" in the '399 patent in any of its summary-judgment motions.  The term appears only in dependent claims 7–10 of that patent, which the district court never addressed because it found that the accused devices lack elements of the independent claims.  Nevertheless, because the construction of "virtual files" is bound up with the construction of "simulating a virtual file system" in the '449 patent, and because the construction may be important on remand, we address both phrases now.

ed or derived" may already exist on the interface device
when the host requests the virtual file. Although framed
in different ways by the parties, the disagreement is
similar to the dispute over the "when connected" language
of the district court's construction of "data trans-
mit/receive device." The Camera Manufacturers argue
that "virtual files" cannot contain data already existing
physically on the claimed interface device; rather, the
data in such files must be present only on the data device,
not the interface device, when requested by the host
device. Papst argues that the phrases "virtual files" and
"simulating a virtual file system" allow the virtual files to
be derived from data already physically stored on the
interface device when the host requests the relevant
virtual file.

We agree with Papst. Nothing in the claims or writ-
ten description *limits* a "virtual file" to one whose content
is stored off the interface device, though it includes such
files. "Virtual" conveys some kind of *as if* action, one
thing emulating another; the term was prominently used
that way in the computer field at the time of the inven-
tions here. *See CardSoft v. Verifone, Inc.*, 769 F.3d 1114,
1117–18 (Fed. Cir. 2014) (discussing Java Virtual Ma-
chine in patent dating to 1998). What is crucial is how
the patent identifies the emulation. In the present con-
text, the emulation does not turn on whether data in a
"virtual file" is physically located in the interface device or
a data device when the host seeks it.

As we have explained, what the patent describes as
the advance over prior art is the use of a host-native
driver for obtaining access to data even when the data is
not actually on a device of the type for which that driver
was designed—in the featured example, not actually on a
hard drive. Nothing in the written description suggests
that this depends on what non-host physical memory
units hold the data as long as the interface device mimics
the data-organizational tools expected by the host-native

driver, such as directory structures for a hard-disk drive, to enable the host to gain access to it. To impose the district court's requirement tied to physical location is to introduce a meaning of "virtual" that is foreign to what is described as the invention's advance. An interface device file is "virtual" in the only way relevant to the invention when it organizes data in a manner that allows the host to use its native driver to gain access to the data even if the data is not actually on a device for which the native driver was designed—regardless of where else that data may be.

The written description uniformly speaks of the "virtual" files in such data-organization terms, regardless of physical location in the memory of the interface device or on the data device. For example, the interface device may "simulate[] a hard disk with a root directory whose entries are 'virtual' files," though no hard disk is in fact present. '399 patent, col. 6, lines 1–3. Similarly, in one embodiment the host device, during its boot sequence (system startup), sends a request to which the interface device responds with "a virtual boot sequence," causing the host to "assume[] that the interface device according to a preferred embodiment of the present invention is a hard disk drive." *Id.* lines 26–35 (figure numbers removed). Thereafter, the interface device supplies the host with data-organization responses consistent with a hard disk, including "the directory structure of the virtual hard disk." *Id.* lines 40–44. The written description elsewhere states that, "due to the simulation of a virtual mass storage device, the data is managed and made available in such a way that it can be transferred directly to other storage media, *e.g.*[,] to an actual hard disk of the host device." *Id.* col. 8, lines 50–55; *see also id.* col. 12, lines 26–29 ("[B]y simulating a virtual mass storage device, the interface device is automatically supported by all known host systems without any additional sophisticated driver software." (figure numbers removed)). While all of these

examples discuss the organizational structure that the interface device conveys to the host device, not one mentions where data physically resides.

The point is reinforced by "[o]ther claims of the patent[s] in question." *Phillips*, 415 F.3d at 1314. Claim 1 of the '449 patent requires a "virtual file system including a directory structure." '449 patent, col. 12, lines 5–6. Claim 2 explains the types of files that may appear in the directory structure: "the directory structure has a configuration file . . . or an executable or a batch file . . . or a data file . . . or a help file." *Id.* col. 12, lines 8–13. Enumerating those types of files as part of the virtual file system suggests that virtual files may include data physically stored on the interface device, particularly if the interface device is stand-alone, which it may be. For example, the "help file" is "for giving help on handling the interface device." *Id.* col. 12, lines 12–13. A logical place to store such a file, as indicated by the written description, is on the interface device. *See id.* col. 11, line 37 (referring to "[h]elp files included on the interface device"). So too with a "configuration file" for "setting and controlling the functions of the interface device." *Id.* col. 12, lines 8–9. And the written description makes clear that the data for those files may be stored directly on the interface device. *See, e.g., id.* col. 6, lines 50–54 (explaining that storing files, like the configuration file, "in the memory means of the interface device" allows "any enhancements or even completely new functions of the interface device [to] be quickly implemented" (figure numbers removed)); *id.* lines 61–67 ("[I]nstallation [on the host device] of certain routines which can be frequently used . . . is rendered unnecessary as the EXE files *are already installed on the interface device and appear in the virtual root directory* . . . ." (emphasis added; figure numbers removed)). Those passages appear at column 7 of the '399 patent as well, and a similar analysis applies to claims 7–10 of the '399 patent. *See* '399 patent, col. 13, lines 33–51.

The written description does refer to one type of virtual file as a "real-time input" file, where the host computer can request a portion of the data from the real-time input file "whereupon data commences to be received via the second connecting device and data commences to be sent to the host device via the first connecting device." *Id.* col. 7, lines 17–22. The written description's discussion of real-time input files shows that a virtual file *may* be constructed from data residing on the data device. But nothing in the written description limits virtual files to that arrangement. Files whose content resides on the interface device are just as virtual in the relevant respect: they are accessible by the host's use of the same driver it would use if they were present on the actual device for which the host driver was created even when they are not.

E

Finally, Papst appeals the district court's construction of the term "input/output device customary in a host device" in the '399 patent and the term "storage device customary in a host device" in the '449 patent. The district court construed the '399 term to be a "data input/output device that was normally present within the chassis of most commercially available computers at the time of the invention." *Claim Constr. Op.* at 55. The court's construction for the '449 patent is identical, except that the words "data input/output" are replaced with the word "storage." *Id.*

When a host computer asks the claimed interface device what type of device it is, the interface device must respond that it is an "input/output device customary in a host device" so that the host will communicate with the interface device using the host's native software for that type of device. The parties disagree over whether the claims require that the device the interface device says it is be a type of device "normally present *within the chassis*" of a computer. We hold that the claims are not so

limited.  The written description makes clear that it is enough for the device to be one that was normally part of commercially available computer systems at the time of the invention.

Claim 1 of the '399 patent uses the phrase "input/output device[s] customary in a host device" three times, first in the preamble when it explains that the host device comprises "drivers for input/output devices customary in a host device," then twice when it defines how the interface device and the host computer communicate—the interface device "signals to the host device that it is an input/output device customary in a host device," thereby prompting the host to "communicat[e] with the interface device by means of the driver for the input/output device customary in a host device."  This language does not carry a plain, precise meaning of physical location inside the chassis.  The phrase "customary in a host device" is not especially precise, and it seems to emphasize what is customary, not whether the unit is inside or outside the device.  It contrasts with, for example, "customarily found in" or simply "input/output device in a host device"—which have a greater suggestion of location, though themselves perhaps not definitively so.

For these reasons, we turn to the written description, which clearly evinces the intended meaning—and meets even the standard for overriding a seemingly plain meaning of the claim language.  The written description shows that the "in" from "customary in" does not imply physical location inside a computer chassis.  Most starkly, the patent explains that "[d]rivers for *input/output devices customary in a host device* . . . are, for example, drivers for *hard disks*, for *graphics devices*[,] or for *printer devices*." '399 patent, col. 4, lines 27–30 (emphases added).  By its structure—"drivers for X are, for example, drivers for 1, 2, and 3," thus equating X with 1, 2, and 3—the sentence clearly means that, notably, a printer device is an example of an "input/output device customary in a host

device." No one contends that a printer device was physically located inside the chassis of a computer at the time of the invention.

In addition, a preferred embodiment of the invention includes "a 25-pin D-shell connector to permit attachment to a printer interface of a host device[,] for example." *Id.* col. 9, lines 43–48 (figure numbers removed); *see also id.*, Figure 2 (illustrating the D-shell printer connector). The clear implication is that the preferred embodiment allows the interface device to connect to the printer interface of the host computer because the interface device can inform the host computer that it is a printer and that the host should communicate with it using its built-in printer drivers. We do not generally construe the claims of a patent to exclude a preferred embodiment. *Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*, 616 F.3d 1283, 1290 (Fed. Cir. 2010) ("A claim construction that excludes the preferred embodiment 'is rarely, if ever, correct and would require highly persuasive evidentiary support.'" (citation omitted)).

Further undermining the construction of "customary in a host device" as "normally found in the chassis of most commercially available computers" is the fact that the written description does not equate "host device" with "computer." To the contrary, the description uses the words "host device," "host systems," "computer," and "computer systems" more or less interchangeably. *See*, *e.g.*, '399 patent, col. 1, lines 20–21 ("host devices or computer systems are attached by means of an interface to a device"); *id.*, lines 49–50 (describing an "electronic measuring device . . . attached to a computer system"); *id.* col. 2, lines 1–7 (referring to "host systems" and "computer systems"); *id.* col. 4, line 60, to col. 5, line 32 (alternating between "host device," "host systems," "computer system," and "computer"); *id.* col. 8, lines 1–22 (similar). Even if we were to conclude that the phrase "customary in" conveys a physical location, therefore, the district

court was wrong to conclude that the physical location must be inside a computer chassis. *See Pickholtz v. Rainbow Techs., Inc.*, 284 F.3d 1365, 1373–74 (Fed. Cir. 2002) (construing "located in the computer" to mean "located in the CPU, main memory, the CPU or main memory circuit boards, or qualifying peripherals" based on the written description's repeated use of "computer" and "computer system" interchangeably).

## CONCLUSION

For the foregoing reasons, we vacate the district court's entry of final judgment and remand for further proceedings consistent with this opinion.

Costs are awarded to Papst.

## **VACATED AND REMANDED**

# United States Court of Appeals
# for the Federal Circuit

—————————————

February 3, 2015

**ERRATA**

—————————————

Appeal No. 2014-1110

**IN RE PAPST LICENSING DIGITAL CAMERA
PATENT LITIGATION**

—————————————————————————

**PAPST LICENSING GMBH & CO. KG,**

v.

**FUJIFILM CORPORATION, FUJIFILM NORTH
AMERICA CORPORATION (formerly known as
Fujifilm USA, Inc.), HEWLETT-PACKARD
COMPANY, JVC COMPANY OF AMERICA, NIKON
CORPORATION, NIKON, INC., OLYMPUS CORP.,
OLYMPUS IMAGING AMERICA INC., PANASONIC
CORPORATION (formerly known as Matsushita
Electric Industrial Co., LTD.), PANASONIC
CORPORATION OF NORTH AMERICA , SAMSUNG
OPTO-ELECTRONICS AMERICA, INC., SAMSUNG
TECHWIN CO., AND VICTOR COMPANY OF JAPAN,
LTD.,**

Decided:  February 2, 2015
Precedential Opinion

—————————————

Please make the following change:

On page two, replace the sentence

> JOHN T. BATTAGLIA, Fisch Hoffman Sigler LLP, of Washington, DC, argued for plaintiff-appellant.

with the following sentence:

> JOHN T. BATTAGLIA, Fisch Sigler LLP, of Washington, DC, argued for plaintiff-appellant.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN RE PAPST LICENSING GMBH & CO. KG
LITIGATION

Misc. Action No.  07-493 (RMC)[1]

MDL Docket No. 1880

This Document Relates To:

Papst Licensing GmbH & Co. KG v. Samsung
Techwin Co., Civ. No. 07-2088 (D.D.C.)

## OPINION REGARDING SAMSUNG'S MOTION FOR SUMMARY JUDGMENT OF NONINFRINGEMENT AS TO WRONGFULLY ACCUSED PRODUCTS

Papst Licensing GmbH & Co. KG brought suit against Samsung Techwin Co.,

Ltd., and Samsung Opto-Electronics America, Inc., for alleged infringement of Patent Nos.

6,470,399 and 6,895,449.  Defendants seek summary judgment of noninfringement on forty-

seven accused products that Defendants assert they never made, used, sold, offered, or imported

in/into the United States.[2]  The eight-page motion has occasioned a blizzard of paper but none

that effectively challenges Defendants' sworn affidavits.  In an effort to avoid summary

judgment, Papst claims indirect infringement by inducement but that claim was not sufficiently

---

[1] This Multi District Litigation currently consists of First and Second Wave Cases currently pending in this District.  The "First Wave Cases" are:  *Fujifilm Corp. v. Papst*, 07-cv-1118; *Matsushita Elec. Indus. Co., Ltd. v. Papst*, 07-cv-1222; *Papst v. Olympus Corp.*, 07-cv-2086; *Papst v. Samsung Techwin Co.*, 07-cv-2088; *Hewlett Packard Co. v. Papst*, 08-cv-865; and *Papst v. Nikon Corp.*, 08-cv-985.  The "Second Wave Cases" are:  *Papst v. Canon*, 08-cv-1406; *Papst v. Eastman Kodak*, 08-cv-1407; *Papst v. Sanyo*, 09-cv-530.

[2] This motion is just one piece of a much larger Multi District Litigation by which Papst claims that numerous manufacturers of digital cameras in the United States violate its Patents.

preserved in its final infringement contentions and will not be heard now.  Papst also argues that it needs discovery, but nothing on which it seeks discovery would refute the highly confidential sales records that Defendants already have shared with Papst.  Summary judgment of noninfringement as to the forty-seven products will be granted to Defendants.

## I.  FACTS

This suit has a long procedural history.  In June 2007, Papst brought suit against Korea-based Samsung Techwin Company (Techwin) and its U.S. subsidiary, Samsung Opto-Electronics America, Inc. (Opto-Electronics) (collectively, Defendants).[3]  Papst complained that Defendants infringed U.S. Patent Nos. 6,470,399 and 6,895,449 (the Patents) by "making, using, offering to sell or selling within the United States and/or importing into the United States . . . digital cameras" covered by the Patents.  *See Papst Licensing GmbH & Co. KG v. Samsung Techwin Co. (Papst v. Techwin)*, Civ. No. 07-2088 (D.D.C.), Compl. [Dkt. 3-1] ¶¶ 9, 17.  Papst also alleged that Defendants "actively induced others and/or contributed to the infringement" of the Patents.  *Id*. ¶¶ 10, 18.

The Multi District Litigation Panel transferred the case into this Multi District Litigation (MDL).  *See id.*, MDL Transfer Order [Dkt. 1].  In September 2008, the Court held a three-day *Markman* hearing.[4]  Thereafter, the Court rendered its claims construction opinion and order.  *See* Modified Claims Construction Op. [Dkt. 336]; Modified Order [Dkt. 337] (replacing

---

[3] Papst originally filed suit in federal district court in California.  *See Papst Licensing GmbH & Co. KG v. Samsung Techwin Co*., No. 07-4249 (C.D. Calif.).  The Central District of California court then transferred the case to the District of New Jersey.  *See Papst Licensing GmbH & Co. KG v. Samsung Techwin Co.*, 07-4940 (D.N.J.).

[4] Pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996), the Court is required to construe the contested claims of the patents before a jury can determine whether the accused products infringe.  Thus a claims construction hearing is often called a *Markman* hearing.

original claims construction Op. [Dkt. 312] and Order [Dkt. 313]).

In February 2009, after the claims construction hearing but before the claims construction ruling, Techwin transferred its digital camera business to Samsung Digital Imaging Company, which in turn merged its digital camera business into Korea-based Samsung Electronics Company Ltd. on April 1, 2010.[5]  Before Techwin's transfer to Samsung Digital Imaging Company, co-Defendant Opto-Electronics purchased digital cameras made by Techwin and Opto-Electronics sold these cameras in the United States.  *See* Mot. for Summ. J. Regarding Wrongfully Accused Products [Dkt. 448], Ex. 2 (First Lee Decl.) ¶ 2; Resp. to Surreply [Dkt. 495], Ex. 8 (Second Lee Decl.) ¶ 2.

A year and a half after Techwin spun-off its digital camera business, in October 2010, Papst moved for leave to file a first amended complaint, seeking to add as defendants in *Papst v. Techwin*, the following:  Samsung Electronics Company Ltd. and its U.S. subsidiaries, Samsung Electronics America, Inc. and Samsung Telecommunications America, LLC. (all three collectively, Samsung Electronics Entities).  The Court denied the motion to amend because it was untimely and because it would complicate and delay the litigation against Defendants.[6]  *See* Op. [Dkt. 424]; Order [Dkt. 425].

Thereafter, the Court ordered Papst to file final asserted infringement claims and contentions (Final Contentions) in compliance with detailed requirements.  *See* Mot. for Sanctions [Dkt. 388], Ex. A (Tr. of Aug. 31, 2010 Hearing); Sixth Prac. & Pro. Order (Sixth PPO) [Dkt. 372].  In January 2011, Papst filed Final Contentions, but because Papst failed to

---

[5] After the merger, Samsung Digital Imaging Company ceased to exist as a separate entity.

[6] While Papst has not filed a separate suit against the Samsung Electronics Entities in this district, the record does not indicate whether Papst has filed suit against them in another forum.

follow the direct orders of the Court, the Court ordered sanctions.  *See* Final Contentions [Dkt. 416]; Sanctions Op. [Dkt. 429]; Sanctions Order [Dkt. 430].  In the Sanctions Order, the Court barred Papst "from advancing any arguments for infringement . . . that are not set forth specifically and explicitly" in the Final Contentions.  *See* Sanctions Order [Dkt. 430] at 2.  In its Final Contentions, Papst also attempted to advance claims against the Samsung Electronics Entities that are *not* part of this MDL.  In the Sanctions Order, the Court struck all contentions that assert claims against the Samsung Electronics Entities.  *Id.*

## II.  LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  Moreover, summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor.  *Anderson*, 477 U.S. at 255.  A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. The nonmoving party must point out specific facts showing that there is a genuine issue for trial.  *Celotex*, 477 U.S. at 324.  In addition, the nonmoving party may not rely solely on allegations or conclusory statements.  *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).  Rather, the nonmoving party must present specific facts that would enable a reasonable

jury to find in its favor.  *Id.* at 675.  If the evidence "is merely colorable, or is not significantly

probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249-50 (citations

omitted).

Papst seeks additional discovery under Federal Rule of Civil Procedure 56(d),

which provides:

> If a nonmovant shows by affidavit or declaration that, for specified
> reasons, it cannot present facts essential to justify its opposition,
> the court may:
>
> (1) defer considering the motion or deny it;
>
> (2) allow time to obtain affidavits or declarations or to take
> discovery; or
>
> (3) issue any other appropriate order.

Fed. R. Civ. P. 56(d).  "The nonmoving party bears the burden of identifying the facts to be

discovered that would create a triable issue and the reasons why the party cannot produce those

facts in opposition to the motion.  The nonmoving party must show a reasonable basis to suggest

that discovery would reveal triable issues of fact."  *Scott-Blanton v. Universal City Studios*

*Prods. LLP*, 246 F.R.D. 344, 347 (D.D.C. 2007), *aff'd* 308 Fed. App'x 452 (D.C. Cir. 2009).  A

generalized, speculative request for more discovery is insufficient; a request for more discovery

must show that "further *specific* discovery will defeat a summary judgment motion."  *Estate of*

*Parsons v. Palestinian Auth.*, 715 F. Supp. 2d 27, 35 (D.D.C. 2010), *aff'd*, No. 10-7085, 2011

WL 3528749 (D.C. Cir. Aug. 12, 2011).

## III.  ANALYSIS

In its Final Contentions, Papst accused Defendants and the Samsung Electronics

Entities of infringement, pointing to over 350 "Samsung" products.  Since the Samsung

Electronics Entities are not parties in this MDL, especially after this Court barred their untimely

addition, Defendants asked Papst to withdraw its contentions regarding certain alleged

"Samsung" products that the Samsung Electronics Entities may have made, used, sold, offered

for sale, or imported ("made/sold") in/into the United States, but that were not made/sold in the

United States by *Defendants*.  Papst partially complied but continues to accuse forty-seven

products that Defendants assert are wrongfully accused.[7]

Forty of the products at issue[8] were made/sold in the United States by a Samsung

Entity but not by these Defendants (Non-Techwin Products):

| AQ 100 | HZ50W | SL30 | SL620 | TL210 |
| CL 65 | i80 | SL35 | SL630 | TL229 |
| CL80 | NX10 | SL40 | SL720 | TL225 |
| HZ10W | PL200 | SL420 | SL820 | TL240 |
| HZ15W | PL90 | SL50 | TL100 | TL320 |
| HZ25W | SL102 | SL502 | TL105 | TL350 |
| HZ30W | SL105 | SLK600 | TL110 | TL500 |
| HZ35W | SL202 | SL605 | TL205 | TL90 |

Seven of the products at issue[9] were not made/sold in the United States (Non-U.S. Products):

---

[7] Defendants advise that their products covered by the summary judgment motions filed jointly
with the First Wave Camera Manufacturers (*e.g.*, Mots. for Summ. J. [Dkts. 447, 449, 450, 451,
452,) are limited to Techwin/Opto-Electronics products and do not include the forty-seven
products at issue here.  Mot. for Summ. J. Regarding Wrongfully Accused Products at 2 n.2.

[8] Papst accused these forty products of infringement in the Final Contentions.  *See* Final
Contentions (Part III) at 82-84, 89-91, 111-17, 133-37, 158-63, 170-72, 187-94, 205-06, 214-17.

[9] Papst also accused these seven products of infringement in the Final Contentions.  See Final
Contentions (Part III) at 82-84, 89-91, 111-117, 133-37. 158-163, 170-72, 187-94, 205-06, 214-17.

A000224

| Digimax A4 |
|---|
| DigimaxA40 |
| DigimaxA403 |
| DigimaxD85 |
| L83T |
| S1030 |
| S830 |

The Non-Techwin Products together with Non-U.S. Products are collectively referred to as the

"Forty-Seven Accused Products."

Sang-Yoon Lee, a Techwin Senior Manager during the relevant time period,

described the relationship between Techwin and Opto-Electronics.  Mr. Lee made four critical

points:

(1) Techwin is a South Korean publicly traded company which spun off its digital camera business into a new, separate publicly traded company, Samsung Digital Imaging Company, on February 1, 2009.  First Lee Decl.¶ 1.

(2) Opto-Electronics is a wholly-owned subsidiary of Techwin located in the United States.  Prior to the spin-off, Opto-Electronics sold in the United States digital cameras that were made by Techwin.  *Id*. ¶ 2; Second Lee Decl. ¶ 2.

(3) In his First Declaration, Mr. Lee referred to Techwin and Opto-Electronics collectively as "STW."  First Lee Decl. *¶ 2.*

(4) The forty Non-Techwin Products and the seven Non-U.S. Products were never made/sold by "STW," i.e., were not ever made/sold by either Techwin or Opto-Electronics. *Id*. ¶¶ 6–17; Second Lee Decl. ¶¶ 6–7.

Papst opposes summary judgment.  First, Papst argues that it has a valid claim of

infringement by inducement against Defendants with regard to the Forty-Seven Accused

Products. *See Samsung Techwin*, Civ. No. 07-2088, Compl. ¶¶ 10-18. Second, Papst contends

there is sufficient circumstantial evidence that the Forty-Seven Accused Products were made/sold

here by Defendants, that such evidence is sufficient to create a genuine issue of material fact, and

that Papst is entitled to more discovery to prove it.[10]

### A. Infringement by Inducement

In order to induce infringement, there must be an act of direct infringement and

proof that a defendant "knowingly induced infringement with the intent to encourage the

infringement." *DSU Med. Corp. v. JMS Co. Ltd.*, 471 F.3d 1293, 1304 (Fed. Cir. 2006). "A

person induces infringement under [35 U.S.C.] § 271(b) by actively and knowingly aiding and

abetting another's direct infringement." *C.R. Bard, Inc. v. Advanced Cardiovascular Sys. Inc.*,

911 F.2d 670, 675 (Fed. Cir. 1990). Although Papst contends that Defendants induced the

Samsung Electronics Entities to infringe the Patents, Papst has not preserved this claim in light

of the Sanctions Order. The Sanctions Order arose from a Court mandate that Papst revise its

original infringement contentions, as Papst had filed them before the *Markman* decision. The

Court and the parties discussed the need for final contentions from Papst at a discovery status

conference in August 2010. The Court chastised Papst for failing to propose focused discovery

and ordered Papst to define its asserted claims and infringement contentions in light of the claims

construction:

---

[10] In response to motions for summary judgment filed by Defendants and by the other Camera
Manufacturers, Papst filed motions for Rule 56(d) discovery. *See* Mot. for Discovery [Dkt. 479]
(addressing Techwin and Opto-Electronics specifically at 33-36); Opp. [Dkt. 472] (Papst seeks
discovery in opposition to the Motion for Summary Judgment Regarding Wrongfully Accused
Products).

> I said focused discovery and what I got was a shotgun shell. I
> mean, everything. I do not consider that focused and I don't think
> that it fulfills my obligation to get this done quickly and with the
> least expense possible under the circumstances. So what I think
> we need to start with is the concept that Papst filed infringement
> contentions . . . and hasn't changed them, hasn't indicated it wants
> to change them, hasn't indicated it plans or needs to change them
> but now says [it] need[s] a ton of discovery. I'm not sure that all of
> your contentions can stand in light of the claims construction
> decision which I appreciate you don't like, it's okay. But nobody
> knows what they're fighting about now. Nobody can tell and you
> don't want to tell them, and we're not going to do it that way. I
> mean, you're the plaintiff. You have allegations, you need to say
> what they are. So the first thing is I'm going to direct Papst to
> refile its claims contentions, its infringement contentions. . . . File
> that, then we'll know what we're arguing about. Only then can we
> figure out what discovery is really needed.

Tr. of Aug. 31, 2010 Hearing at 18-19. The Court further directed, "you have got to bring your

infringement contentions up to date. People have to know what they're litigating about. And

only when you do can you then say okay, this is the discovery we need for these reasons." *Id*. at

32. The Court told Papst that its asserted claims and infringement contentions needed to be clear

cut:

> First you have to decide what your infringement contentions are.
> Only when you know what, what camera you're asserting
> [infringes] what claim and for what reason[,] can you possibly
> figure out what discovery you might need that you don't already
> have.

*Id*. at 33-34.

As a result of the status conference, the Court issued its Sixth Practice and

Procedure Order (PPO) requiring Papst to file final contentions with specificity as to each alleged

infringer, each alleged infringing product, and each Patent Claim allegedly infringed. The Sixth

PPO provided:

2. No later than October 13, 2010, Papst shall file its Final

-9-

A000227

Disclosure of Asserted Claims and Infringement Contentions. Separately for each opposing party, this Final Disclosure shall contain the following information:

a. Each claim of each patent in suit that is allegedly infringed by each opposing party, including for each claim the applicable statutory subsections of 35 U.S.C. § 271 asserted;

b. Separately for each asserted claim, each accused apparatus, product, device, process, method, act or other instrumentality ("Accused Instrumentality") of each opposing party of which Papst is aware. This identification shall be as specific as possible. Each product, device, and apparatus shall be identified by name or model number, if known.  Each method or process shall be identified by name, if known or by any product, device or apparatus which, when used, allegedly results in the practice of the claimed method or process;

c. A chart identifying specifically where each limitation of each asserted claim is found within each Accused Instrumentality, including for each limitation that such party contends is governed by 35 U.S.C. § 112(6), the identity of the structure(s), act(s), or material(s) in the Accused Instrumentality that performs the claimed function.

*d. For each claim which is alleged to have been indirectly infringed, an identification of any direct infringement and a description of the acts of the alleged indirect infringer that contribute to or are inducing that direct infringement.  Insofar as alleged direct infringement is based on joint acts of multiple parties, the role of each such party in the direct infringement must be described.*

e. Whether each limitation of each asserted claim is alleged to be literally present or present under the doctrine of equivalents in the Accused Instrumentality; and

f. For any patent that claims priority to an earlier application, the priority date to which  each asserted claim allegedly is entitled.

Sixth PPO ¶ 2 (adopting provisions of Rule 3-1 (N.D. Cal. Patent Local Rules)) (emphasis added regarding infringement by inducement).

The Sixth PPO adopted the requirements set forth in Northern District of California Patent Rule 3-1 because that Rule was designed to "make the parties more efficient, to streamline the litigation process, and to articulate with specificity the claims and theory of a plaintiff's infringement claims." *Bender v. Micrel, Inc.*, Civ. No. 09-1144, 2010 WL 520513, at *2 (N.D. Cal. Feb. 6, 2010). Rule 3-1 was intended to prevent cases from "stagger[ing] for months without clear direction" by "focusing discovery on building precise final infringement or invalidity contentions and narrowing issues for *Markman*, summary judgment trial, and beyond." *Connectel, LLC v. Cisco Sys., Inc.*, 391 F. Supp. 2d 526, 527 (E.D. Tex. 2005). Via the language of Rule 3-1, the Court required Papst to "crystallize its theory of the case and patent claims."[11] *See InterTrust Tech. Corp. v. Microsoft Corp.*, Civ. No. 01-1640, 2003 WL 23120174, at *3 (N.D. Cal. Dec. 1, 2003) (characterizing Rule 3-1). In sum, the Court ordered Papst to file contentions that comported with the Court's claims constructions and that were sufficiently precise and detailed for the purpose of streamlining this already protracted litigation.

Papst filed Final Contentions, but they were vague and uninformative. Through its experienced patent lawyers, Papst blatantly disregarded the Sixth PPO. The Court took Papst to task for obfuscating its infringement theories, finding that Papst had done so intentionally as part of its strategy to extend this litigation excessively, since Papst's business *is* litigation:

> Instead of crystallizing its asserted claims and infringement contentions in this case, Papst's Final Contentions intentionally obfuscate Papst's infringement theories. As this Court has previously noted, Papst is in the business of litigation.

---

[11] A plaintiff in the Northern District of California is expected to articulate its infringement contentions no later than 14 days after the initial case management conference, a much earlier stage than was required in this MDL. N.D. Cal. Patent Rule 3-1. Papst was required to crystallize its theory only after claims construction.

> Papst is a German company that produces no
> products; it acquires patents on products or methods
> allegedly invented by others and then searches the
> world for patents it might challenge for
> infringement.  At one of the first status conferences
> of the MDL, when the Court queried whether this
> was old-fashioned "claim-jumping," counsel for
> Papst readily agreed that it had been called worse.
> Of course, this is a perfectly lawful and respectable
> business.  But it underscores that the business of
> Papst is *litigation*, not invention or production.
> Litigation is the business model whereby Papst,
> when successful, achieves royalty payments from
> others.  As is clear from this record, the threat of
> litigation alone often achieves royalty payments.

Mem. Op. [Dkt. 86].  While the threat of litigation alone often
achieves royalty payments, the threat of never-ending discovery
can induce even larger royalty payments.  Frankly, this appears to
be Papst's strategy in this case.  The Final Contentions are
purposefully vague; they were drafted to further Papst's intention
to engage in protracted and expensive litigation.

Sanctions Op. at 7-8.

In addition to concealing its infringement theories, Papst purposely disregarded

the Modified Claims Construction Opinion and Order.  The Sanctions Opinion explained:

> [T]he Final Contentions additionally lack the requisite specificity
> because they repeatedly reiterate Papst's version of previously
> rejected claims constructions and then advance theories based on
> such rejected constructions.  *See, e.g.*, Final Contentions at 33
> (asserting that "second connecting device" means a device for
> interfacing and not "a physical plug or socket for permitting a user
> readily to attach and detach . . ." as construed by the Court).  In this
> same vein, Papst also attempts to incorporate and reassert its
> original contentions filed May 28, 2008, before claims
> construction.  *Id*. at 2.  Such an approach bespeaks a total lack of
> respect for Court orders and the timely resolution of this case, but
> it is consistent with Papst's approach from the beginning.[12]

---

[12] *See, e.g.*, Mem. Op. [Dkt. 82] (sanctioning Papst for failure to comply with a direct discovery
order), *modified in part by* Mem. Op. [Dkt. 123].  Notably, Papst filed a petition for writ of

*Id*. at 10. Papst's failure to properly detail its infringement claims was not an innocent error; it was part of a calculated strategy.

For this astounding and brash failure to follow court orders, the Court imposed a reasonable sanction against Papst—requiring Papst "to live with its Final Contentions as they stand without further modification." Sanctions Op. at 7. Thus, the Court barred Papst from modifying the Final Contentions and barred Papst from advancing any arguments for infringement (or against claims of noninfringement) that either (1) are not based solely on this Court's constructions of the Patents or (2) are not already set forth specifically and explicitly in the Final Contentions. *See* Sanctions Order at 2.

In this context, the Court considers Papst's induced-infringement contentions against Defendants to ascertain whether they are specific and explicit enough to survive the Court's sanction. They are not. Papst's Final Contentions assert induced-infringement by merely making this conclusory statement:

> Papst further asserts that each of these Defendants also is liable under 35 U.S.C. § 271(b) for actively inducing users of the accused products to directly infringe the asserted claims in the U.S., and thus is liable for infringement by inducement. Papst also asserts that each of these Defendants also [is] liable under 35 U.S.C. § 271(b) for actively inducing their own affiliates and/or related entities and/or third-parties to sell infringing products in the U.S., and thus [is] liable for inducement by infringement.

Final Contentions at 3. These allegations fail to meet the level of specificity demanded by the Sixth PPO, especially paragraph 2(d), which required Papst to set forth "[f]or each claim which is alleged to have been indirectly infringed, an identification of any direct infringement and a

---

mandamus, *see* Dkt. 167, and the Federal Circuit denied the petition. *In re Papst Licensing GmbH & Co. KG*, Misc. No. 877, 314 Fed. App'x 295, 2008 WL 5691048 (Fed. Cir. Aug. 5, 2008).

A000231

description of the acts of the alleged indirect infringer that contribute to or are inducing that direct infringement.  Insofar as alleged direct infringement is based on joint acts of multiple parties, the role of each such party in the direct infringement must be described."  Papst's vague and conclusory contentions regarding infringement by inducement in no way satisfy the level of specificity that the Court required, and thus Papst has waived the claim against Defendants for infringement by inducement.

### B.  Alleged Genuine Issue of Fact and Motion for Rule 56(d) Discovery

Papst  argues that it should be allowed "some discovery . . . to track down the actual facts because . . . the . . . story keeps changing with respect to these 47 models of Samsung products."  *See* Mot. for Discovery at 34.  Papst also attacks the declaration of Mr. Lee because, in part, Mr. Lee stated the "legal conclusion" that Defendants never made/sold the Forty-Seven Accused Products in the United States, and Papst wants to review every Techwin and every Opto-Electronics document that Mr. Lee reviewed before he submitted his declarations.  *See* Reply [Dkt. 491] at 1–2.  In order to sort out the "changing story" and determine if Mr. Lee's First and Second Declarations are credible, Papst requests (1) a Rule 30(b)(6) deposition of a corporate representative of both Defendants concerning the manufacture and sale of the Forty-Seven Accused Products; (2) the identity of the Samsung department and company that authored User Manuals for these products; (3) the identity of the Samsung department and company that authored and maintains the Samsung websites which offer drivers and other support over the Internet for these products; (4) the knowledge of Defendants as to where and to whom these products would be sold; and (5) the facts underlying Defendants' alleged indirect induced infringement.  *See* Mot. for Discovery [Dkt. 479] at 34–36.

The parties have met numerous times and counsel for Defendants tried to provide

convincing information that neither of Defendants has made/sold any of the Forty-Seven

Accused Products in the United States.  Papst remains unconvinced.  Papst does not contest that

Defendants have shared confidential proprietary information with Papst on importation and sales

in the United States and that such information does not include any sales of the Forty-Seven

Accused Products.  Instead, Papst complains that Samsung has not produced any documents such

as sales receipts, invoices, correspondence, or emails that demonstrate how the Forty-Seven

Accused Products reached the United States or that demonstrate Defendants knew the products

would reach the United States.  Mot. for Discovery [Dkt. 479] at 36.

Papst's demand that Defendants produce U.S. import and sales information from

corporate entities, which are not parties to this suit, cannot forestall summary judgment.  Sales by

any other "Samsung" affiliate would not prove infringement of the Patents by *these* Defendants,

and Papst has waived its claim to infringement by inducement.  Thus, the question devolves to

whether Papst has enough information to support a good faith belief that the immediate

Defendants—Techwin and Opto-Electronics—might have infringed the Patents through the

making/selling of any of the Forty-Seven Accused Products.

First, Papst urges the Court to give Mr. Lee's declarations no weight regarding

Defendants' liability because they have not provided or identified the business records he

reviewed prior to making his declarations.  Papst concludes that Defendants' summary judgment

motion "should be denied because it is not supported by any competent evidence."  Papst

Surreply [Dkt. 493] at 6.  The argument is unavailing.  Mr. Lee's declarations constitute

competent evidence of the matters of which he declares.  Merely claiming that the First and

Second Lee Declarations are inaccurate or incorrect is not sufficient.  "A party may not defeat a

properly supported motion for summary judgment merely by raising generalized questions as to

the credibility of the movant's affiants." *Robinson v. Cheney*, 876 F.2d 152, 162 (D.C. Cir. 1989).[13]

Papst also presents a vehement argument that Opto-Electronics is not entitled to summary judgment because Mr. Lee's declaration addresses only Techwin and does not even assert that Opto-Electronics never made/sold the Forty-Seven Accused Products in the United States. *See* Papst Surreply [Dkt. 493] at 1. The argument represents a complete misrerepresentation of Mr. Lee's first declaration. Mr. Lee made it clear that he referred to both Techwin and Opto-Electronics collectively as "STW." *See* First Lee Decl. ¶ 2. He also explained that Opto-Electronics was a Techwin subsidiary which sold digital cameras made by Techwin in the United States. *Id.* Thus, his references to "Techwin" included Opto-Electronics and his review of Techwin records revealed which model cameras Techwin sold to Opto-Electronics for further sale in the United States. The argument that Mr. Lee's declarations failed to address Opto-Electronics is totally meritless.

Papst further argues extensively that Defendants have been inconsistent in their position regarding the accused products and that this somehow shows that questions of material fact remain open for discovery. Defendants respond that they supplemented their discovery over the years that this case has been pending and that they have never changed their position on the Forty-Seven Accused Products. To show the alleged inconsistency, Papst notes:

---

[13] Papst moved to strike the Second Lee Declaration, asserting erroneously that it was untimely, lacked foundation, and contained hearsay. Mot. to Strike [Dkt. 497]. The Second Lee Declaration is deemed timely as it bolstered Defendants' original position and addressed new matters Papst raised. Further, the Second Declaration was based on Mr. Lee's personal knowledge, including his familiarity with Defendants' products and sales history, and his review of business records including sales records. Second Lee Decl. ¶¶ 3, 8. The motion to strike will be denied.

A000234

(1) Defendants' second set of Answers to Interrogatories added 23 camera models that were not mentioned in their first set.  Surreply [Dkt. 493] at 3.

(2) Defendants' third set of Answers to Interrogatories added 7 more cameras not in their first or second set of answers.  *Id*. at 4.

(3) Defendants told Papst that model i80 was not sold in the U.S. but then later asserted that it is not a Techwin model.  *Id.*

(4) Defendants told Papst that models i50 and i70 were not sold in the United States but now list them as still at issue.  *Id.* at 4.

Of these camera models, only the i80 is among the Forty-Seven Accused Products immediately at issue.

The Court finds no relevant inconsistency.  Papst sees "inconsistency" in Defendants' supplemental interrogatory answers which added camera models because, allegedly, those models might have been mentioned earlier.  Papst's definition of inconsistency is highly questionable.  A matter is inconsistent with another when it is incompatible or contradictory. There is no inconsistency here, but merely the addition of camera models without any subtraction.  Defendants can be deemed to have been "inconsistent" only with regard to one camera model, the i80.  While Defendants originally told Papst the i80 was not sold in the United States, they now state that it may have been sold in the United States by others but it is not a Techwin product and was not made/sold here by these Defendants.  *See* Second Lee Decl. ¶ 5-6. The difference is not material to the critical issue:  the i80 should not be an accused product because neither of these Defendants ever made/sold the i80 model in the United States.

Furthermore, Papst contends that it should be permitted discovery because circumstantial evidence shows that the Forty-Seven Accused Products were in fact made/sold in the United States by these Defendants.  The circumstantial evidence on which Papst relies

includes the following facts:  (1) user manuals for the forty Non-Techwin Products list Opto-

Electronic's name and address; (2) user manuals for the seven Non-U.S. Products include a

declaration of compliance with the U.S. Federal Communications Commission requirements; and

(3) the www.samsung.com website offers individuals in the United States the ability to download

drivers and user manuals for the Forty-Seven Accused Products.  Mr. Lee explained these

anomalies, noting that the department responsible for creating user manuals sometimes does not

know where the products will be sold.  First Lee Decl. ¶ 19.  The user manuals for the Non-U.S.

Products list multiple Samsung affiliates from around the world, regardless of where the products

are actually sold.  *Id*.  With regard to FCC compliance declaration, this only indicates that

Techwin designed cameras for compliance with the standards of multiple countries, including the

United States.  It is not proof that any of the seven cameras was sold here.  Further, the

international website offering drivers and manuals to individuals located in the United States

does not indicate that the products were made/sold here by these Defendants, only that it is

possible that some residents in the United States may have such cameras.

            To defeat Defendants' motion for summary judgment and demonstrate a genuine

issue of fact, Papst must show more than a scintilla of evidence in support of its position.  *See*

*Anderson*, 477 U.S. at 252.  Papst has failed in this regard.  If the evidence "is merely colorable,

or is not significantly probative, summary judgment may be granted."  *Id.* at 249-50 (citations

omitted).  On its Rule 56(d) motion, Papst bears the burden of (1) identifying the specific facts to

be discovered that would create a triable issue and (2) showing a reasonable basis to suggest that

discovery would reveal triable issues of fact as to these Defendants.  *Scott-Blanton*, 246 F.R.D. at

347; *Estate of Parsons*, 715 F. Supp. 2d at 35.  The circumstantial evidence on which Papst relies

is not probative of whether these Defendants, contrary to their confidential business records and

sworn statements, made/sold the Forty-Seven Accused Products in the United States. Papst has not raised a genuine issue of material fact nor has it shown that more discovery would help it do so.

## IV.  CONCLUSION

As explained above, the motion for summary judgment regarding wrongfully accused products filed by Samsung Techwin Co. and Samsung Opto-Electronics America, Inc. [Dkt. 448] will be granted. Papst's motion for Rule 56(d) discovery [Dkt. 479] will be denied in part, insofar as it relates to the motion for summary judgment filed by Defendants.[14] The Forty-Seven Accused Products will be stricken from Papst's Final Contentions [Dkt. 416]. Papst's motion to strike the Second Lee Declaration [Dkt. 497] will be denied. A memorializing Order accompanies this Opinion.

Date: November 20, 2012                         _____/s/_____
                                                ROSEMARY M. COLLYER
                                                United States District Judge

---

[14] Papst's motion for discovery otherwise remains pending.

A000237

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **IN RE PAPST LICENSING GMBH & CO. KG LITIGATION** | **Misc. Action No.  07-493 (RMC)** |
|  | **MDL Docket No. 1880** |
| **This Document Relates To:** |  |
| **Papst Licensing GmbH & Co. KG v. Samsung Techwin Co., Civ. No. 07-2088 (D.D.C.)** |  |

**ORDER REGARDING SAMSUNG'S MOTION FOR SUMMARY JUDGMENT OF NONINFRINGEMENT AS TO WRONGFULLY ACCUSED PRODUCTS**

For the reasons stated in the Opinion issued simultaneously with this Order, it is hereby

**ORDERED** that the motion for summary judgment filed by Samsung Techwin Co. and Samsung Opto-Electronics America, Inc. [Dkt. 448] is **GRANTED**; and it is

**FURTHER ORDERED** that the motion for Rule 56(d) discovery filed by Papst Licensing GmbH & Co. KG (Papst) [Dkt. 479] is **DENIED IN PART**, insofar as it relates to the motion for summary judgment filed at Docket 448; and it is

**FURTHER ORDERED** that the Forty-Seven Accused Products identified in the accompanying Opinion are **STRICKEN** from Papst's Final Contentions [Dkt. 416]; and it is

**FURTHER ORDERED** that Papst's motion to strike the Second Lee Declaration [Dkt. 497] is **DENIED**.

Date: November 20, 2012

_____/s/_____
ROSEMARY M. COLLYER
United States District Judge

A000238

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record who have consented to electronic

service are being served with a copy of the foregoing document via the Court's

CM/ECF system. The document was also sent via electronic mail to:

Steven J. Routh
ORRICK, HERRINGTON & SUTCLIFFE LLP
Columbia Center
1152 15th Street, N.W.
Washington, DC 20005
Direct: 202-339-8509
Fax: 202-339-8500
Email: srouth@orrick.com

John R. Inge
ORRICK, HERRINGTON & SUTCLIFFE LLP
Izumi Garden Tower, 28th Floor
6-1 Roppongi 1-Chome
Minato-ku
+81332242900
+81332242901
Email: jinge@orrick.com

Sten Jensen
ORRICK, HERRINGTON & SUTCLIFFE LLP
Columbia Center
1152 15th Street, N.W.
Washington, DC 20005
Direct: 202-339-8669
Fax: 202-339-8500
Email: sjensen@orrick.com

T. Vann Pearce, Jr.
ORRICK, HERRINGTON & SUTCLIFFE LLP
Columbia Center
1152 15th Street, N.W.
Washington, DC 20005
Direct: 202-339-8696
Fax: 202-339-8500
Email: vpearce@orrick.com

Rachel M. Capoccia
ALSTON & BIRD LLP
333 South Hope Street
16th Floor
Los Angeles, CA 90071
Direct: 213-576-1037
Email: rachel.capoccia@alston.com
Fax: 213-576-1100

Thomas W. Davison
ALSTON & BIRD LLP
950 F Street, N.W.
Washington, DC 20004
Direct: 202-239-3933
Email: tom.davison@alston.com

Charlene M. Morrow
FENWICK & WEST, LLP
801 California Street
Silicon Valley Center
Mountain View, CA 94041
Direct: 650-988-8500
Email: cmorrow@fenwick.com

Bryan Alexander Kohm
FENWICK & WEST, LLP
555 California Street
12th Floor
San Francisco, CA 94104
Direct: 415-875-2300
Fax: 415-281-1350
Email: bkohm@fenwick.com

David Douglas Schumann
FENWICK & WEST, LLP
555 California Street
12th Floor
San Francisco, CA 94104
Direct: 415-875-2300
Fax: 415-281-1350
Email: dschumann@fenwick.com

Richard de Bodo
MORGAN LEWIS & BOCKIUS LLP
1601 Cloverfield Boulevard
Suite 2050 North
Santa Monica, CA 90404
Direct: 310-907-1000
Fax: 310-907-2000
Email: richard.debodo@morganlewis.com

Andrew V. Devkar
MORGAN LEWIS & BOCKIUS LLP
1601 Cloverfield Boulevard
Suite 2050 North
Santa Monica, CA 90404
Direct: 310-907-1000
Fax: 310-907-2000
Email: andrew.devkar@morganlewis.com

Alan M. Fisch
FISCH SIGLER LLP
5335 Wisconsin Avenue NW
Eighth Floor
Washington, DC 20015
Suite 3700
Direct: 202-362-3500
Email: alan.fisch@fischllp.com

R. William Sigler
FISCH SIGLER LLP
5335 Wisconsin Avenue NW
Eighth Floor
Washington, DC 20015
Suite 3700
Direct: 202-362-3500
Email: bill.sigler@fischllp.com

John T. Battaglia
FISCH SIGLER LLP
5335 Wisconsin Avenue NW
Eighth Floor
Washington, DC 20015
Suite 3700
Direct: 202-362-3500
Email: john.battaglia@fischllp.com

David L. Witcoff
JONES DAY
Suite 3500
77 West Wacker Drive
Chicago, IL 60601-1692
Direct: 312-269-4259
Email: dlwitcoff@jonesday.com

Marc Blackman
JONES DAY
Suite 3500
77 West Wacker Drive
Chicago, IL 60601-1692
Direct: 312-782-3939
Fax: (312) 782-8585
Email: msblackman@jonesday.com

Marron Ann Mahoney
JONES DAY
77 West Wacker Drive
Chicago, IL 60601-1692
Direct: 312-269-4291
Email: mmahoney@jonesday.com

2 March, 2015                               /s/ Patrick J. Kelleher
                                           Patrick J. Kelleher

78942640.1